UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
ELIZABETH BRANDENBURG a/k/a MOTHER FOTEINI;
MARIA KALLIS a/k/a SISTER THEONYMPHI,                    **AMENDED**
                                                        **COMPLAINT**
                                    Plaintiffs,
                                                        **JURY TRIAL**
        - against -                                     **DEMANDED**

GREEK ORTHODOX ARCHDIOCESE OF NORTH AMERICA;            1:20 Civ. 03809-JMF
GERASIMOS MAKRIS a/k/a FATHER GERASIMOS MAKRIS;
DEMETRIOS TRAKATELLIS a/k/a ARCHBISHOP DEMETRIOS;
ALLEN PAROPOULOS a/k/a BISHOP ANDONIOS; and
CHARLENE ASQUITH a/k/a MOTHER EISODIA.

                                    Defendants.
-------------------------------------------------------------------------------X

        Plaintiffs ELIZABETH BRANDENBURG ("Plaintiff Brandenburg") and MARIA

KALLIS ("Plaintiff Kallis"), by and through their attorneys, EISENBERG & BAUM, LLP, as and

for their Verified Complaint against Defendants, state as follows:

### PLAINTIFFS' CLAIMS NOT BARRED BY THE MINISTERIAL EXCEPTION

1.      It is well settled that a church may hire, fire, promote, refuse to promote, and

prescribe duties of its minsters free from scrutiny of the courts and without justification for such

actions. However, hostile work environment claims based on sex, as well as retaliation for

engaging in protected activity as a result of those claims, by a clergy member against another

clergy member is not barred by the First Amendment or the "ministerial exemption."

### THE PARTIES

2.      Plaintiff ELIZABETH BRANDENBURG a/k/a MOTHER FOTEINI is an

individual residing in Missouri [hereinafter "Plaintiff Brandenburg"]. At the relevant times, she

was employed by the GREEK ORTHODOX ARCHDIOCESE OF NORTH AMERICA and

resided at the All Saints Monastery in Calverton, New York.

3.      Plaintiff MARIA KALLIAS a/k/a SISTER THEONYMPHI [hereinafter "Plaintiff Kallis"] is an individual residing in Missouri. At the relevant times, she was employed by the GREEK ORTHODOX ARCHDIOCESE OF NORTH AMERICA and resided at the All Saints Monastery in Calverton, New York.

4.      Upon information and belief, Defendant GREEK ORTHODOX ARCHDIOCESE OF NORTH AMERICA is a religious institution located in Manhattan, NY [hereinafter "Archdiocese" or "Defendant Archdiocese"].

5.      Upon information and belief, Defendant GERASIMOS MAKRIS a/k/a FATHER GERASIMOS MAKRIS [hereinafter "Defendant Makris"] is an individual whose place of residence is unknown, however, during the time in question he was a resident of New York. He was employed by the Archdiocese and was also a member and Presiding Priest of the Holy Cross Church in Brooklyn Parish during the relevant time period.

6.      Upon information and belief, Defendant DEMETRIOS TRAKATELLIS a/k/a ARCHBISHOP DEMETRIOS [hereinafter "Defendant Demetrios"] is an individual whose place of residence is unknown, however, during the time in question he was a resident of New York. He was employed by the Archdiocese as the Archbishop during the relevant time period until 2019.

7.      Upon information and belief, Defendant ALLEN PAROPOULOS a/k/a BISHOP ANDONIOS [hereinafter "Defendant Andonios"] is an individual whose place of residence is unknown, however, during the time in question he was a resident of New York. He was employed by the Archdiocese as a Chancellor and Bishop during the relevant time period.

8.      Upon information and belief, Defendant CHARLENE ASQUITH a/k/a MOTHER EISODIA [hereinafter "Defendant Eisodia"] is an individual whose place of residence is in New

York. She is employed by the Archdiocese and is also a member of the All Saints Monastery in Calverton, New York.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the lawsuit is between "citizens of different States" and the amount in controversy exceeds "$75,000, exclusive of interests and costs."

10.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants reside in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## JURY DEMAND

11.     Plaintiffs demand a trial by jury in this action.

## FACTS

### General Background

12.     Plaintiff Brandenburg is a woman employed by the Defendant Archdiocese of New York since April 2010.

13.     Plaintiff Kallis is a woman employed by the Defendant Archdiocese of New York since April 2010.

14.     At all times relevant herein, Plaintiffs Brandenburg and Kallis were subjected to sexual harassment, gender discrimination, and retaliation by Defendant Makris, Defendant Archdiocese, Defendant Andonios, and Defendant Demetrios, that took place within the five boroughs of New York City.

15.   At all relevant times herein, the Archdiocese, the Holy Cross Parish, and the All Saints Monastery were places that were open to the public and were places of public accommodation when the conduct and omissions complained of herein took place.

16.   Since April 2010, Plaintiffs Brandenburg and Kallis have been working for Defendant Archdiocese while located at the All Saints Monastery in Calverton, New York, and traveling into New York City for various work related duties and obligations.

17.   On or about November 1, 2018, both Plaintiffs were forced to leave due to a pattern of sexual harassment and gender discrimination perpetrated by Defendant Makris and condoned by Defendants Demetrios, Andonios, and Archdiocese.

18.   Upon information and belief, Defendant Archdiocese pays its male clergy a salary in connection with services in furtherance of their job tasks and duties.

19.   Upon information and belief, Defendant Archdiocese avoids paying women by referring to and considering them as "laypeople" rather than clergy.

20.   At all times relevant herein, although Plaintiffs Brandenburg and Kallis had the title of "nun" while working for Defendant Archdiocese they were referred to and considered as "laypeople" by the Archdiocese Defendants such that they would not be paid for carrying out services in furtherance of their job tasks and duties. Examples of tasks and duties performed by Plaintiffs include, but are not limited to, the following:

   a.   Traveling to the Holy Cross Parish located in Brooklyn, New York, between approximately 5 – 10 times per year in order to sing in the Mass or speak to students at the parochial school;

   b.   Traveling to Defendant Archdiocese located in Manhattan, New York, approximately 6 times per year in order to meet with Defendant Archdiocese and

4

Bishops in order to provide them with updates regarding the All Saints Monastery and to receive permission to carry out functions at the All Saints Monastery, such as renovations and other administrative functions;

c.  Traveling to Queens, New York, every week to take lessons on liturgical music;

d.  Accompanying Defendant Demetrios to services at Parishes located throughout all five boroughs of New York City in order to support Defendant Archdiocese;

e.  Traveling to Defendant Archdiocese located in Manhattan, New York, at least once per month in order to perform tasks related to organizing a national choir, including working with a committee and planning concerts;

f.  Listening to Archbishop Demetrios each year at the St. Nicholas ground zero project in Manhattan, New York;

g.  Attending multiple lectures per year throughout the five boroughs of Manhattan, including an annual lecture at Fordham University as well as visiting scholar lectures at Defendant Archdiocese in New York City;

21.  Plaintiffs Brandenburg and Kallis were both expected and required to regularly travel to New York City throughout the course of their employment with Defendant Archdiocese.

### Background: 2003 - 2009

22.  Upon information and belief, Defendant Makris was the Chaplain and Dean of Students in Hellenic College-Holy Cross in Massachusetts from approximately 2000 through 2007.

23.  In or around Fall 2003, Plaintiff Kallis began her undergraduate studies at Hellenic College-Holy Cross in Massachusetts and met Defendant Makris, who became her Spiritual Father.

24.     In or around Spring 2004, Plaintiff Brandenburg began her graduate studies at Hellenic College-Holy Cross in Massachusetts and met Defendant Makris, who appointed himself her Spiritual Father.

25.     Upon information and belief, a "Spiritual Father" in the Greek Orthodox branch of Catholicism is someone who guides his "Spiritual Children" in their faith and teaches them how to be close to God. In the Greek Orthodox faith, a person's relationship with their "Spiritual Father" is considered to be one of the most important relationships one can have. A "Spiritual Father" is one who can take confession and may not divulge what was shared in confession.

26.     In or around March 2004, a male student sexually assaulted Plaintiff Brandenburg and confessed to Defendant Makris within a few days.

27.     Upon information and belief, both Defendant Makris and the Hellenic College-Holy Cross were aware that the male student previously sexually assaulted a different female enrolled at Hellenic College-Holy Cross student prior to attacking Plaintiff Brandenburg.

28.     Upon information and belief, Defendant Makris did not report the crime to local police, nor did he or the school launch an investigation.

29.     In or around July 2004, Defendant Makris made Plaintiff Brandenburg marry her attacker in order to cure the sexual assault.

30.     During the course of the marriage from approximately 2006 through 2009, Plaintiff Brandenburg's attacker subjected her to a pervasive onslaught of various threats to her life, including but not limited to:

    a.   holding a knife to her throat in front of Defendant Makris and several other professors at the Hellenic College-Holy Cross; and

b.  telling Plaintiff Brandenburg that he would "kill [her] and dump [her] body without anyone ever knowing" during a pilgrimage with Defendant Makris and other students of the Hellenic College-Holy Cross, however when Plaintiff Brandenburg brought this to Defendant Makris' attention, Defendant Makris ignored Plaintiff Brandenburg's pleas.

**Becoming Nuns: 2009 - 2010**

31.   Towards the end of the Plaintiffs' education at Hellenic College-Holy Cross, Defendant Makris began speaking to the Plaintiffs about becoming nuns and joining a monastery he hoped to found in Calverton, NY.

32.   The relationship between nuns and the Greek Orthodox Archdiocese is that of employee-employer. Upon information and belief, the Greek Orthodox Archdiocese directs its nuns in terms of the daily tasks they must complete, the services they must perform, when and where they can travel. Although the Greek Orthodox Archdiocese pays its male clergy for similar tasks, it does not pay its female laypeople (nuns) for the same.

33.   Upon information and belief, although the Archdiocese does not pay the Plaintiffs for their services, the Archdiocese employed the Plaintiffs to review accounting books, run Mass services, clean, and maintain gardens and restricted their ability to move between states and even within the state without prior permission.

34.   Upon information and belief, Defendant Archdiocese does not require nuns, who are female, to take a vow of poverty and does not pay their nuns, including Plaintiffs Kallis and Brandenburg, any money in exchange for their services for Defendants and are instead expected to fund their own employment.

35.     Upon information and belief, Defendant Archdiocese pays its male clergy for services performed during the course of their employment.

36.     Plaintiffs Kallis and Brandenburg supported their services to the Archdiocese by selling candles at events organized by parishes affiliated with the Archdiocese before they were told they could no longer participate in retaliation for complaining about Defendant Makris' sexual misconduct and/or harassment.

37.     Upon information and belief, in order for women to become nuns in the Greek Orthodox faith, they must become sanctified. For example, a married woman seeking to become a nun must first divorce before applying to the Greek Orthodox Archdiocese to become a nun and seeking their blessing.

38.     In or around November 2009, Defendant Makris granted Plaintiff Brandenburg permission to divorce her husband after years of Plaintiff Brandenburg publicly suffering violence at the hands of her husband.

39.     Upon information and belief, Defendant Makris recommended Plaintiff Brandenburg's attacker to the priesthood knowing that he had subjected Plaintiff Brandenburg and at least one other female student at Hellenic College-Holy Cross to sexual, physical, and verbal assaults.

40.     In or around 2010, Plaintiff Brandenburg and Plaintiff Kallis became nuns with the Greek Orthodox Archdiocese of New York and together with Defendant Makris founded the All Saints Monastery located in Calverton, New York.

41.     In or around 2010, the Defendant Archdiocese appointed Defendant Makris the Spiritual Father of the All Saints Monastery, and as a result he was the Spiritual Father to both Plaintiffs.

42.     Beginning in or around January 2003 until in or around August 2017, Defendant Makris subjected Plaintiffs Brandenburg and Kallis to various acts of sexual harassment he termed "fatherly affection," including, but not limited to, the following:

a.  Hugging Plaintiff Kallis from behind after graduation so that she could feel his penis against her back through his clothing in or around 2005;

b.  Brushing his penis against Plaintiff Brandenburg's hand while they were helping a student move out of the dormitory at Hellenic College-Holy Cross in or around 2006;

c.  Leaning against Plaintiff Kallis, squeezing her leg and pressing her against a car in an empty parking lot in Queens in March 2017;

d.  Kissing Plaintiff Kallis on her neck and near her lips despite this contact being unwanted and offensive in or around August 2009;

e.  Telling Plaintiffs Kallis and Brandenburg that they would make "cute nuns" over the course of one year leading up to and including April 2010;

f.  Hugging Plaintiffs Kallis and Brandenburg so tightly they had difficulty breathing, their breasts pressed against his chest, and saying "I can't get enough of you," such contact and comments were offensive and unwanted to both Plaintiffs beginning in or around 2007 until in or around 2013;

g.  Refusing to let Plaintiff Kallis go and saying "no, I'm not done" when she tried to escape his full-body, forceful, offensive, and unwanted hugs in or around late 2009 or early 2010;

h.  Making eye contact with, winking at, and smirking at Plaintiffs Kallis and Brandenburg while grazing their legs or arms when driving in cars together in

Queens, New York, which Plaintiffs Kallis and Brandenburg understood as an expression of his sexual desire for them beginning in or around 2007 leading up until April 2017;

i.    Stroking the hair, arms, and lower backs of Plaintiffs Kallis and Brandenburg in an inappropriate way during spiritual alone time or when sitting next to each other beginning in or around 2009 up until around April 2010;

j.    Telling Plaintiffs Kallis and Brandenburg that they shared a "special connection," implying a romantic or sexual desire rather than simply a spiritual and professional relationship beginning in 2005 up until October 2017, often occurring in New York City between 2006 until October 2017;

k.    Reiterating that "even Jesus Christ had his favorites" whenever Plaintiffs Kallis and Brandenburg voiced their discomfort to Defendant Makris in his sexualized behavior towards them beginning in or around 2005 until around October 2017, often occurring in New York City between 2006 and October 2017;

l.    Demanding Plaintiff Kallis tell him "I love you" and be more expressive of her love from approximately summer 2008 until around April 2010;

m.   Telling Plaintiff  Kallis that he felt as though he died when she moved out of state following graduation in order to express how much he missed her, signifying a connection that is much closer than the professional relationship between a spiritual father and spiritual child around late 2005 or early 2006; and

n.    Asking to meet Plaintiffs Kallis and Brandenburg to meet him alone, after hours, or after dark so they could spend time alone together without being seen under the guise of offering them spiritual guidance but really to engage in the aforementioned

acts of "fatherly affection," which consisted of unwanted and offensive touching, full-body hugs from which Plaintiffs could not move until Defendant Makris let them go, and kissing beginning around 2005 until 2010 for Plaintiff Kallis, and beginning around 2005 until October 2017 for Plaintiff Brandenburg, often occurring in New York City between 2006 and October 2017.

### Sexual Harassment, Gender Discrimination & Retaliation

43.    On or about March 28, 2017, Defendant Makris apologized to Plaintiffs and ask for their forgiveness for hurting them via email.

44.    On or about October 17, 2017, Defendant Makris again apologized and asked for forgiveness for hurting Plaintiffs via email.

45.    On or about October 25, 2017, Plaintiff Brandenburg and Plaintiff Kallis called the Chancellor, Defendant Bishop Andonios in New York City, to inform him of Defendant Makris' misconduct over the years.

46.    On or about November 27, 2017, Defendant Makris again sent an email to the Plaintiffs asking for forgiveness of any shortcomings.

47.    On or about January 25, 2018, Father Chrysostom Panos, the assistant to Defendant Andonios at the Archdiocese, called Plaintiff Brandenburg from his office at the Archdiocese in New York City, making it clear that he was calling on behalf of Defendant Andonios, yelling at her to "make Sister Theonymphi [Plaintiff Kallis]stop worrying" and saying that he and Defendant Andonios were considering sending them to Greece to become "real nuns" in retaliation for her complaints.

11

48.     On or about February 12, 2018, Defendant Andonios called Plaintiff Kallis from his office at the Archdiocese in New York City, yelling and threatening to send Plaintiffs to Greece to learn how to be "real nuns" in retaliation for their complaints.

49.     In early March, 2018, Plaintiffs learned from parishioners and from a non-profit that the Priest told them they could no longer help the Plaintiffs due to their allegations and complaints against Defendant Makris. Upon information and belief, this was done in order to ostracize them from the community and in retaliation

50.     On or about March 30, 2018, Plaintiffs met with Archbishop Demetrios at the Archdiocese in New York City to follow up on their complaint. During their conversation, Plaintiffs heard Defendant Demetrios tell them the following:

  a. "In this whole long story, where did you find yourself guilty of anything? Because I hear complaints about the Bishop and the Father. Is there anything in which you are responsible?"

  b. "I don't want anything negative to be attached to the monastery, for a very simple reason – it's unfair."

  c. "I don't want you to use the terminology of 'victim.' You are a very decent person, you are not a victim of anything."

  d. Dismissing their complaints because it was not as bad as the crucifixion.

51.     On or about April 18, 2018, parishioners at the Holy Cross Parish located in Brooklyn confirmed their parish priest announced the parishioners were not allowed to visit or help the Plaintiffs as retaliation for the Plaintiffs coming forward and complaining about Defendant Makris' sexual harassment of them.

52.     On or about April 21, 2018, a Professor at the Hellenic College-Holy Cross wrote to the Plaintiffs to tell them to stop talking about the abuse they suffered at the hands of Defendant Makris and to forgive him for it.

53.     Upon information and belief, although the Archdiocese was aware of Plaintiffs' complaints against Defendant Makris, the Defendants refused to investigate the complaints of sexual misconduct and/or harassment.

54.     On or about June 25, 2018, a priest in Mattituck, NY called the Plaintiffs to tell them they are no longer welcome at their parish in retaliation for the Plaintiffs having complained about Defendant Makris' sexual misconduct and/or harassment.

55.     On or around August 14, 2018, Defendant Demetrios informed Plaintiffs Kallis and Brandenburg that Defendant Makris would return to his position as the Priest at the Holy Cross Parish located in Brooklyn.

56.     In or around September 2018, Defendant Archdiocese held a spiritual court in New York City to allegedly investigate Plaintiff Kallis' and Brandenburg's complaints of sexual harassment against Defendant Makris. Although Plaintiff Kallis was invited to attend spiritual court, she informed the Archdiocese she was out of town and requested the hearing to be rescheduled but never heard back. Plaintiff Brandenburg also requested to be present during the hearing as it concerned her complaints as well, but her calls went unanswered as well.

57.     Upon information and belief, the Spiritual Court investigating Defendant Makris was never held. Defendant Archdiocese and Defendant Andonios failed to investigate Plaintiffs Kallis and Brandenburg complaints of sexual misconduct and/or harassment against Defendant Makris and intended to return Defendant Makris to a leadership position within the Greek

13

Archdiocese of North America without taking any steps to prevent such conduct from happening again.

## Defamation & Retaliation

58.     On or around November 18, 2018, Plaintiffs were forced to move away from the All Saints Monastery as they had no other choice given the retaliatory environment they had been experiencing for nearly 1 year since complaining and because they learned that Defendant Makris would be reinstated to his former position.

59.     Upon information and belief, on or around November 2, 2018, Defendant Eisodia began working at the All Saints Monastery as the Abbess and/or Head Nun.

60.     Upon information and belief, beginning on or around November 19, 2018, through the present, Defendant Eisodia makes defamatory remarks about Plaintiffs Kallis and Brandenburg to various third parties such as current parishioners, new parishioners who had never met the Plaintiffs, potential parishioners, as well as the local police department.

61.     Upon information and belief, beginning on or around November 19, 2018, until on or around December 31, 2019, Defendant Eisodia has told current parishioners at All Saints Monastery, potential parishioners, and new parishioners who have never met the Plaintiffs, that "the nuns left in the middle of the night and stole a car that belongs to the Monastery," with reckless disregard of the truth of these statements and/or knowing these statements to be untrue.

62.     Upon information and belief, beginning in or around March 2019 until on or around December 31, 2019, Defendant Eisodia has told current parishioners at the All Saints Monastery, potential parishioners, and new parishioners who have never met the Plaintiffs, that "I went to the [Riverhead, Suffolk County Police Department] to report the car as stolen and I told them to boot

it and to tell the police where the nuns live now that it's stolen," with reckless disregard of the truth of these statements and/or knowing these statements to be untrue.

63.     Upon information and belief, in or around March 2019, the Riverhead, Suffolk County Police Department informed Mother Eisodia that the car was not stolen and instead belonged to Plaintiffs, however Mother Eisodia continued telling current, potential, and new parishioners at the All Saints Monastery that the car was stolen with the knowledge that those statements were untrue.

64.     With respect to the car that Defendant Eisodia states the Plaintiffs stole, with the knowledge it was false when making the statement—the car never belonged to the monastery. Instead, it is a vehicle that the Plaintiffs purchased using their personal funds.

65.     Upon information and belief, when Defendant Eisodia reported the vehicle as stolen to the local police department she learned that the vehicle belonged to the Plaintiffs, but continues to make such defamatory statements to current, new, and potential parishioners, knowing these statements to be false.

66.     As a result of the false and defamatory statements uttered by Defendant Eisodia, Plaintiffs suffered monetary losses as a significant portion of their income came from candle purchases made by their parishioners and visitors to the monastery as well as others in the Greek orthodox community.

67.     Upon information and belief, in or around April 2019, Defendant Eisodia called the police on Plaintiff Kallis claiming that she is not allowed in the Convent "because of all the bad things she did."

**FIRST CAUSE OF ACTION**
Retaliation – All Defendants

68.     Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

69.     Section 296.1(a) of the New York Human Right Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107, prohibit retaliation against an employee who seeks to assert rights under the Human Rights Law. Defendants were Plaintiffs' employers within the meaning of those laws. Additionally, Defendants were and/or operated a place of public accommodation within the meaning of those laws.

70.     The New York City Human Rights Law is designed to be "construed liberally… regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Furthermore, in 2016 an amendment to the City Law clarified the law's objective of being "maximally protective of civil rights *in all circumstances*." N.Y.C. Local L. No. 35 § 1 (2016), https://on.nyc.gov/349Bh1H (emphasis added).

71.     Plaintiffs complained to Defendants about the mistreatment based on gender, race and sexual harassment inflicted upon them by employees and managers of Defendants. In response, Plaintiffs were subjected to additional mistreatment, all with the knowledge and approval of Defendant for the purpose of punishing them for attempting to assert their rights.

72.     Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

73.     As a direct and proximate result of Defendant's discriminatory conduct, Plaintiffs suffered adverse employment consequences. Plaintiffs were caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well to endure severe emotional pain and trauma, all to their detriment.

## SECOND CAUSE OF ACTION
(Sexual Harassment, Quid Pro Quo and Hostile Workplace – Against All Defendants)

74.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

75.     Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, and Title 8 of the New York City Administrative Code, § 8-107, prohibit sexual harassment in employment and in public accommodations. Defendants were Plaintiffs' employers within the meaning of those laws.

76.     The New York City Human Rights Law is designed to be "construed liberally… regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Furthermore, in 2016 an amendment to the City Law clarified the law's objective of being "maximally protective of civil rights *in all circumstances*." N.Y.C. Local L. No. 35 § 1 (2016), https://on.nyc.gov/349Bh1H (emphasis added).

77.     Plaintiffs deserved to retain their employment and/or accommodation with Defendants, and to receive promotions, and did not do anything to merit discharge or discipline. Nevertheless, Defendants denied Plaintiffs the benefit of employment and/or accommodation, including all favorable conditions and emoluments thereof and created and allowed to exist a hostile, intolerable workplace and/or accommodation based on sexual harassment that was imposed upon them by the conduct of the defendants' employees and managers, of which they were well aware of and without any non-discriminatory basis therefor.

78.     Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

17

79.     Defendant Archdiocese is liable for the acts of its supervisors and managers Archbishop Demetrios, Bishop Andonios, Father Makris, and Mother Eisodia.

80.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse employment and/or accommodation consequences. Plaintiffs were caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment and/or accommodation as well as to endure severe emotional pain and trauma, all to their detriment.

81.     Defendants' actions were knowing, willful and/or malicious.

### THIRD CAUSE OF ACTION
Sexual Harassment Constructive Discharge – Against Archdiocese, Makris, Andonios, Demetrios

82.     Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

83.     Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq*. and Title 8 of the New York City Administrative Code, § 8-107 prohibit gender discrimination in employment and in public accommodations. Defendants were Plaintiffs' employers within the meaning of those laws. Additionally, Defendants were and/or operated a place of public accommodation within the meaning of those laws.

84.     The New York City Human Rights Law is designed to be "construed liberally… regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Furthermore, in 2016 an amendment to the City Law clarified the law's objective of being "maximally protective of civil rights *in all circumstances*." N.Y.C. Local L. No. 35 § 1 (2016), https://on.nyc.gov/349Bh1H (emphasis added).

18

85.     Plaintiffs deserved to retain their employment and/or accommodation with Defendants and did not do anything to merit discharge or discipline. Nevertheless, Defendants denied Plaintiffs the benefit of employment and/or accommodation, including all favorable conditions and emoluments thereof, because of hostility to Plaintiffs based on their gender (female) and without any non-discriminatory basis thereof. Other employees and/or persons who were male were not subject to the same acts of discrimination.

86.     Defendants' actions were taking under circumstances giving rise to an inference of discrimination.

87.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse employment and/or accommodation consequences. Plaintiffs were caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well as to endure severe emotional pain and trauma, all to their detriment.

### FOURTH CAUSE OF ACTION
Defamation – All Plaintiffs against All Defendants

88.     Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

89.     Defendants made or caused to be made by their agents and/or legal representatives and published to their parishioners, other members of the religious community, and to local law enforcement, knowingly made false statements about Plaintiffs that were published to third parties without privilege or authorization.

90.     In particular, Defendants and/or their agents, employees and/or authorized legal representatives falsely accused Plaintiffs of asserting false claims of sexual harassment and stealing a motor vehicle from the monastery.

91.     Such statements were made by Defendants and/or their agents, employees and/or authorized legal representatives and/or spokesperson of Defendants in the course of their duties on their behalf and as such were actionable *per se* without proof of special damages.

92.     Such statements were entirely false and known to Defendants to be false when they were made, and were made solely for purposes of harassment and/or intimidation in order to attempt to induce the Plaintiffs to drop their claims of sexual harassment against Defendants.

93.     As a direct and proximate result of Defendants' willful and malicious conduct, Plaintiffs suffered adverse consequences to their personal and professional reputation. Plaintiffs were caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment as well as to endure severe emotional pain and trauma, all to their detriment.

**FIFTH CAUSE OF ACTION**
Gender Discrimination – All Defendants

94.     Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

95.     Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq*. and Title 8 of the New York City Administrative Code, § 8-107, prohibit gender discrimination in employment and in public accommodations. Defendants were Plaintiffs' employers within the meaning of those laws. Additionally, Defendants were and/or operated a place of public accommodation within the meaning of those laws.

96.     The New York City Human Rights Law is designed to be "construed liberally… regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130(a). Furthermore, in 2016 an amendment to the City Law clarified the law's

objective of being "maximally protective of civil rights *in all circumstances*." N.Y.C. Local L. No. 35 § 1 (2016), https://on.nyc.gov/349Bh1H (emphasis added).

97.     Plaintiffs deserved to retain their employment and/or public accommodation with Defendants and did not do anything to merit discharge or discipline. Nevertheless, Defendants denied Plaintiffs the benefits of employment and/or accommodation, including all favorable conditions and emoluments thereof, because of hostility to Plaintiff based on their gender (female) and without any non-discriminatory basis thereof. Other employees and persons who were male were not subject to the same acts of discrimination.

98.     Defendants' actions were taken under circumstances giving rise to an inference of discrimination.

99.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered adverse employment and/or public accommodation consequences. Plaintiffs were caused to suffer lost past and future wages, professional opportunities, other valuable benefits and emoluments of employment, accommodation, as well as to endure severe emotional pain and trauma, all to their detriment.

## SIXTH CAUSE OF ACTION
### Violations of the New York Civil Rights Law

100.     Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length herein.

101.     At all times relevant to this action, the New York Civil Rights Law has been in full force and effect and has applied to Defendant's conduct.

102.     The New York Civil Rights Law prohibits discrimination, as contemplated by the NYSHRL. *See* N.Y. Civ. Rights Law §§ 40-c & 40-d; N.Y. Exec. Law § 296(2); *see also Ganzy*

*v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1997) ("Facts sufficient to sustain a cause of action under New York Executive Law section 296 will support a cause of action under section 40-c of the Civil Rights Law.").

103.    Based on Defendants' discrimination of Plaintiffs, Defendants are liable "for each and every violation" of "a penalty of not less than one hundred dollars nor more than five hundred dollars." N.Y. Civ. Rights Law § 40-d.

104.    "At or before the commencement of [this] action," notice was provided to the New York Attorney General. N.Y. Civ. Rights Law § 40-d.

## SEVENTH CAUSE OF ACTION
### Unpaid Wages – All Defendants

105.    Plaintiffs repeat, reiterate and re-allege each and every allegation set forth in paragraphs numbered "1" through "64" as if set forth more fully and at length therein.

106.    The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations 12 N.Y.C.R.R. 142-2.1 and 142-2.2 (collectively hereinafter "NYLL") requires employers to pay employees for work performed, including regular pay and an overtime wage at the rate of one and a half times the employee's regular rate of pay for all hours worked in excess of 40 hours in a workweek.

107.    Here, Plaintiffs were employees of Defendants.

108.    By virtue of their positions, roles, and conduct described above, Defendants are "employers" under the NYLL.

109.    Defendants knowingly, deliberately, or voluntarily disregarded their obligation to pay wages to Plaintiffs and failed to pay for all the hours they worked and/or overtime wages to which they were entitled, all in violation of NYLL.

110.    As a direct and proximate result of Defendants' conduct, Plaintiffs were not compensated at all for the work they performed, all to their detriment. Plaintiffs are entitled to recover from Defendants their unpaid wages, unpaid overtime wages, liquidated damages, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant the following relief against the Defendants:

A.    Enter a declaratory judgment stating that Defendants' practices, policies, and procedures subjected Plaintiffs to sexual harassment, gender discrimination, and retaliation in violation of Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107.

B.    Issue an injunction to enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies employees and/or guests of any gender the full and equal enjoyment of Defendants' benefits, pay increases, promotional opportunities and advancement within the company, and/or ability to stay at the place of public accommodation, and specifically enjoin them:

      i.    To develop, implement, promulgate, and comply with a policy providing for the training of each and every employee and manager in the civil rights of employees in the workplace and/or place of public accommodation, including but not limited to sexual harassment, gender discrimination, and retaliation;

      ii.    To develop, implement, promulgate, and comply with a policy providing for reporting and investigation of complaints regarding civil rights abuses,

including but not limited to sexual harassment, gender discrimination, and retaliation; and

iii.   To develop, implement, promulgate, and comply with a policy providing for disciplinary measures to be imposed upon any person found responsible for civil rights abuses, including but not limited to sexual harassment, gender discrimination, and retaliation;

C.   On the First Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper;

D.   On the Second Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper;

E.   On the Third Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be

determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper;

F.      On the Fourth Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper;

G.      On the Fifth Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to, damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper; and

H.      On the Sixth Cause of Action, enter a declaratory judgment against the named defendants stating that Defendants' practices, policies, and procedures subjected Plaintiffs to sexual harassment, gender discrimination, and retaliation in violation of Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107; and

I.      On the Seventh Cause of Action, enter judgment against the named defendants and an award of compensatory damages including, but not limited to damages for emotional distress and lost past and future earnings, punitive and/or exemplary damages, attorneys' fees, pre- and post-judgment interest, in an amount, in excess of the jurisdictional limits of any other court, to be

determined at trial by the jury, and further relief as this Honorable Court deems just, equitable, and proper.

Dated:      New York, NY                              EISENBERG & BAUM, LLP
            August 3, 2020

                                                     By:    /s/ Eric M. Baum, Esq.
                                                            Eric M. Baum, Esq.
                                                            Ayo Alston-Moore, Esq.
                                                            Attorneys for Plaintiffs
                                                            24 Union Square East, 4th Fl.
                                                            New York, NY 10003
                                                            (212) 353-8700