UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X
ELIZABETH BRANDENBURG a/k/a
MOTHER FOTEINI, MARIA KALLIS a/k/a
SISTER THEONYMPHI,

                Plaintiffs,

      -against-

GREEK ORTHODOX ARCHDIOCESE OF
NORTH AMERICA, GERASIMOS
MAKRIS a/k/a FATHER GERASIMOS
MAKRIS, DEMETRIOS TRAKATELLIS
a/k/a ARCHBISHOP DEMETRIOS, ALLEN
PAROPOULOS a/k/a BISHOP ANDONIOS,
AND CHARLENE ASQUITH a/k/a
MOTHER EISODIA,

              Defendants.

------------------------------------------------------ X

Civil Action No.: 1:20 Civ. 03809-JMF

The Hon. Jesse M. Furman

ECF CASE

**ORAL ARGUMENT REQUESTED**

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

---

Dated: New York, New York
     August 31, 2020

*Of Counsel and On the Brief:*
     Gerald L. Maatman, Jr.
     Karen Y. Bitar
     Lisa L. Savadjian

SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500
*Attorneys for Defendants Greek Orthodox Archdiocese of North America, Gerasimos Makris*
*a/k/a Father Gerasimos Makris, Demetrios Trakatellis a/k/a Archbishop Demetrios, Allen*
*Paropoulos a/k/a Bishop Andonios, and Charlene Asquith a/k/a Mother Eisodia*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

FACTUAL BACKGROUND..................................................................................2

STANDARD OF REVIEW ....................................................................................4

ARGUMENT ..........................................................................................................4

I.      THE MINISTERIAL EXCEPTION BARS PLAINTIFFS' CLAIMS IN COUNTS
        I, III, V AND VI...........................................................................................4

        A.      General First Amendment Principles ...........................................4

        B.      Ministerial Exception .....................................................................6

                1.      *Ministerial Capacity*...........................................................7

                2.      *Religious Institution*...........................................................9

        C.      The Constructive Discharge, Retaliation, And Gender Discrimination
                Claims Are Barred By The Ministerial Exception................................10

        D.      Plaintiffs' Retaliation Claims Also Independently Fail Under The
                NYSHRL Religious Exemption ...............................................................12

II.     PLAINTIFFS' SEXUAL HARASSMENT CLAIMS IN COUNT II FAIL ...................13

        A.      Plaintiffs' Sexual Harassment Claims Prior To March 18, 2017 Are Time-
                Barred ......................................................................................................13

III.    THE NYCHRL CLAIMS FAIL FOR LACK OF SUBJECT-MATTER
        JURISDICTION...........................................................................................15

        A.      New York City Human Rights Law Does Not Apply To Acts That
                Occurred Outside Of New York City ................................................16

        B.      The Allegations Did Not Have A Discriminatory "Impact" In New York
                City...........................................................................................................17

        C.      Occasional Travel For Work-Related Purposes Does Not Establish
                Discriminatory Impact In New York City.............................................18

IV.     PLAINTIFFS' CIVIL RIGHTS LAW CLAIM FAILS FOR THE SAME
        REASONS AS THE HUMAN RIGHTS LAW CLAIMS................................20

V.      PLAINTIFFS WERE NOT EMPLOYEES UNDER THE NEW YORK LABOR
        LAW ........................................................................................................................20

VI.     THE ALLEGED DEFAMATORY STATEMENTS WERE PRIVILEGED...................22

        A.      Statements to Police Are Qualified Under The Law Enforcement Privilege........23

        B.      Intra-Church Communications Are Protected By Common Interest
                Privilege..............................................................................................................25

CONCLUSION...........................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Cathedral Buffet, Inc.*,
    887 F.3d 761 (6th Cir. 2018) ..............................................................................22

*Alicea-Hernandez v. Catholic Bishop of Chicago*,
    320 F.3d 698 (7th Cir. 2003) ................................................................................9

*Amaya v. Ballyshear LLC*,
    340 F. Supp. 3d 215 (E.D.N.Y. 2018) ................................................................17

*Aparicio v. Christian Union, Inc.*,
    No. 18 Civ. 0592, 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) ....................6, 10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................4

*Berger v. Temple Beth-El of Great Neck*,
    41 A.D.3d 626 (2d Dep't 2007) .....................................................................24, 25

*Casper v. Lew Lieberbaum & Co.*,
    No. 97 Civ. 3016 (JGK), 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998) ...............17

*Chisolm v. City of New York*,
    No. 17-CV-5327(MKB), 2018 WL 3336451 (E.D.N.Y. July 6, 2018) ................24

*Copantitla v. Fiskardo Estiatorio, Inc.*,
    788 F. Supp. 2d 253 (S.D.N.Y. 2001) ................................................................15

*D'Amico v. Zingaro*,
    24 N.Y.S.3d 339 (2d Dep't 2016) ........................................................................24

*Dole v. Shenandoah Baptist Church*,
    899 F.2d 1389 (4th Cir. 1990) ............................................................................22

*E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*,
    213 F.3d 795 (4th Cir. 2000) ................................................................................9

*EEOC v. Bloomberg L.P.*,
    967 F. Supp. 2d 816 (S.D.N.Y. 2013) ................................................................17

iii

*Faur v. Jewish Theological Seminary of America*,
146 A.D.2d 566 (2d Dep't 1989) ........................................................................12

*Fermin v. Las Delicias Peruanas Rest., Inc.*,
93 F. Supp. 3d 19 (E.D.N.Y. 2015) .....................................................................21

*Foster v. Churchill*,
87 N.Y.2d 744 (1996) ...............................................................................23, 25

*Fratello v. Archdiocese of New York*,
863 F.3d 190 (2d Cir. 2017) .........................................................................*passim*

*Friedlander v. Port Jewish Ctr.*,
347 F. App'x 654 (2d Cir. 2009) ........................................................................10

*Ganzy v. Allen Christian Sch.*,
995 F. Supp. 340 (E.D.N.Y. 1998) ......................................................................20

*Gellington v. Christian Methodist Episcopal Church*,
203 F.3d 1299 (11th Cir. 2000) .........................................................................11

*George v. Prof'l Disposables Int'l, Inc.*,
221 F. Supp. 3d 428 (S.D.N.Y. 2016) ..................................................................13

*Glascoe v. Solomon*,
No. 18 Civ. 8284 (AT), 2020 WL 1272120 (S.D.N.Y. Mar. 17, 2020)..................................19

*Hankins v. New York Annual Conf. of United Methodist Church*,
351 F. App'x 489 (2d Cir. 2009) ..........................................................................7

*Hardwick v. Auriemma*,
116 A.D.3d 465 (1st Dep't 2014)........................................................................17

*Hoffman v. Parade Publ'n.*,
15 N.Y.3d 285 (2010)................................................................................17, 18

*Hogan v. Lewis Cty.*,
No. 7:16-CV-1325, 2020 WL 2850162 (N.D.N.Y. June 1, 2020)...................................23, 24

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
565 U.S. 171 (2012) ..................................................................................*passim*

*Joseph v. Westchester Cty. Dep't of Cmty. Mental Health*,
No. 7:20 Civ. 0420 (NSR), 2020 WL 2555334 (S.D.N.Y. May 19, 2020)...........................16

*Kearse v. ATC Healthcare Servs.*,
No. 12 CIV. 233 NRB, 2013 WL 1496951 (S.D.N.Y. Apr. 8, 2013)....................................17

*Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*,
  344 U.S. 94 (1952) ............................................................................................................. 13

*Lambui v. Collins*,
  No. 14-CV-6457, 2015 WL 5821589 (E.D.N.Y. Sept. 30, 2015) ................................... 16, 17

*Langella v. Mahopac Cent. Sch. Dist.*,
  No. 18 Civ. 10023, 2020 WL 2836760 (S.D.N.Y. May 31, 2020) ....................................... 14

*Lesser v. TD Bank*,
  No. 18 Civ. 9922, 2020 WL 2787645 (S.D.N.Y. May 28, 2020) ........................................... 2

*Levy v. City Comm'n on Human Rights*,
  85 N.Y.2d 740 (1995) ......................................................................................................... 17

*Makarova v. United States*,
  201 F.3d 110 (2d Cir. 2000) ............................................................................................... 16

*Marom v. Pierot*,
  No. 18 Civ. 12094 (VB), 2020 WL 1444938 (S.D.N.Y. Mar. 25, 2020) .............................. 23

*Mills v. Standing Gen. Comm'n on Christian Unity & Interreligious Concerns*,
  117 A.D.3d 509 (1st Dep't 2014) ......................................................................................... 12

*Moreno v. Episcopal Diocese of Long Island*,
  No. 15 Civ. 147231 (JS), 2016 WL 8711448 (E.D.N.Y. Jan. 20, 2016) ...................... 6, 10, 11

*Morrison v. National Australia Bank Ltd.*,
  547 F.3d 167 (2d Cir. 2008) ............................................................................................... 16

*O'Connor v. Church of St. Ignatius Loyola*,
  8 A.D.3d 125 (1st Dep't 2004) ........................................................................................... 12

*O'Donnell v. Jef Golf Corp.*,
  173 A.D.3d 1528 (3d Dep't. 2019) ..................................................................................... 20

*Ortiz v. Haier America Trading, LLC*,
  No. 101705/11, 2011 WL 2283771 (N.Y. Sup. Ct. May 24, 2011) ....................................... 18

*Our Lady of Guadalupe School v. Morrissey-Berru*,
  140 S. Ct 2049 (2020). ............................................................................................ 5, 6, 9, 11

*Padmanabhan v. New York Inst. of Tech. Campus, New York*,
  No. 18 Civ. 5284, 2019 WL 4572194 (S.D.N.Y. Sept. 20, 2019) ....................................... 20

*Pappas v. Passias*,
  271 A.D.2d 420 (2d Dep't 2000) ......................................................................................... 23

*Pedroza v. Ralph Lauren Corp.*,
  No. 19 Civ. 08639 (ER), 2020 WL 4273988 (S.D.N.Y. July 24, 2020) ...............................19

*Penn v. New York Methodist Hosp.*,
  No. 11 Civ. 9137 (NSR), 2013 WL 5477600 (S.D.N.Y. Sept. 30, 2013) ...........................4, 6

*Petrosino v. Bell Atl.*,
  385 F.3d 210 (2d Cir. 2004) ...........................................................................................15

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006) ...........................................................................................11

*Popa v. PricewaterhouseCoopers LLP*,
  No. 08 Civ. 8138 (LTS), 2009 WL 2524625 (S.D.N.Y. Aug. 14, 2009) ...............................14

*Presler v. Domestic and Foreign Missionary Society of Protestant Episcopal
  Church*,
  113 A.D.3d 409 (1st Dep't 2014) ....................................................................................25

*Remley v. State*,
  665 N.Y.S.2d 1005 (Ct. Cl. N.Y. 1997) ...........................................................................24

*Rivera v. Steinway Medical*,
  No. 18-CV-00624, 2019 WL 5212848 (E.D.N.Y. Oct. 15, 2019) ........................................20

*Robles v. Cox & Co.*,
  841 F. Supp. 2d 615 (E.D.N.Y. 2012) .............................................................................19

*Rweyemamu v. Cote*,
  520 F.3d 198 (2d Cir. 2008) .............................................................................. 6, 7, 9, 10

*Rylott-Rooney v. Alitalia-Linee Aeree Italiane-Societa Per Azioni*,
  549 F.Supp.2d 549 (S.D.N.Y. 2008) ...............................................................................16

*Sborgi v. Green*,
  281 A.D.2d 230 (1st Dep't 2001) .....................................................................................25

*Serbian Orthodox Diocese for the U.S.. & Canada v. Milivojevich*,
  426 U.S. 696 (1976) ......................................................................................................13

*Shukla v. Sharma*,
  No. 07-CV-2972, 2009 WL 10690810 (E.D.N.Y. Aug. 21, 2009) .................................12, 22

*Spilkevitz v. Chase Inv. Servs.*,
  No. 08-CV-3407, 2009 WL 2762451 (E.D.N.Y. Aug. 27, 2009) ........................................17

*Stabler v. Congregation Emanu-El of the City of New York*,
  No. 16 Civ. 9601 (RWS), 2017 WL 3268201 (S.D.N.Y. July 28, 2017) ................................9

*Stone v. 23rd Chelsea Assocs.*,
  No. 18 Civ. 3869, 2020 WL 1503671 (S.D.N.Y. Mar. 30, 2020)...........................................14

*Tannerite Sports, LLC v. NBC Universal*,
  864 F.3d 236 (2d Cir. 2017) .............................................................................................23

*Traggis v. St. Barbara's Greek Orthodox Church*,
  851 F.2d 584 (2d Cir. 1988) .............................................................................................11

*Udechukwu v. City of New York*,
  333 F. Supp. 3d 161 (E.D.N.Y. 2018)...............................................................................24

*Washington v. African Methodist Episcopal Church, Inc.*,
  No. 11-CV-6087-CJS, 2011 WL 4352404 (W.D.N.Y. Sept. 16, 2011)..................................7

*Watson v. Jones*,
  80 U.S. 679 (1871) ..............................................................................................................5

*Weerahandi v. Am. Statistical Ass'n*,
  2014 WL 3738079 (N.Y. Sup. Ct. July 28, 2014) .............................................................18

*Williams v. New York City Hous. Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) .........................................................................................15

**Statutes**

12 N.Y.C.C.R. 142-2.2......................................................................................................20

New York City Administrative Code, § 8-107.............................................................*passim*

N.Y. Exec. Law § 290 ..........................................................................................................1

N.Y. Exec. Law § 292(9) ...................................................................................................11

N.Y. Exec. Law § 296(4) ...................................................................................................20

N.Y. Exec. Law § 296(11)..................................................................................................13

NY Civil Rights Law § 40-c...............................................................................................20

NYLL § 198.................................................................................................................20, 21

NYLL § 651.................................................................................................................21, 22

NYLL § 663.......................................................................................................................20

WCL § 201 (5)...................................................................................................................21

65416284v.3

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 1, 16

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 1, 4, 16, 17

First Amendment to the United States Constitution ....................................... 4, 5, 6, 12

U.S. Dep't Of Labor, Field Operations Handbook, Ch. 10b03(b) (2016) .................................... 21

Webster's Dictionary of the English Language Unabridged (2020) ............................................ 7

WHD Opinion Letter FLSA2018-29, 2018 WL 6839426 (Dec. 21, 2018) ................................. 21

Defendants Greek Orthodox Archdiocese of North America, (the "GOA"), Gerasimos Makris a/k/a Father Gerasimos Makris, Demetrios Trakatellis a/k/a Archbishop Demetrios, Allen Paropoulos a/k/a Bishop Andonios, and Charlene Asquith a/k/a Mother Eisodia (hereinafter collectively referred to as the "Defendants"), by and through their attorneys, Seyfarth Shaw LLP, respectfully submit this Memorandum of Law in support of their motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, and in part pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

This action is brought by Plaintiffs Elizabeth Brandenburg a/k/a/ Mother Foteini ("Brandenburg") and Maria Kallis a/k/a Sister Theonymphi ("Kallis"), sanctified nuns who formerly lived and served at a Greek Monastery in Calverton, New York, against the GOA and its religious leaders. Following timely removal to this Court, Defendants moved to dismiss the Complaint. Despite using Defendants' brief as a roadmap to cure certain of the Complaint's deficiencies, Plaintiffs' second pleading fares no better than their first, as the amendments do not cure the fatal constitutional, jurisdictional, and statute of limitations defects.

Plaintiffs' allegations mainly stem from events allegedly occurring as far as fifteen years ago while they were in college in Massachusetts. Despite never having been "employed" by the GOA, a religious organization headquartered in New York City, or by any individual Defendant, the Amended Complaint asserts employment claims against Defendants pursuant to N.Y. Exec. Law § 290 ("NYSHRL") and Title 8 of the New York City Administrative Code, § 8-107 ("NYCHRL") for Retaliation, Sexual Harassment, Quid Pro Quo and Hostile Workplace, Gender Discrimination, and Constructive Discharge (against all Defendants except Mother Eisodia). Plaintiffs also bring a New York Labor Law ("NYLL") unpaid wage claim and a defamation claim against all Defendants, and a New York Civil Rights Law claim. All claims should be dismissed.

Plaintiffs' employment claims which seek to apply anti-discrimination statutes to their alleged constructive removal are plainly barred by the "ministerial exception," precluding such claims by ministers (like Plaintiffs) against religious organizations, such as the GOA. Further, this Court still lacks subject-matter jurisdiction over the NYCHRL claims since Plaintiffs worked in Long Island, and thus, any impact of the alleged discrimination or retaliation could not have been plausibly felt in New York City. Plaintiffs' remaining sexual harassment claims fail to state a valid or timely claim for relief. Since Plaintiffs also cannot establish that, as nuns, they were employees of the GOA, they are not entitled to wages. Finally, Plaintiffs' defamation claims fail as the alleged statements, even if false, were wholly privileged when made to the police and parishioners.

## FACTUAL BACKGROUND[1]

The basis of the instant dispute is nothing more than the failure of a purely ecclesiastical relationship that is not the province of this Court. Plaintiffs are nuns within the Greek Orthodox faith who formerly resided at the All Saints Monastery in Calverton, Long Island since April 2010. (Am. Compl. ¶¶ 2-3, 33). Plaintiffs plead they were sanctified nuns in the Greek Orthodox faith. (*Id.* ¶¶ 1, 20, 32, 34, 37, 40). Plaintiffs attended Hellenic College-Holy Cross in or around 2003 and 2004. (*Id.* ¶¶ 23-24). Defendant Father Makris, who at the time was Chaplain and Dean of Students, appointed himself as Plaintiffs' Spiritual Father. (*Id.* ¶¶ 23-25). Plaintiffs claim that, in or around 2010, they and Father Makris founded the All Saints Monastery in Calverton, and that he was appointed as their Spiritual Father. (*Id.* ¶¶ 40-41). Plaintiffs allege that from January 2003, while Defendant Makris was Chaplain of the Hellenic College-Holy Cross, until or around August 2017, he subjected them to sexual harassment, which he termed "fatherly affection." (*Id.* ¶ 42).

---

[1] The alleged facts are assumed but not conceded to be true. *See Lesser v. TD Bank*, No. 18 Civ. 9922, 2020 WL 2787645, at *1, n.1 (S.D.N.Y. May 28, 2020). Defendants will vigorously contest these claims on the merits.

2

Plaintiffs allege that they complained to Defendant Bishop Andonios on October 25, 2017, regarding Makris' misconduct "over the years." (*Id.* ¶ 45). Plaintiffs allege that in March and April 2018, in retaliation for Plaintiffs' complaints against Father Makris, parishioners at the Holy Cross Parish located in Brooklyn were told that they were not allowed to visit or help the Plaintiffs. (*Id.* ¶¶ 49, 52). Plaintiffs do not allege they were employed by the Holy Cross Parish. Instead, Plaintiffs allege that they traveled to the Holy Cross Parish "for various work related duties and obligations" while they were serving as nuns "for Defendant Archdiocese while located at the All Saints Monastery in Calverton, New York." (*Id.* ¶ 16). Plaintiffs also allege that while they "had the title of 'nun' while working for Defendant Archdiocese," they performed other duties, including visiting the Holy Cross Parish in Brooklyn for Mass or speaking engagements, visiting the GOA in Manhattan, attending lessons on liturgical music in Queens, and other unspecified duties that necessitated travel, at unknown times, throughout the five boroughs of New York City.  (*Id.* ¶ 20).

On June 25, 2018, Plaintiffs claim that an unidentified Priest in Mattituck, New York called Plaintiffs to tell them they were "no longer welcome at their parish in retaliation for Plaintiffs having complained about Defendants Makris' sexual misconduct and/harassment." (*Id.* ¶ 54). On or around August 14, 2018, Defendant Demetrios informed Plaintiffs that Father Makris would return to his position as the Priest at the Holy Cross Parish in Brooklyn. (*Id.* ¶ 55).  In September 2018, Plaintiffs allege that the Archdiocese "held a spiritual court in New York City" to investigate Plaintiffs' complaints against Defendant Makris, (*id.* ¶ 56), but upon information and belief, "the Spiritual Court investigating Defendant Makris was never held." (*Id.* ¶ 57).

Two months later on November 18, 2018, Plaintiffs left the All Saints Monastery for Missouri, after learning that Father Makris would be reinstated to his former position. (Am. Compl. ¶ 58). Plaintiffs allege Mother Eisodia made defamatory remarks about them to parishioners and to the police suggesting Plaintiffs stole a car when leaving for Missouri. (*Id.* ¶¶ 60-62). Plaintiffs

3

also claim that the relationship between nuns and the GOA is that of employee-employer, and that it does not pay female clergy (nuns) for the work that it pays male clergy. (*Id.* ¶¶ 18-20, 32-34).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim on which relief can be granted." To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* In other words, the complaint must plead sufficient facts to push his claim "across the line from conceivable to plausible." *Id.* at 570.

## ARGUMENT

## I.    THE MINISTERIAL EXCEPTION BARS PLAINTIFFS' CLAIMS IN COUNTS I, III, V AND VI

Plaintiffs' NYSHRL and NYCHRL claims in Counts I, III, V, and VI relating to the separation of their "employment" from the All Saints Monastery are barred by the First Amendment, and fail to state a claim pursuant to Rule 12(b)(6).[2]

### A.    General First Amendment Principles

"The establishment clause [of the First Amendment to the U.S. Constitution] prevents the government from appointing ministers, and the free exercise clause prevents it from interfering with the freedom of religious groups to select their own." *Hosanna-Tabor Evangelical Lutheran*

---

[2] The ministerial exception operates as an affirmative defense, not a jurisdictional bar. *Hosanna-Tabor.*, 565 U.S. at 195, n.4.; *see also Penn v. New York Methodist Hosp.*, No. 11 Civ. 9137 (NSR), 2013 WL 5477600, at *4 (S.D.N.Y. Sept. 30, 2013) (explaining the defense is to properly asserted in a Rule 12(b)(6) motion to dismiss).

*Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012). For over 150 years, the Supreme Court has recognized civil courts should not wade into religious disputes. *See Watson v. Jones*, 80 U.S. 679, 733 (1871) (holding courts should not resolve matters concerning "church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them"). A constitutional concern for religious liberty is the foundation of the U.S. Supreme Court's unanimous 2012 decision in *Hosanna-Tabor*, which firmly established what other Courts of Appeals had ruled for years: religious ministries have an absolute First Amendment right to select their own religious ministers, free from government interference. 565 U.S. 171 (2012).

The Court in *Hosanna-Tabor* recognized the existence of a "ministerial exception" in the First Amendment, which precludes application of Title VII and other employment discrimination laws to claims concerning the employment relationship between a religious institution and its ministers.  565 U.S. at 171. The exception "ensures that the authority to select and control who will minister to the faithful — a matter 'strictly ecclesiastical,'— is the church's alone." *Id*. It "gives special solicitude to the rights of religious organizations," respecting their autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions. *Id*. at 189. Thus, the ministerial exception "bars an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Id.* at 171.  The Supreme Court's recent decision in *Our Lady of Guadalupe School v. Morrissey-Berru* ("*Guadalupe*") once again rejected judicial intervention in employment discrimination claims against churches and religious institutions, holding: "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." 140 S. Ct. at 2060. The Supreme Court further opined: "state interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the

central attributes of an establishment of religion. *Id.* (declining intervention into two Catholic school employees' discrimination suit since First Amendment outlaws this intrusion).

### B.      Ministerial Exception

As established, "the 'ministerial exception' to employment discrimination laws is well entrenched; it has been applied by courts across the country for the past thirty-five years." *Aparicio v. Christian Union, Inc.*, No. 18 Civ. 0592, 2019 WL 1437618, at *3 (S.D.N.Y. Mar. 29, 2019); *Rweyemamu v. Cote*, 520 F.3d 198, 206-07 (2d Cir. 2008) (formally adopting the ministerial exception and affirming "the vitality of that doctrine in the Second Circuit.").

As in *Hosanna-Tabor* and *Guadalupe*, this case "concerns government interference with an internal church decision that affects the faith and mission of the church itself." 565 U.S. at 190. As such, requiring this Court "to engage in a pretext inquiry . . . [i]n order to probe the real reason for [plaintiff's] firing, [would require the] court — and perhaps a jury — . . . to make a judgment about church doctrine," thereby directly implicating the First Amendment. *Id.* at 205 (Alito, J., concurring); *Fratello v. Archdiocese of New York*, 863 F.3d 190, 206 (2d Cir. 2017) (holding that the Supreme Court made clear that those characterized as "ministers" are barred from bringing employment discrimination claims against the religious groups that employ or formerly employed them); *Rweyemamu*, 520 F.3d at 209 (holding priest could not bring Title VII discrimination claim against Catholic Diocese because "in order to prevail [plaintiff] must argue that the decision of the [Defendants was]  pretextual. Such an argument cannot be heard . . . without impermissible entanglement with religious doctrine."); *Penn v. New York Methodist Hosp.*, No. 11 Civ. 9137 (NSR), 2013 WL 5477600, at *6 (S.D.N.Y. Sept. 30, 2013) (granting motion to dismiss where plaintiff alleged that he was "primarily responsible for ministry"); *Moreno v. Episcopal Diocese of Long Island*, No. 15 Civ. 147231 (JS)(AKT), 2016 WL 8711448, at *8 (E.D.N.Y. Jan. 20, 2016), (dismissing claims because Complaint "consistently refers to Plaintiff as 'Reverend,' plaintiff

conceded he was "employed as a Priest," and "graduat[ed] from the Episcopal Seminary"); *Washington v. African Methodist Episcopal Church, Inc.*, No. 11-CV-6087-CJS, 2011 WL 4352404, at *4 (W.D.N.Y. Sept. 16, 2011) (declining to adjudicate pastor's termination claim).

Two inquiries govern the application of the ministerial exception: whether Plaintiffs served (1) in a ministerial capacity, and (2) for a religiously affiliated institution.

### 1.     *Ministerial Capacity*

While there is no bright-line test to determine whether an employee qualifies as a minister, the Second Circuit endorsed the factors relied upon by the Supreme Court in *Hosanna Tabor* to determine if one qualifies as a minister, including: (1) their title; (2) whether they were held out by the employer as a minister); (3) whether the employee held himself or herself out as a minister; and (4) the employee's job responsibilities, including whether they are religious in nature. *Id.* at 190-95; *see Fratello*, 863 F.3d at 204-05. But, "the most important consideration ... is whether, and to what extent, the plaintiff performed important religious functions . . . ." *Id.* at 208-09.

Plaintiffs were "ministers" within the meaning of the ministerial exception. Plaintiffs' titles as "nuns," as well as their "sanctified" status in the GOA Church establishes they are not secular, but categorically ministerial. Indeed, "sanctified," which is how Plaintiffs have characterized themselves, (Am. Compl. ¶ 37), is defined as "to set apart to a sacred purpose or to religious use."[3] "[T]he fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee's position." *Hosanna-Tabor*, 565 U.S. at 193; *see Hankins v. New York Annual Conf. of United Methodist Church*, 351 F. App'x 489, 491 (2d Cir. 2009) (ministerial exception required dismissal of ordained United Methodist minister's claims); *Rweyemamu*, 520

---

[3]   *See* Webster's Dictionary of the English Language Unabridged (2020), https://www.merriam-webster.com/dictionary/sanctify (last accessed August 28, 2020).

F.3d 198 (relevant that plaintiff was an ordained priest of the Roman Catholic Church). Here, Plaintiffs repeatedly identify themselves as "nuns," and since graduating from Hellenic College-Holy Cross, and hold themselves out as sanctified nuns. (Am. Compl. ¶ 20, 32, 37). Plaintiffs also admit that the GOA "directs its nuns in terms of . . . the services they must perform," (*id.* ¶ 32), and that, among the activities they performed, they "r[a]n Mass services." (*Id.* ¶ 33). Finally, the Amended Complaint alleges the Calverton Monastery, where Plaintiffs claim they were employed, had "parishioners." (*See id.* ¶¶ 60-62).

In response to Defendants' first Motion to Dismiss, Plaintiffs reinvent themselves by deleting the descriptor word "clergy," and in its place inserting "laypeople." (*See e.g.*, revision to Am. Compl. ¶ 32 "female ~~clergy~~ laypeople (nuns)"). This transparent revision aside, Plaintiffs *still* identify themselves as clergy *in the very first paragraph* of the Amended Complaint, which argues their claims for hostile work environment "by a clergy member against another clergy member" should not be barred." (*Id.* ¶ 1) (emphasis added). Further, they readily compare themselves to "male clergy" in arguing an entitlement to wages for performing "similar tasks" to male clergy. (*Id.* ¶¶ 18, 32, 35). Plaintiffs concede in this allusion to "male clergy" that they *too* are female "clergy," not simply "lay people." Plaintiffs also acknowledge that as nuns, they were not paid money for their services and were expected to "fund their own employment," a fact which itself distinguishes them from a "lay person" employed at a church. (*Id.* ¶ 34). All told, Plaintiffs cannot *plausibly* argue that their claims do not fall within the ministerial exception in light of their repeated: 1) references to themselves as "clergy," 2) comparisons of themselves to male clergy, and 3) admissions they served as sanctified nuns with no expectation of compensation. The clear import of these allegations is fatal to Plaintiffs' claims given the Court's Order allowing no further amendments. (ECF 16).

8

Plaintiffs' attempted *post hoc* revision that they were "lay people" also suggests a misunderstanding of the ministerial exception's breadth. The Second Circuit has explained that the term "ministerial exception" is judicial shorthand and protects more than just "ministers." *Rweyemamu* 520 F.3d at 206. Even where a formal title of teacher was not inherently religious, the Second Circuit applied the ministerial exception because "the record clearly establishe[d] that she held herself out as a spiritual leader of the school, and that she performed many significant religious functions to advance its religious mission." *Fratello*, 863 F.3d at 192.

Even if Plaintiffs consistently alleged they were "lay" ordained nuns (a suspicious classification), the linguistic semantics are irrelevant, as Courts apply the ministerial exception regardless of job tile. It strains credulity that the title "nuns," which Plaintiffs unreservedly adopt, does not fall within the ministerial exception as evidenced by the many cases that applied the ministerial exception to titles which are much less ministerial in nature: "lay teacher," "principal," "director of music ministry and part-time music teacher," and "press secretary."[4] In sum, as "sanctified nuns," (Am. Compl. ¶ 37), charged with running Mass services (*id.* ¶ 33), Plaintiffs held themselves out as ministers to their congregants and predominantly engaged in religious functions with the GOA, within the meaning of the ministerial exception.[5]

### 2.   *Religious Institution*

The second factor of the ministerial exception requires that a defendant must be a religious institution. *Hosanna-Tabor*, 565 U.S at 188-89 (ministerial exception "precludes application of [civil rights] legislation to claims concerning the employment relationship between a religious

---

[4] *See Hosanna-Tabor* (plaintiff began as a "lay teacher" who was then "called" by the congregation to teach as a "Minister of Religion, Commissioned."); *Our Lady of Guadalupe*, 140 S. Ct. 2049 (teachers); *Fratello*, 863 F.3d at 210 (principal); *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000) (music teacher); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) (press secretary).

[5] By contrast, in *Stabler v. Congregation Emanu-El of the City of New York*, No. 16 Civ. 9601 (RWS), 2017 WL 3268201, at *7 (S.D.N.Y. July 28, 2017), the court denied the application of ministerial exception to a secular "Librarian." The difference between Plaintiffs, *ordained nuns*, and a *librarian*, is even more stark.

institution and its ministers."). A religiously-affiliated entity is a religious institution for purposes of the ministerial exception whenever that entity's mission is marked by clear or obvious religious characteristics. *See Aparicio*, 2019 WL 1437618, at *4. Courts typically presume that traditional religious organizations — such as churches, dioceses or synagogues — are in fact "religious groups" for purposes of the ministerial exception. *See Hosanna-Tabor*, 565 U.S. 171 (determining without analysis that the church-owned school which employed plaintiff was a "religious employer" within the meaning of the ministerial exception). Courts in this Circuit find that the ministerial exception bars a plaintiff's employment-discrimination claims against a Diocese, which is a religious group within the meaning of the ministerial exception. *See Fratello*, 863 F.3d at 206 (finding that Catholic Archdiocese was a religious group); *Rweyemamu*, 520 F.3d at 209 (finding Roman Catholic Diocese was a religious organization); *Friedlander v. Port Jewish Ctr.*, 347 F. App'x 654 (2d Cir. 2009) (same with respect to Union of Reform Judaism); *see also Moreno*, 2016 WL 8711448, at *9 (same with respect to Episcopal Diocese).

It is beyond dispute that the GOA is a traditional religious organization within the meaning of the ministerial exception, as the Plaintiffs allege in the Amended Complaint that it: (1) is a "religious institution;" (2) that Plaintiffs were "nuns with the [GOA] of New York" (3), that they founded the All Saints Monastery with Makris; and (4) that the GOA appointed Makris to be the Spiritual Father of the All Saints Monastery (Am. Compl. ¶¶ 4, 40-41). Likewise, GOA's authority empowered it to appoint Priests as Parish leaders to its member churches. (*Id.* ¶¶ 41, 55).

**C.    The Constructive Discharge, Retaliation, And Gender Discrimination Claims Are Barred By The Ministerial Exception**

Plaintiffs' claims of retaliation in Count I, constructive discharge in Count III, and gender discrimination in Count V all stem from the allegation that they were "forced to leave" their residency as nuns within the All Saints Monastery. (Am. Compl. ¶ 17, 58). In support of this claim,

Plaintiffs argue that they "deserved to retain their employment and/or public accommodation with Defendants and did not do anything to merit discharge or discipline." (*Id.* ¶¶ 77, 85. 97).[6] Essentially, Plaintiffs complain that their "employment" as nuns was terminated unfairly.

Plaintiffs are both "ministers," and since GOA, their alleged employer, is a religious organization, their employment discrimination and retaliation claims challenging their constructive discharge necessarily fail.[7] The ministerial exception bars "an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her." *Moreno*, 2016 WL 8711448, at *10; *Hosanna-Tabor*, 565 U.S. at 188-89 ("requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision [and] interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs."); *Fratello*, 863 F.3d at 206 ("ministers" are barred from bringing employment discrimination claims against the Archdiocese that formerly employed them). This Court cannot opine on the permissibility of an alleged employment decision irrespective of whether it violates discrimination laws when it relates to the removal of ministers within a church organization, such as the GOA. *Guadalupe*, 140 S. Ct. at 2060.

While *Hosanna-Tabor* applied the ministerial exception to Title VII claims, it is grounded

---

[6] Plaintiffs' alternative theory that they were discriminated against in a "place of public accommodation" fails because the GOA is not a place of public accommodation. (Am. Compl. ¶ 15). Notwithstanding Plaintiffs' plainly contradictory allegations regarding conduct that occurred in unidentified parking lots and moving cars, the NYSHRL and NYCHRL both *exclude* religious institutions from consideration as places of public accommodation. *See* NYSHRL § 292(9) (excluding "a religious corporation incorporated under the education law or the religious corporations law," as it "shall be deemed to be in its nature distinctly private"); NYCHRL § 8-102 (same). There is indeed ample cause law holding that church institutions, including the GOA, are not places of public accommodation. *See Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586, 590 (2d Cir. 1988) (affirming determination that the Greek Orthodox Church did not constitute a public accommodation, and Church defendants were not liable under public accommodations law because Church was a house of worship and religious edifice, not a commercial building).

[7] There is no distinction between claims for discrimination, retaliation, or constructive discharge. *See e.g. Petruska v. Gannon Univ.*, 462 F.3d 294 (3d Cir. 2006) (holding doctrine applied to Title VII discrimination, constructive discharge and retaliation claims); *Gellington v. Christian Methodist Episcopal Church*, 203 F.3d 1299, 1303-04 (11th Cir. 2000) (affirming dismissal of minister's Title VII retaliation and constructive discharge claims).

11

in the First Amendment and is applied "to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers. *Shukla v. Sharma*, No. 07-CV-2972, 2009 WL 10690810, at *3 (E.D.N.Y. Aug. 21, 2009). New York state courts also recognize the ministerial exception precludes suits by clergy against religious institutions on constitutional grounds. *See Mills v. Standing Gen. Comm'n on Christian Unity & Interreligious Concerns*, 117 A.D.3d 509, 510 (1st Dep't 2014) ("[A] church's decision to hire, to fire, and to prescribe the duties of its minister are commonly held to be constitutionally protected."; dismissing wrongful termination claim where plaintiff was ordained minister of United Methodist Church); *O'Connor v. Church of St. Ignatius Loyola*, 8 A.D.3d 125 (1st Dep't 2004) (applying ministerial exception to dismiss church employee's state discrimination claims); *Faur v. Jewish Theological Seminary of America*, 146 A.D.2d 566 (2d Dep't 1989) (affirming dismissal of rabbinical professor's discrimination claim which required court to impermissibly interfere in religious matters).

Any relief sought by Plaintiffs bears impermissible First Amendment ramifications, and a judgment would also run afoul of the First Amendment. *See Hosanna-Tabor*, 565 U.S. at 194 (finding both monetary relief as well as an order overturning plaintiff's termination  is precluded by the First Amendment). Likewise, awarding monetary relief to Plaintiffs would effectively operate as a "a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination." *Id.* Plaintiffs' retaliation, constructive discharge and gender discrimination claims pursuant to the NYSHRL fail.

### D.    Plaintiffs' Retaliation Claims Also Independently Fail Under The NYSHRL Religious Exemption

In defining "forbidden" practices, the NYSHRL contains a religious exemption, which provides that nothing in those laws shall be construed as barring a religious organization from "taking such action" or "making such selection," respectively, to the extent those actions and

selections are "calculated by such organization to promote the religious principles for which it is established or maintained." N.Y. Exec. Law § 296(11).[8]

Plaintiffs allege that GOA leadership and Father Chrysostom Panos (who is not named as a Defendant) admonished Plaintiffs that he and Defendant Bishop Andonios were considering sending them to Greece to become "real nuns" in retaliation for their complaints. (Am. Compl. ¶ 47). Plaintiffs also plead that an unidentified priest in Mattituck informed Plaintiffs they were no longer welcome at his parish. (*Id.* ¶ 54). Even accepting these allegations as true, they fall squarely within the type of conduct that this Court is unable to address. The Supreme Court has held the Constitution permits churches to establish their own rules for "internal discipline and government" and to create tribunals for adjudicating disputes over these matters." *Serbian Orthodox Diocese for the U.S.. & Canada v. Milivojevich*, 426 U.S. 696, 717, 724 (1976) (courts may not engage in substantive review of church's decision regarding removal of church leader as "questions of church discipline . . . are at the core of ecclesiastical concern"); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church*, 344 U.S. 94, 116 (1952) (holding that the Free Exercise Clause protects religious organizations' power "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine").[9] Accordingly, the NYSHRL claims for constructive discharge, gender discrimination, and retaliation must be dismissed.

## II.   PLAINTIFFS' SEXUAL HARASSMENT CLAIMS IN COUNT II FAIL

### A.   Plaintiffs' Sexual Harassment Claims Prior To March 18, 2017 Are Time-Barred

Claims arising under the NYSHRL are subject to a three-year statute of limitations. *George v. Prof'l Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 436 (S.D.N.Y. 2016). Similarly, the statute

---

[8] The NYCHRL contains a substantively identical religious organization exemption. N.Y. Admin Code 8-107(12).
[9] While the GOA's "General Regulations for the Establishment and Operation of Holy Monasteries in the Greek Orthodox Archdiocese of America" regulate discipline, Defendants will not rely on matters outside the pleadings.

of limitations for a NYCHRL claim is "three years after the alleged unlawful discriminatory practice . . . occurred." NYCHRL § 8-502(d). Plaintiffs commenced this action on March 18, 2020, and under the statute of limitations, any claims of discrimination, retaliation, sexual harassment, or a hostile work environment arising out of conduct that occurred prior to March 18, 2017 would necessarily be time-barred. *See Langella v. Mahopac Cent. Sch. Dist.*, No. 18 Civ. 10023, 2020 WL 2836760, at \*15 (S.D.N.Y. May 31, 2020) (dismissing NYSHRL claims falling outside of the statute of limitations); *Stone v. 23rd Chelsea Assocs.*, No. 18 Civ. 3869, 2020 WL 1503671, at \*6 (S.D.N.Y. Mar. 30, 2020) (dismissing Plaintiff's NYSHRL and NYCHRL claims as time-barred).

Indeed, the majority of Plaintiffs' claims *are* time-barred. The Amended Complaint vaguely details events beginning in 2003, many of which that allegedly took place in Massachusetts and at a time when they were not "employed" by the GOA (before the All Saints Monastery was founded).[10] (Am. Compl. ¶ 42). Specifically, the incidents outlined in Paragraph 42 (a) (hugging at graduation in 2005), (b) (brushing penis past Brandenburg's hand while moving students out of college dormitory in or around 2006), (d) (kissing Kallis' neck in 2009), (e) (telling Plaintiffs they would make "cute nuns" in 2010), (f) (hugging in 2007 to 2013), (g) (hugging in 2009 or 2010), (i) (stroking hair and backs in 2009 to 2010), (l) (asking for verbal expressions of love in 2008 to 2010), and (m) (expressing that he missed Kallis in 2006), are all time-barred.

As to the remainder of Paragraph 42's allegations, Plaintiffs plead with no particularity to support a timely or actionable harassment claim. Father Makris is alleged to have "squeezed [Kallis's] legs and pressed her against a car in an empty parking lot," in "March 2017," (*id* ¶ 42(c)),

---

[10] The Amended Complaint includes allegations concerning Plaintiffs' studies at the Hellenic College-Holy Cross in Massachusetts from 2004 to 2007, when they were not "employed" by GOA, and when the "impact" of any action was not felt in New York. (*See* Am. Compl. ¶¶ 26-30). Neither the NYSHRL nor NYCHRL apply to discrimination against individuals outside of their respective boundaries and done by foreign defendants, regardless of the residency status of the parties. *See Popa v. PricewaterhouseCoopers LLP*, No. 08 Civ. 8138 (LTS), 2009 WL 2524625, at \*6 (S.D.N.Y. Aug. 14, 2009) (dismissing with prejudice NYSHRL and NYCHRL claims occurring when Plaintiff was not a citizen of New York and where the alleged discriminatory or retaliatory acts did not occur in New York).

yet this *still* fails to plead a timely event as the alleged behavior may have occurred between March 1 and March 17, 2017, which is time-barred.[11] As to Paragraph 42 (j) and (k), even if Father Makris told Plaintiffs they shared a "special connection," or were his "favorites," he was their Spiritual Father which they "considered to be one of the most important relationships," and they founded a Monastery together. (*Id.* ¶¶ 25, 40-41). This fails to sufficiently support an objectively hostile work environment or sexual harassment claim under the NYSHRL. Simple teasing, offhand comments, or isolated incidents of offensive conduct will not support a claim of discriminatory harassment. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 223 (2d Cir. 2004). Likewise, allegations that Father Makris winked at, or made eye contact with Plaintiffs in April 2017 are insufficient to state a claim. (*Id.* ¶ 42(h)). Even analyzing the NYCHRL independently, Courts find comments that a reasonable person would view as "petty slights and trivial inconveniences" do not reveal a discriminatory motive. *See Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009).

Nor do the allegations establish grounds for tolling, or support a continuing violation from claims occurring while Plaintiffs were "students" and not "employed" by the GOA. Plaintiffs cannot rely on non-actionable conduct within the statute of limitations period. *Id.* at 63 ("in the absence of any connection to actionable conduct during the limitations period, the continuing violation doctrine" fails). Even assuming Plaintiffs could establish a continuing violation, it would not be viable under New York law. Lastly, Plaintiffs' failure to plead an underlying claim dooms their allegations of individual liability for each Defendant under the NYSHRL and NYCHRL.

## III.   THE NYCHRL CLAIMS FAIL FOR LACK OF SUBJECT-MATTER JURISDICTION

Plaintiffs' NYCHRL claims in Counts I-III, and V against all Defendants fail for lack of subject-matter jurisdiction under Rule 12(b)(1), in addition to failing to state a claim under Rule

---

[11] Even if timely, the March 2017 allegation is only about Kallis. All of *Brandenburg's* claims are still time-barred.

12(b)(6), as the alleged discrimination or retaliation did not occur in New York City, nor did it have any impact there. "Determining the existence of subject matter jurisdiction is a threshold inquiry," *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), and "[a] case is properly dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Although a court "must accept as true the factual allegations contained in the Complaint, . . . it will not draw argumentative inferences in favor of Plaintiff because subject-matter jurisdiction must show affirmatively." *Lambui v. Collins*, No. 14-CV-6457, 2015 WL 5821589, at *4 (E.D.N.Y. Sept. 30, 2015). Plaintiffs "bear[] the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *Id.*

### A.    New York City Human Rights Law Does Not Apply To Acts That Occurred Outside Of New York City

Plaintiffs allege they were "employed" as nuns at the All Saints Monastery in Calverton, Long Island and that they are now domiciled in Missouri. (Am. Compl. ¶¶ 3-4, 40). *See Rylott-Rooney v. Alitalia-Linee Aeree Italiane-Societa Per Azioni*, 549 F.Supp.2d 549, 551 (S.D.N.Y. 2008) ("When a non-resident seeks to invoke the coverage of the New York City and State human rights laws, he or she must show that the alleged discrimination occurred within [the] City and [] State respectively."). The Court lacks subject-matter jurisdiction over the NYCHRL claims as the statute "does not apply to discriminatory acts that occurred outside of New York City." *Joseph v. Westchester Cty. Dep't of Cmty. Mental Health*, No. 7:20 Civ. 0420 (NSR), 2020 WL 2555334, at *2 (S.D.N.Y. May 19, 2020). The NYCHRL aims only to "to eliminate and prevent discrimination within the City of New York." *Levy v. City Comm'n on Human Rights*, 85 N.Y.2d 740, 743 (1995); *see Kearse v. ATC Healthcare Servs.*, No. 12 CIV. 233 NRB, 2013 WL 1496951, at *2 (S.D.N.Y.

Apr. 8, 2013) ("To state a claim under the NYCHRL, a plaintiff must allege that the defendant engaged in discriminatory conduct 'within the boundaries of New York City.").

Where a plaintiff both *resides* and *works* outside of New York City, courts routinely conclude that they lack subject-matter jurisdiction over NYCHRL claims. *See*, *e.g.*, *Lambui*, 2015 WL 5821589, at *5 (dismissing NYCHRL claims brought by employee based in Long Island); *Hoffman v. Parade Publ'n.*, 15 N.Y.3d 285, 290-91 (2010) (dismissing NYCHRL claims brought by employee based in Georgia);[12] *Casper v. Lew Lieberbaum & Co.*, No. 97 Civ. 3016 (JGK), 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998) (dismissing NYCHRL claims as allegations occurring in Garden City were insufficient to demonstrate discriminatory conduct or impact in New York City); *Hardwick v. Auriemma*, 116 A.D.3d 465, 467 (1st Dep't 2014) (affirming dismissal of NYCHRL claims where discriminatory acts did not occur within the City).

### B.   The Allegations Did Not Have A Discriminatory "Impact" In New York City

"[I]n order for a non-resident to invoke the protections of . . . NYCHRL, she must show that the discriminatory act had an impact within" City boundaries. *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013) (*citing Hoffman*, 15 N.Y.3d at 290-91 ("[T]he impact requirement . . . confines the protections of the NYCHRL to those who are meant to be protected — those who work in the city.")); *see Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 223 (E.D.N.Y. 2018) (granting motion to dismiss as plaintiff had "no basis to invoke the protections of the NYCHRL" where impact of the alleged discrimination was felt exclusively on Long Island).

Plaintiffs' allegations lack any discriminatory impact sufficient to establish jurisdiction under the NYCHRL. They allege that on April 18, 2018, parishioners at the Holy Cross Parish in

---

[12] The Court in *Hoffman* used an impact analysis to dismiss NYCHRL claims for lack of subject-matter jurisdiction, which applies equally to a Rule 12(b)(6) motion. *See Spilkevitz v. Chase Inv. Servs.*, No. 08-CV-3407, 2009 WL 2762451, at *5 (E.D.N.Y. Aug. 27, 2009) (granting 12(b)(6) motion to dismiss NYCHRL claims where plaintiff worked in Long Island).

Brooklyn allegedly "confirmed" their unidentified parish priest had announced (at an unidentified point in time) they could not visit Plaintiffs in Calverton or help them due to their complaints about Makris, (Am. Compl. ¶ 49). Plaintiffs do not allege *they* were prevented from visiting the Brooklyn parish based on the unidentified parish priest's warnings; they only allege the Holy Cross parishioners were instructed not to visit or help Plaintiffs in *Calverton*. (*Id*. ¶ 51). Nor do they explain how the instruction to parishioners had an impact on Plaintiffs in *Brooklyn*, rather than in *Calverton*, where they lived. They also plead they left the Monastery in *Calverton* upon learning Makris would return to his position in Brooklyn. (*Id.* ¶¶ 55, 58). Plaintiffs concede, once they felt the impacts of these acts within the Monastery *in Calverton*, they then felt encouraged to leave.

The "impact" requirement is also not satisfied simply because the GOA's principal place of business in New York City, given that an employer's headquarters is irrelevant to whether a plaintiff is covered by the NYCHRL. *See Ortiz v. Haier America Trading, LLC*, No. 101705/11, 2011 WL 2283771, at \*2 (N.Y. Sup. Ct. May 24, 2011) (defendant's NYC headquarters insufficient to satisfy impact requirement); *Weerahandi v. Am. Statistical Ass'n*, 2014 WL 3738079, at \*3-4 (N.Y. Sup. Ct. July 28, 2014) (allegation that defendant's "president 'operates' in Manhattan . . . with nothing more, is light-years from providing this court with jurisdiction").[13]

### C. Occasional Travel For Work-Related Purposes Does Not Establish Discriminatory Impact In New York City

Plaintiffs now allege occasional travel to New York City as part of their ecclesiastical duties with the Monastery in Calverton. Even accepting these allegations as true, courts repeatedly hold "that a non-resident plaintiff's occasional meetings in or travel to the City are tangential and do not satisfy the requirement" that the *impact* of alleged discrimination be *felt* in New York City.

---

[13] To the extent Plaintiffs may contend GOA's alleged ratification of Father Makris' conduct led to their constructive discharge, the argument that a plaintiff could invoke the NYCHRL because the "decision to terminate" was made in New York City was explicitly rejected by the New York Court of Appeals in *Hoffman*, 15 N.Y.3d at 290–91.

*Pedroza v. Ralph Lauren Corp.*, No. 19 Civ. 08639 (ER), 2020 WL 4273988, at *3-4 (S.D.N.Y. July 24, 2020) (dismissing NYCHRL claims where New Jersey based plaintiff traveled to New York City twelve times in six months, as, "to say that [plaintiff's] occasional travel [to New York City] and her work with other employees in the City prove impact . . . would considerably broaden NYCHRL"). By cataloguing their various "work related duties and obligations" requiring travel into New York City, Plaintiffs readily concede these tasks related solely to their roles as nuns, further reinforcing that the allegations did not have a *discriminatory impact* in New York City. (Am. Compl. ¶¶ 16, 20 (a)-(g)).

Plaintiffs belatedly proffer that during these occasional travels, certain unwelcome conduct "occur[ed] in New York City between 2006 and October 2017." *See* Am. Compl. ¶¶ 42(c), (h), (j), (k), (n). These unspecific allegations spanning eleven years are either time-barred if they occurred before March 18, 2017, or detail incidents which themselves are insufficient to plausibly state a claim. The allegations in paragraph 42, to the extent they did not occur in Massachusetts or prior to March 18, 2017, still fail to state the requisite details–the "when, where, and how"–of such allegations occurred in New York City with specific dates, times, and locations.[14] *See Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 623 (E.D.N.Y. 2012) (general allegations of "discriminatory acts", which do not identify any particular acts that allegedly occurred in New York City are insufficient to state a NYCHRL claim). Plaintiffs cannot simply manufacture jurisdiction with no facts to suggest it exists. Accordingly, the NYCHRL claims alleging employment discrimination, sexual harassment, and retaliation must be dismissed.[15]

---

[14] Plaintiffs claim that certain of the other acts allegedly occurred in "New York City," without specifying the boroughs. (Am. Compl. ¶ 42 (j), (k), (n)). Plaintiffs also plead venue in the Southern District (encompassing Manhattan and the Bronx). (*Id.* ¶ 10). Plaintiffs then claim other allegations occurred in "New York City" and Queens in paragraph 42 (c), (h), with *no* mention of either Manhattan or the Bronx. Even on its face, the Amended Complaint is vague and contradictory. *See Glascoe v. Solomon*, No. 18 Civ. 8284 (AT), 2020 WL 1272120, at *10 (S.D.N.Y. Mar. 17, 2020) ("Plaintiff's vague, conclusory pleadings are insufficient to withstand a motion to dismiss").
[15] Even assuming jurisdiction for Plaintiffs' NYCHRL claims, they still fail for the reasons outlined *infra*, I-II.

19

## IV.   PLAINTIFFS' CIVIL RIGHTS LAW CLAIM FAILS FOR THE SAME REASONS AS THE HUMAN RIGHTS LAW CLAIMS

The NY Civil Rights Law § 40-c is analyzed together with NYSHRL § 296(4), which similarly prohibits discrimination based on protected grounds. *Padmanabhan v. New York Inst. of Tech. Campus, New York*, No. 18 Civ. 5284, 2019 WL 4572194, at *5 (S.D.N.Y. Sept. 20, 2019). While Plaintiffs preemptively cite *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 350 (E.D.N.Y. 1998) (notably pre-dating *Hosanna-Tabor* by fourteen years), the case actually supports Defendants' arguments. *Ganzy* held in the "case of alleged gender discrimination, if a religious organization offers a legitimate religious reason for an employee's termination, applied equally to both sexes, the court cannot examine the rationality of the proffered belief." *Id*. 348–49. It continued, "a court cannot inquire into whether the employer's stated reason for terminating a math teacher from religious school for failure to fulfill spiritual mission of the school is unwise or unreasonable," and that it would not evaluate the dogma of religious decisions. *Id*. Thus, even Plaintiff's preemptively-proffered, and outdated, case law establishes that a Court cannot interfere with ecclesiastical discipline within the Church.

## V.   PLAINTIFFS WERE NOT EMPLOYEES UNDER THE NEW YORK LABOR LAW

The Amended Complaint does not cure the deficiencies in the "Unpaid Wages" Claim asserted in Count Seven.[16] Plaintiffs allege that they were "employees," and that Defendants, by virtue of their "positions, roles and conduct" were "employers" under the NYLL. (Am. Compl. ¶¶

---

[16] Plaintiffs improperly lump their minimum wage and overtime claims together in Count Seven, despite these claims being distinct. Minimum wage claims pursuant to NYLL § 198 permit an employee to sue her employer for unpaid wages owed, whereas NYLL § 663 authorizes a civil action for overtime wages under 12 N.Y.C.C.R. 142-2.2 and 146-1.4, requiring employers to pay overtime. As to either, Plaintiffs fail to state how many hours per week they worked for regular wages, and how many hours they worked in each work week in excess of 40 hours. Both actions require proof that the employee performed work for which she was not properly compensated. *O'Donnell v. Jef Golf Corp.*, 173 A.D.3d 1528, 1529 (3d Dep't. 2019). Likewise, the burden of showing that an employee was not paid overtime wages rests with the plaintiff. *Rivera v. Steinway Medical*, No. 18-CV-00624, 2019 WL 5212848, at *4 (E.D.N.Y. Oct. 15, 2019). Even if Plaintiffs had a valid claim to back wages, which they do not, it could only be to wages earned from March 18, 2014 to November 18, 2018, which represents the start of the NYLL six-year statute of limitations period until Plaintiffs' departure from the Monastery. N.Y. Lab. Law § 198 (3). (Am. Compl. ¶ 58).

102-103). They allege they were denied pay for all the hours they worked and overtime wages. (*Id.* ¶ 105). At the same time, Plaintiffs plead that, as "lay people", it was understood "they would not be paid for carrying out services in furtherance of their job tasks and duties." (*Id*. ¶ 19, 20, 33).

"To recover under the NYLL, Plaintiffs must prove that they were employees and that Defendants were "employers" as defined by the statute." *Fermin v. Las Delicias Peruanas Rest.*, Inc., 93 F. Supp. 3d 19, 34 (E.D.N.Y. 2015). Despite the rote allegations of an existence of an employee-employer relationship, the NYLL defines an "employee" as any individual employed or permitted to work by an employer in any occupation, *but shall not include any individual who is employed or permitted to work (f) as a member of a religious order,* or as a *duly ordained, commissioned or licensed minister, priest* or rabbi . . ." NYLL § 651. Under the Minimum Wage Act, the term "employee" does not include any individual who is employed or permitted to work as a member of a religious order. NYLL § 651(5)(g). *See also* U.S. Dep't of Labor, Field Operations Handbook, Ch. 10b03(b) (2016) (recognizing that religious workers must be excluded from FLSA's scope: "persons such as nuns, monks, priests, lay brothers, ministers, deacons, and other members of religious orders who serve pursuant to their religious obligations in the schools, hospitals, and other institutions operated by their church or religious order shall not be considered to be 'employees.'").[17] Likewise, non-employee volunteers of religious institutions are specifically excluded from the definition of employees covered by the New York Workers' Compensation Law. WCL § 201 (5).

The NYLL's plain language clearly does not apply to Plaintiffs as nuns (lay or not) within the GOA. *See Shukla*, 2009 WL 10690810, at *2 (applying ministerial exception and dismissing

---

[17]   Members of a religious organization are not employees under the FLSA. The Department of Labor states: "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purposes or pleasure, worked in activities carried on by persons either for their pleasure or profit,' is outside the sweep of the Act." WHD, Opinion Letter FLSA2018-29, 2018 WL 6839426, at *1. The FLSA does not apply to religious ministers serving in that capacity. *Id.*

Hindu priest's FLSA and State wage claims). NYLL § 651 also exempts anyone employed or permitted to work "as a volunteer, learner or apprentice by a . . . foundation organized and operated exclusively for religious . . . purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual." Plaintiffs clearly acknowledge serving as nuns for the All Saints Monastery, and doing so *despite knowing* that the GOA does not pay nuns for their services. (Am. Compl. ¶ 19, 20, 33). As such, Plaintiffs' claims relating to violations of the NYLL fall within the ministerial exception because Plaintiffs voluntarily performed purely ministerial services as nuns at the All Saints Monastery and recognize they did so <u>with no expectation</u> of compensation. *See Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 763 (6th Cir. 2018) (concluding religiously motivated church volunteers were not employees because they did not "expect to receive compensation"); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1397 (4th Cir. 1990) (holding clergy were excluded from the definition of employee under the FLSA and could not make overtime claim). As such, Plaintiffs' NYLL claims for wages must be dismissed.

## VI.     THE ALLEGED DEFAMATORY STATEMENTS WERE PRIVILEGED

Plaintiffs allege they were defamed by Mother Eisodia's statements on November 2, 2018 when she began working at the All Saints Monastery as the Abbess / Head Nun. (Am. Compl. ¶ 59). She allegedly made defamatory statements beginning November 19, 2018, when she allegedly said that Plaintiffs "left in the middle of the night and stole a car that belongs to the Monastery." (*Id.* ¶¶ 60-61). These statements were allegedly made to unnamed current and potential parishioners, and to the Suffolk County police department to report the car was stolen. (*Id.* ¶ 62).

To state a claim for defamation *per se* under New York law, plaintiff must allege: "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation *per se* or caused special damages." *Marom v. Pierot*, No. 18 Civ. 12094 (VB), 2020

WL 1444938, at *2 (S.D.N.Y. Mar. 25, 2020). Here, Plaintiffs' claims fail because under no reasonable interpretation of these statements could they be considered defamatory *per se*, and Plaintiffs have failed to make any allegations of special damages. Even assuming the statements could be considered defamatory *per se*, Plaintiffs' pleading on special damages is also insufficient, necessitating the dismissal of a special damages claim.[18] *See Pappas v. Passias*, 271 A.D.2d 420, 421 (2d Dep't 2000) (affirming dismissal of former church parishioner's defamation claim against Greek Orthodox Archdiocese where statements were not considered to be libelous *per se* and therefore special damages must have been pleaded).

Assuming, *arguendo*, that the statements that Plaintiffs absconded with the church's car were false,[19] were published to third parties with the required level of fault, and resulted in injury to Plaintiffs, the statements are still nevertheless protected by the law enforcement and common interest privileges. A qualified privilege attaches to a communication made by a person with a legitimate interest in making or a duty to make the communication, and the communication is sent to a person with a corresponding interest or duty, even though without the privilege the communication would be defamatory. *Foster v. Churchill*, 87 N.Y.2d 744, 745 (1996).

### A.    Statements to Police Are Qualified Under The Law Enforcement Privilege

Statements to police are entitled to a qualified law enforcement privilege, which extends to statements made to the police aiming to protect and encourage the reporting of alleged crimes.

---

[18] "Special damages" are "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Hogan v. Lewis Cty.*, No. 7:16-CV-1325, 2020 WL 2850162, at *15 (N.D.N.Y. June 1, 2020). Plaintiffs claim they "suffered monetary losses as a significant portion of their income came from candle purchases made by their parishioners and visitors to the monastery as well as others in the Green Orthodox community," and that they "suffered adverse consequences to their personal and professional reputation," without further detail as to the scope of those alleged losses, and the impacts on their reputation. (*Id.* ¶¶ 66, 93).

[19] Plaintiffs fail to plead how nuns within the All Saints Monastery could own private property which did not belong to the GOA or the Monastery. *See Tannerite Sports, LLC v. NBC Universal*, 864 F.3d 236, 245 (2d Cir. 2017) (requiring that New York plaintiff must identify how defendant's statement was false to survive a motion to dismiss). Even if the defamation claims survive this Motion, the GOA's Regulations Governing Monasteries will establish a complete defense. These required Plaintiffs, as nuns, to pledge they *could not* own property, thus disproving the claims that the car belonged to them, and proving that the reports of the car being stolen were, in fact, true.

*See D'Amico v. Zingaro*, 24 N.Y.S.3d 339, 341 (2d Dep't 2016). Specifically, "New York courts recognize a qualified privilege for statements made to police officers about suspected crimes." *Hogan v. Lewis Cty.*, No. 7:16-CV-1325, 2020 WL 2850162, at *16 (N.D.N.Y. June 1, 2020) (*citing Udechukwu v. City of New York*, 333 F. Supp. 3d 161, 172 (E.D.N.Y. 2018) (dismissing defamation claim because statements made to police officers were entitled to qualified privilege and Plaintiff could not establish malice)); *see also Remley v. State*, 665 N.Y.S.2d 1005, 1008 (Ct. Cl. N.Y. 1997) ("A person filing a formal complaint charging another with a crime is . . . entitled to absolute immunity from a civil suit for defamation.").

Statements to police are protected by the qualified privilege and cannot serve as the basis for a defamation claim, unless Plaintiffs can show malice, *i.e.,* "evidence that the defendant knew the statement to be false, but made it anyway." *Udechukwu*, 333 F. Supp. 3d at 172. Plaintiffs plead no allegations that Mother Eisodia knew her statements to be false. Plaintiffs allege that the police investigated Mother Eisodia's complaint that the car had been stolen, and only after the investigation did the police inform her that the car allegedly belonged to the Plaintiffs. (Am. Compl. ¶ 62). As such, Mother Eisodia reported what she reasonably believed to be a stolen car, and was then allegedly informed otherwise by the police. Plaintiffs cannot show the high standard of malice that Mother Eisodia *knew* the claims to be false when making her report to the police. *See Berger v. Temple Beth-El of Great Neck*, 41 A.D.3d 626, 627 (2d Dep't 2007) ("The plaintiff's conclusory allegations of malice are insufficient to defeat the claim of qualified privilege.").[20]

---

[20] While Plaintiffs allege Mother Eisodia "continued to make such defamatory statements to current, new, and potential parishioners, knowing these statements to be false," (Am. Compl. ¶ 63), Plaintiffs provide no specific allegations regarding the statements, such as when, to whom, where, and how they were made. *See Chisolm v. City of New York*, No. 17-CV-5327(MKB), 2018 WL 3336451, at *5 (E.D.N.Y. July 6, 2018) (dismissing defamation claim where plaintiff did not "state what the alleged defamatory statement was, to whom it was made, or the date that it was published" and failed to provide the court with "enough facts to state a claim to relief that is plausible on its face.").

**B.     Intra-Church Communications Are Protected By Common Interest Privilege**

The remaining defamation allegations concern intra-Church communications that are protected by the common interest privilege, and those which were simply the repetition of qualified reports of a potential crime to the police. "Even though a statement is defamatory, there exists a qualified privilege when the communication is made to persons who have a common interest in the subject matter." *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996). There is a qualified privilege for statements made by clergy in the discharge of their ecclesiastical duties and in furtherance of a common interest of a religious organization between a church and its parishioners. *See Presler v. Domestic and Foreign Missionary Society of Protestant Episcopal Church*, 113 A.D.3d 409 (1st Dep't 2014) (allegedly defamatory statements to former employee of church were subject to a qualified privilege, where they were made to other employees also charged with plaintiff's supervision); *Temple Beth-El*, 41 A.D.3d at 627 (affirming dismissal of defamation claims from terminated Temple member where challenged statements were made in discharge of a private duty and in furtherance of a common interest of a religious organization); *Sborgi v. Green*, 281 A.D.2d 230, 230 (1st Dep't 2001) (dismissing plaintiff's defamation claim where bishop's comments that she was "unstable" and had "disturbed" children were not made with malice as there was a common interest in her character and fitness as a prospective teacher and promoter of their faith).

Here, Plaintiffs allege Mother Eisodia made the allegedly defamatory statements to other GOA church parishioners and prospective parishioners. These statements are subject to the qualified common interest privilege because these parishioners would have an interest in knowing that Plaintiffs allegedly committed theft of church property, which Mother Eisodia reasonably believed when she reported the theft of the Monastery's car. (*See* Am. Compl. ¶ 61.)

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint in its entirety, with prejudice, and grant Defendants such other and further relief as this Court deems just and proper.

Dated: New York, New York
      August 31, 2020

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Gerald L. Maatman, Jr.*
    Gerald L. Maatman, Jr.
    gmaatman@seyfarth.com
    Karen Bitar
    kbitar@seyfarth.com
    Lisa Savadjian
    lsavadjian@seyfarth.com
    620 Eighth Avenue
    New York, NY 10018
    Telephone: (212) 218-5500
    Facsimile: (212) 218-5526

Attorneys for Defendants
GREEK ORTHODOX ARCHDIOCESE OF NORTH AMERICA, GERASIMOS MAKRIS a/k/a FATHER GERASIMOS MAKRIS, DEMETRIOS TRAKATELLIS a/k/a ARCHBISHOP DEMETRIOS, ALLEN PAROPOULOS a/k/a BISHOP ANDONIOS, AND CHARLENE ASQUITH a/k/a MOTHER EISODIA

65416284v.3