UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                       :

ELIZABETH BRANDENBURG et al.,        :

                                       :

               Plaintiffs,       :

                                       :             20-CV-3809 (JMF)

        -v-                 :

                                       :          OPINION AND ORDER

GREEK ORTHODOX ARCHDIOCESE OF NORTH  :
AMERICA et al.,                     :

                                       :

             Defendants.      :

                                       :

-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiffs Elizabeth Brandenburg and Maria Kallis worked as "sanctified nuns" at a monastery operated by the Greek Orthodox Archdiocese of North America (the "Archdiocese"). Invoking the Court's diversity jurisdiction, they bring this suit against the Archdiocese and several of its clergy members, including Father Gerasimos Makris, Archbishop Demetrios Trakatellis ("Archbishop Demetrios"), Bishop Allen Paropoulos ("Bishop Andonios"), and Charlene Asquith ("Mother Eisodia"). They allege discrimination, retaliation, and civil rights claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; and the New York Civil Rights Law ("Civil Rights Law"), N.Y. Civ. Rights Law §§ 40-c, 40-d. Plaintiffs also bring a defamation claim under New York law and claims for unpaid wages under the New York Labor Law and its supporting regulations (collectively, "NYLL"), N.Y. Lab. Law § 650 *et seq.*; 12 N.Y.C.R.R. §§ 142-2.1, 142-2.2. Defendants now move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss all of Plaintiffs' claims. For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

The following facts, drawn from the Amended Complaint (the "Amended Complaint"), *see* ECF No. 18 ("Am. Compl."), are assumed to be true for the purposes of this motion.  *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 147, 152 (2d Cir. 2013).

Plaintiffs are sanctified nuns within the Greek Orthodox faith who resided and worked at the All Saints Monastery in Calverton, New York, from 2010 to 2018.  Long before that, beginning in 2003 and 2004, they attended Hellenic College-Holy Cross in Massachusetts, where they first met Father Makris.  *See* Am. Compl. ¶¶ 23-24.  Father Makris, who served as Chaplain and Dean of Students at the time, became Plaintiffs' "Spiritual Father."  *Id.* ¶¶ 22-24.  In the Greek Orthodox faith, "a 'Spiritual Father' . . . is someone who guides his 'Spiritual Children' in their faith and teaches them how to be close to God."  *Id.* ¶ 25.

In or about March 2004, a male student at Hellenic College-Holy Cross sexually assaulted Brandenburg.  *Id.* ¶ 26.  The male student confessed to Father Makris, but instead of reporting the incident to law enforcement or launching an investigation, Father Makris "made" Brandenburg "marry her attacker in order to cure the sexual assault."  *Id.* ¶¶ 26, 28-29.  During the marriage, Brandenburg's husband regularly subjected her to physical abuse and threats, sometimes in front of Father Makris.  *See id.* ¶ 30.  After several pleas from Brandenburg for help, Makris eventually allowed her to divorce her husband in 2009.  *See id.* ¶ 38.

In 2010, Brandenburg and Kallis became nuns and helped Father Makris found the All Saints Monastery.  *Id.* ¶¶ 40-41.  The Archdiocese appointed Father Makris the Spiritual Father for the new Monastery.  *Id.* ¶ 41.  Plaintiffs' duties at the Monastery included running Mass services, singing in Mass services, speaking to students at the parochial school, and tending to various administrative tasks such as cleaning and maintaining account books.  *See id.* ¶¶ 20, 33.

Plaintiffs lived at the Monastery, but they often traveled to the five boroughs of New York City to perform their duties. *See id.* ¶¶ 2-3, 20-21. Notably, although Plaintiffs were given the formal title of "nuns," they "were referred to and considered as 'laypeople' by the Archdiocese." *Id.* ¶ 20. Unlike the male clergy, they were not paid for their work. *Id.* ¶¶ 20, 32, 34.

Plaintiffs allege that, between 2003 and 2017, Father Makris "subjected" them "to various acts of sexual harassment he termed 'fatherly affection.'" *Id.* ¶ 42. These acts ranged from Father Makris telling Plaintiffs that they would make "cute nuns" to stroking their hair, forcibly giving them full-body hugs, kissing them, and brushing his genitals against their bodies. *See id.* Many of these incidents occurred while Plaintiffs were students at Hellenic College-Holy Cross, but some occurred during their time working as nuns at the Monastery. *See id.* For example, through April 2017, Father Makris would wink or smirk at Plaintiffs while grazing their arms and legs; in March 2017, Father Makris pressed Kallis against a car while squeezing her leg; and Makris subjected Plaintiffs to unwanted and offensive kisses and full-body hugs, which, at least for Brandenburg, continued through October 2017. *Id.*

In October 2017, Plaintiffs complained to Bishop Andonios about Father Makris's misconduct. *Id.* ¶ 45. Thereafter, their interactions with the Archdiocese soured. On January 25, 2018, for example, Bishop Andonios's assistant informed Brandenburg by phone that he and the Bishop were considering sending Plaintiffs to Greece to become "real nuns" in response to their complaints. *Id.* ¶ 47. Bishop Andonios made the same threat to Kallis on February 12, 2018. *Id.* ¶ 48. On or about March 30, 2018, Plaintiffs met with Archbishop Demetrios to follow up on their complaints. *Id.* ¶ 50. Archbishop Demetrios dismissed them, telling Plaintiffs that he did not want them to call themselves "victim[s]" and that he did not want "anything negative to be attached to the monastery." *Id.* In the spring and summer of 2018, Plaintiffs

learned that parishioners had been instructed not to help or visit them and that they would no longer be welcome at another parish in New York.  *See id.* ¶¶ 49, 51, 54.

In or about September 2018, the Archdiocese purported to convene a spiritual court to investigate Plaintiffs' complaints about Father Makris.  *Id.* ¶ 56.  The Archdiocese invited Kallis to the hearing, but she was not able to attend on the scheduled date.  *Id.*  She asked to reschedule, but she never heard back from the Archdiocese.  *Id.*  Brandenburg also asked to attend the hearing, but she did not hear back from the Archdiocese either.  *Id.*  Plaintiffs allege that the spiritual court never actually convened, that Father Makris returned to his prior role, and that the Archdiocese did nothing to prevent further sexual harassment.  *See id.* ¶ 57.

In November 2018, Plaintiffs left the All Saints Monastery.  *Id.* ¶ 58.  That same month, Mother Eisodia began working at the Monastery as the Abbess or Head Nun.  *Id.* ¶ 59.  After Plaintiffs left, Mother Eisodia told current and potential parishioners that Plaintiffs had "left in the middle of the night and stole a car that belongs to the Monastery."  *Id.* ¶ 61.  She also reported the purported theft to the local police.  *Id.* ¶ 62.  In March 2019, however, the police informed Mother Eisodia that the car had not actually been stolen and that Plaintiffs, in fact, owned the car.  *Id.* ¶ 63.  Nevertheless, Mother Eisodia continued through the end of the year to tell current and potential parishioners that Plaintiffs had stolen the car.  *Id.* ¶¶ 62-63.  In April 2019, she also told police that Kallis was no longer allowed in the Convent "because of all the bad things" she had done.  *Id.* ¶ 67.

**LEGAL STANDARDS**

In evaluating a Rule 12(b)(6) motion to dismiss, a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch*

*v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).[1]  A claim will

survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must

show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely

on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's

pleadings "have not nudged [his or her] claims across the line from conceivable to plausible,

[the] complaint must be dismissed."  *Id.* at 570.

## DISCUSSION

Plaintiffs bring five claims for discrimination or retaliation under the NYSHRL, the

NYCHRL, and the New York Civil Rights Law, including retaliation (First Cause of Action),

hostile work environment sexual harassment (Second Cause of Action), "sexual harassment

constructive discharge" (Third Cause of Action), gender discrimination (Fifth Cause of Action),

and corresponding claims under the Civil Rights Law (Sixth Cause of Action).  They also bring

claims under the NYLL (Seventh Cause of Action) and defamation claims (Fourth Cause of

Action).  The Court will begin with Plaintiffs' discrimination and retaliation claims before

turning to their other sets of claims.

---

[1]     As discussed below, although Defendants purport to move to dismiss one set of
Plaintiffs' claims for lack of subject-matter jurisdiction under Rule 12(b)(1), the issue they raise
is not jurisdictional and, thus, is properly considered under Rule 12(b)(6) as well.

## A.  Discrimination and Retaliation Claims

First, Plaintiffs bring claims of retaliation, hostile work environment, constructive

discharge, and gender discrimination under the NYSHRL and NYCHRL, *see* Am. Compl. ¶¶ 68-

87, 94-99, and corresponding claims under the Civil Rights Law, *see id.* ¶¶ 100-04.  Defendants

move to dismiss some, but not all, of these claims — namely, the retaliation, constructive

discharge, and gender discrimination claims — on the ground that they are barred by a First

Amendment doctrine known as "the ministerial exception" to employment-discrimination laws.

*See* ECF No. 22 ("Defs.' Mem."), at 4-13, 20.  Separately, they move to dismiss Plaintiffs'

NYCHRL claims on the ground that the statute does not apply to conduct outside of New York

City, *see id.* at 15-19, and the hostile work environment claims as time-barred, *see id.* at 13-15.

The Court will address each of these arguments in turn.[2]

### 1.  The Ministerial Exception

The First Amendment provides that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  In

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 177 (2012), the

Supreme Court held that these Clauses "flatly bar[]" certain employment-discrimination claims

---

[2]     At the outset, the Court rejects all of Plaintiffs' claims to the extent they are based on a
theory that Defendants operated a place of public accommodation.  *See, e.g.*, Am. Compl. ¶¶ 15,
69, 83, 95.  Defendants argue that the Archdiocese is not a place of public accommodation
within the meaning of the applicable laws.  *See* Defs.' Mem. 11 n.6.  Plaintiffs offer no response;
indeed, they do not even use the words "public accommodation" in their opposition.  *See* ECF
No. 24 ("Pls.' Opp'n").  Thus, the Court concludes that any claims based on a public
accommodation theory have been abandoned.  *See, e.g.*, *Leath v. Cnty. of Orange*, No. 18-CV-
7318 (NSR), 2020 WL 4016530, at *6 (S.D.N.Y. July 15, 2020) ("It is well-settled that the
failure to oppose an argument raised in a motion to dismiss is deemed a concession of the
argument and abandonment of the claims." (collecting cases)).  As a result, the Court will
consider Plaintiffs' claims only to the extent they are based on their alleged employment
relationship with Defendants.

brought by ministers against the religious groups that employ or formerly employed them, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 202-03 (2d Cir. 2017).[3]  To successfully invoke this "ministerial exception," a defendant must show merely that a plaintiff (1) worked for a "religious institution" (2) as a "minister."  *See Hosanna-Tabor*, 565 U.S. at 188-89.  In considering whether the plaintiff worked as a "minister," courts in the Second Circuit are to consider, among other things, (1) the formal title given to the employee by the religious institution, (2) the substance reflected in that title, (3) the employee's own use of that title, and (4) the important religious functions that the employee performed for the institution.  *See Fratello*, 863 F.3d at 204.  Ultimately, the inquiry is flexible and fact-specific.  *Id.* at 204-05.  "What matters, at bottom, is what an employee does."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020).

Applying these standards here, the Court has little trouble holding that the ministerial exception applies to this case.  Plaintiffs do not — and, indeed, could not — dispute that the Archdiocese is a "religious institution."  And while they do briefly try to argue that they were not "ministers" within the meaning of the exception, *see* Pls.' Opp'n 9, their argument falls flat.

---

[3]     Because it derives from the First Amendment, the ministerial exception applies not only to employment-discrimination claims arising under federal law, but also to analogous claims under state and local law, including, as relevant here, the NYCHRL, the NYSHRL, and the New York Civil Rights Law.  *See, e.g.*, *Shukla v. Sharma*, No. 07-CV-2972 (CBA), 2009 WL 10690810, at *3 (E.D.N.Y. Aug. 21, 2009) ("Given that the ministerial exception is grounded in the First Amendment, it may be applied to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers." (internal quotation marks omitted)), *report and recommendation adopted*, No. 07-CV-2972 (CBA), 2009 WL 3151109 (E.D.N.Y. Sept. 29, 2009); *Kraft v. Rector, Churchwardens & Vestry of Grace Church in N.Y.*, No. 01-CV-7871 (KMW), 2004 WL 540327, at *4 n.10 (S.D.N.Y. Mar. 17, 2004) ("Just as there is a ministerial exception to Title VII, there must also be a ministerial exception to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." (internal quotation marks omitted)).

Plaintiffs worked as "nuns."  *E.g.*, Am. Compl. ¶¶ 20, 32, 37.  Moreover, to do so, they had to become "sanctified," *id.* ¶ 37, which is defined as "made holy" or "set apart to sacred duty or use," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2008 (2002).  And as nuns, Plaintiffs were tasked by the Archdiocese to, among other things, "run Mass services," Am. Compl. ¶ 33, "sing in the Mass," *id.* ¶ 20, and meet with students at the parochial school, *see id.*, all of which are quintessential religious functions, *see, e.g.*, *Hosanna-Tabor*, 565 U.S. at 192 (holding that duties such as leading a chapel service and selecting hymns for the service are important religious functions).  Notably, Plaintiffs implicitly *identify themselves* as clergy in the very first paragraph of their Amended Complaint, *see* Am. Compl. ¶ 1 (referring to conduct "by a clergy member against another clergy member"), and they readily compare themselves to the Monastery's "male clergy," *id.* ¶¶ 18, 32, 35.  In short, by any reasonable definition of the word, Plaintiffs qualified as "ministers" within the meaning of the ministerial exception.  That is true even though, as Plaintiffs allege, the Archdiocese characterized them as "laypeople."  *Id.* ¶¶ 19-20; *see Our Lady of Guadalupe*, 140 S. Ct. at 2067 (faulting the lower court for "invest[ing] undue significance in the fact that [plaintiffs] did not have clerical titles"); *see also, e.g.*, *Fratello*, 863 F.3d at 206 (applying the ministerial exception to a "lay principal").

That much is straightforward, but it does not end the inquiry because the question remains whether the exception bars all or only some of Plaintiffs' discrimination and retaliation claims.  Complicating matters, the relevant law is somewhat unsettled.  There is no dispute that the exception "flatly bar[s]" claims arising from, or relating to, "tangible employment actions" — such as hiring, firing, promoting, deciding compensation, job assignments, and the like. *Fratello*, 863 F.3d at 202-03; *see Our Lady of Guadalupe*, 140 S. Ct. at 2060-61 (explaining that "[t]he ministerial exception was recognized to preserve a church's independent authority" to

"select, supervise, and if necessary, remove a minister without interference by secular authorities"); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining a "tangible employment action").  Nor is there any dispute that it bars claims relating to conduct for which the defendant religious organization proffers a religious reason.  But neither the Supreme Court nor the Second Circuit has decided whether the exception bars hostile work environment claims that do not involve challenges to tangible employment actions, and the other Circuits are divided on the question.  The Tenth Circuit has held that the exception applies to all hostile work environment claims, *see Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238 (10th Cir. 2010), while the Ninth Circuit has held that it does not apply to hostile work environment (and retaliatory harassment) claims if, or to the extent, such claims do not involve tangible employment actions, *see Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004).  Last year, a divided panel of the Seventh Circuit adopted the Ninth Circuit's view, *see Demkovich v. St. Andrew the Apostle Parish*, 973 F.3d 718 (7th Cir. 2020), but its decision was vacated and the case was reheard en banc earlier this year, *see* Order, *Demkovich v. St. Andrew the Apostle Parish*, No. 19-2142, ECF No. 85 (7th Cir. Dec. 9, 2020) (granting rehearing en banc and vacating panel opinion); *see also* Order, *Demkovich v. St. Andrew the Apostle Parish*, No. 19-2142, ECF No. 128 (7th Cir. Feb. 9, 2021) (noting that the case was heard and taken under advisement by the en banc court).

At this stage, the Court need not and will not take sides in this spirited debate because Defendants conspicuously (and interestingly) do not move to dismiss Plaintiff's hostile work environment claim based on the ministerial exception and, thus, the parties have not adequately briefed the issues involved.  Defendants explicitly move to dismiss only Plaintiffs' First Cause of Action (for retaliation), Third Cause of Action (for "sexual harassment constructive discharge"),

Fifth Cause of Action (for gender discrimination), and the Sixth Cause of Action (for analogous violations of the New York Civil Rights Law) — and these claims perhaps only to the extent they "relat[e] to the separation of [Plaintiffs'] 'employment' from the All Saints Monastery." Defs.' Mem. 4; *see id.* at 20. Omitted from the list is Plaintiffs' Second Cause of Action (for "Sexual Harassment, Quid Pro Quo and Hostile Workplace"). *See* Am. Compl. ¶¶ 74-81. For purposes of this motion, therefore, Defendants have forfeited any argument that the ministerial exception applies to claims of hostile work environment *qua* hostile work environment — that is, to hostile work environment claims if, or to the extent, they do not involve claims of tangible employment action.[4] For purposes of this motion, therefore, the Court will assume without deciding that the Ninth Circuit's framework applies.

Thus, the limited question for the Court is whether, applying the Ninth Circuit's framework, Plaintiffs' First, Third and Fifth Causes of Action — the claims that Defendants move to dismiss — are barred by the ministerial exception. (Plaintiffs' Sixth Cause of Action is also subject to challenge here, but it rises or falls in tandem with the other Causes of Action and need not be analyzed independently. *See, e.g.*, *Padmanabhan v. N.Y. Inst. of Tech. Campus, New York*, No. 18-CV-5284 (ER), 2019 WL 4572194, at *5 (S.D.N.Y. Sept. 20, 2019).) Taking them out of order, the Court concludes that Plaintiffs' Fifth Cause of Action (for gender discrimination) is indeed barred. At bottom, this claim is not based on the manner in which Plaintiffs were treated during their alleged employment.[5] Instead, it is based on tangible employment actions, including Plaintiffs' purported (constructive) discharge and their salaries

---

[4]     Defendants are free, of course, to raise the issue on summary judgment (at which time, the law may also have developed further).

[5]     Moreover, to the extent it is based on the manner in which Plaintiffs were treated, it would be duplicative of their hostile work environment claim.

(or lack thereof).  *See* Am. Compl. ¶ 97.  Because these actions "concern the Defendants' 'choice of ministers,' the Defendants retain 'unfettered freedom' to take those actions without incurring . . . liability" under an employment-discrimination statute.  *Elvig*, 375 F.3d at 961 (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999)).  For similar reasons, Plaintiffs' First Cause of Action (for retaliation) must be dismissed to the extent that it too is based on tangible employment actions.  *See id.* at 965.  But to the extent that it is based solely on Defendants' alleged harassment of Plaintiffs' in and of itself, and Defendants do not proffer a religious doctrinal reason for their conduct, the claim may proceed.  *See id.*

That leaves Plaintiffs' claim for "sexual harassment constructive discharge," their Third Cause of Action.  Because that claim arises from Plaintiffs' alleged discharge, constructive though it may have been, one might think that it involves a tangible employment action and, thus, is barred by the ministerial exception.  Significantly, however, the Supreme Court has drawn a distinction between constructive discharge claims that are based on tangible employment actions taken by an employer and constructive discharge claims that "stem[] from, and can be regarded as . . . aggravated case[s] of, sexual harassment or hostile work environment."  *Pa. State Police v. Suders*, 542 U.S. 129, 146-48 (2004).  As the Court explained:

> [H]arassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts.  Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be.  A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action.

*Id.* at 148.  This distinction has important implications for application of the ministerial exception under the Ninth Circuit's framework.  If a constructive discharge claim involves official action, it implicates "the authority to select, supervise, and if necessary, remove a minister" and thus is barred by the ministerial exception. *Our Lady of Guadalupe*, 140 S. Ct. at

2060.  But if, or to the extent that, a constructive claim does not involve official action, then is not barred by the exception.  *See Elvig*, 375 F.3d at 963 (reasoning that the "alleged decisions to engage in and permit harassment are insufficient to trigger the ministerial exception" because "nothing in the character of the inquiry will require evaluation of religious doctrine or the reasonableness of the religious practices followed by the church" (cleaned up)).

Plaintiffs' constructive discharge claim here, like the claim in *Suders*, "stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment." *Suders*, 542 U.S. at 146.  That is, they do not base their claim on any tangible employment action, such demotion or reassignment.  *Cf. Petruska v. Gannon Univ.*, 462 F.3d 294 (3d Cir. 2006) (holding that a constructive discharge claim based on a demotion was barred by the ministerial exception); *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1300-01 (11th Cir. 2000) (holding that a constructive discharge claim based on a reassignment was barred by the ministerial exception).  Instead, "[e]ssentially," Plaintiffs "present[] a 'worse case' harassment scenario, harassment ratcheted up to the breaking point."  *Suders*, 542 U.S. at 147-48.  It follows that the claim falls on the hostile work environment side of the line and, assuming applicability of the Ninth Circuit framework, as the Court does in light of Defendants' arguments, it does not run afoul of the ministerial exception.

In sum, based on Defendants' forfeiture of any argument that the ministerial exception applies to all hostile work environment claims, the Court assumes without deciding that the Ninth Circuit framework applies and concludes that only some of Plaintiffs' claims are barred.  Specifically, Plaintiffs' gender discrimination claim (the Fifth Cause of Action) must be dismissed.  So too, their retaliation claim (the First Cause of Action) must be dismissed to the extent that it is based on a tangible employment action.  But Plaintiffs' constructive discharge

claim (the Third Cause of Action) survives, as does the retaliation claim to the extent that it is based solely on Defendants' alleged harassment and not on a tangible employment action. Finally, Plaintiffs' Civil Rights Law claim (the Sixth Cause of Action) is dismissed to the extent that it too is based on a tangible employment action.[6]

### 2. The NYCHRL Claims

Separate and apart from their argument based on the ministerial exception, Defendants move to dismiss Plaintiffs' NYCHRL claims on the ground that the alleged discrimination occurred outside New York City. *See* Defs.' Mem. 15-19.[7]  The NYCHRL is indeed "intended to protect those who work *in* the . . . City." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013).  To bring a NYCHRL claim, a plaintiff need not work exclusively, let alone live, in New York City.  But she must allege "that the discriminatory [or retaliatory] act

---

[6]     Somewhat relatedly, Defendants also move to dismiss Plaintiffs' NYSHRL claims under that statute's exemption for actions taken by a religious organization that are "calculated by such organization to promote the religious principles for which it is established or maintained," N.Y. Exec. Law § 296(11); *see* Defs.' Mem. 12-13, and move to dismiss Plaintiffs' Civil Rights Law claims because, when a religious organization offers a religious reason for an employment action, a court cannot inquire into the rationality or wisdom of that reason, *see* Defs.' Mem 20 (citing *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 348-49 (E.D.N.Y. 1998)).  Because there is no allegation that the alleged harassment of Plaintiffs was "calculated . . . to promote the religious principles" of the Archdiocese, nor that there was a religious reason for the harassment, these arguments do not call for dismissal of the surviving claims.

[7]     Defendants contend that this defect is jurisdictional and, thus, purport to move to dismiss under Rule 12(b)(1).  Although some courts have indeed treated the issue as jurisdictional, *see, e.g.*, *Wexelberg v. Project Brokers LLC*, No. 13-CV-7904 (LAK) (MHD), 2014 WL 2624761, at *9-10 (S.D.N.Y. Apr. 28, 2014), that is plainly wrong in light of *Morrison v. National Australian Bank Ltd.*, 561 U.S. 247 (2010), in which the Supreme Court held that the Second Circuit had erred in treating the extraterritoriality of a statute as a jurisdictional, rather than a merits, question, *see id.* at 153-54.  Ironically, Defendants here cite the Second Circuit's decision in *Morrison* (for the proposition that determining subject-matter jurisdiction is a threshold inquiry), without recognizing or acknowledging the Supreme Court's later decision.  *See* Defs.' Mem. 16. In any event, the applicable Rule aside, whether the issue is jurisdictional or not has no bearing on the Court's analysis.

had an impact within the boundaries" of New York City.  *Id.* (citing *Hoffman v. Parade Publ'ns*, 933 N.E.2d 744, 745 (N.Y. 2010)).  In *Bloomberg*, the court dismissed a nonresident's NYCHRL claims on the ground that she had failed to plausibly allege such an impact.  *See id.* at 865-66. No matter that the plaintiff had had clients and occasionally performed work in the City or that her employer had taken adverse actions against her there.  "[P]ointing to a few occasions in which a claimant performed some work in New York and evidence that certain adverse actions were executed from New York," the court held, "is insufficient to show that the alleged discriminatory events had an impact in New York."  *Id.* at 865; *see also Pedroza v. Ralph Lauren Corp.*, No. 19-CV-08639 (ER), 2020 WL 4273988, at *4 (S.D.N.Y. July 24, 2020) (finding that trips to New York City for "meetings and training" were insufficient to demonstrate impact for purposes of the NYCHRL).

Applying these standards here, the Court concludes that the allegations in the Complaint are insufficient to support claims under the NYCHRL.  Plaintiffs currently live in Missouri and, during their employment with the Archdiocese, lived and primarily worked in Calverton, New York.  *See* Am. Compl. ¶¶ 2-3.  And although the Amended Complaint does include a handful of allegations regarding Plaintiffs' work-related trips to New York City, *see id.* ¶ 20, and Defendants' conduct at the Archdiocese headquarters in New York City, *see id.* ¶¶ 45, 47-48, 50, these allegations, even taken together, show no "more than a tangential relationship between New York [City] and the actions of which [Plaintiffs] complain[]."  *Bloomberg*, 967 F. Supp. 2d at 866; *see, e.g.*, *Hoffman*, 933 N.E.2d at 747 ("[T]he success or failure of an NYCHRL claim should not be solely dependent on something as arbitrary as where the termination decision was made."); *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp. 2d 506, 527 (S.D.N.Y. 2000) ("[T]he NYCHRL only applies where the actual impact of the discriminatory conduct or

decision is felt within the five boroughs, even if a discriminatory decision is made by an employer's New York City office."); *Salvatore v. KLM Royal Dutch Airlines*, No. 98-CV-2450 (LAP), 1999 WL 796172, at *17 (S.D.N.Y. Sept. 30, 1999) (finding a lack of discriminatory impact "even if the isolated incidents in New York City contributed to a hostile work environment").

Plaintiffs' arguments to the contrary are without merit.  First, citing *Chin v. CH2M Hill Cos.*, No. 12-CV-4010 (HB), 2012 U.S. Dist. LEXIS 141154 (S.D.N.Y. Sept. 28, 2012), they contend that it is *Defendants'* burden to show at this stage "that there is no possibility that there was an impact in New York."  Pls.' Opp'n 5.  But that is wrong.  *Chin* did not involve a motion to dismiss under Rule 12(b)(6) (or Rule 12(b)(1)), but rather a motion to remand for lack of subject-matter jurisdiction due to fraudulent joinder.  *See* 2012 U.S. Dist. LEXIS 141154, at *3, *9-10; *see also Pedroza*, 2020 WL 4273988, at *3 (rejecting the same flawed interpretation of *Chin*).  Here, it is Plaintiffs' burden to plausibly allege that Defendants' discriminatory or retaliatory acts had an impact in New York City.  Second, Plaintiffs contend that, in contrast to the plaintiff in *Bloomberg*, they do adequately plead "how frequently they had to travel to New York City in connection with their employment."  Pls.' Opp'n 6.  In the very next sentence, however, they concede that "the Amended Complaint does not specify the number of visits to New York City."  *Id.*  They go on to assert that they spent "an estimated 130-135 days per year" — or "approximately one-third of the year" — traveling to New York City "in connection with their employment."  *Id.*  But "Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."  *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013).

In short, given the allegations in the Amended Complaint, Plaintiffs' NYCHRL claims

must be and are dismissed.  That said, Plaintiffs' memorandum of law suggests that they are in

possession of facts that could remedy the defects in the claims.  Accordingly, and mindful of the

fact that courts must "freely give leave [to amend a complaint] when justice so requires," Fed. R.

Civ. P. 15(a)(2), the Court will grant Plaintiffs leave to amend their NYCHRL claims.

### 3.   The Hostile Work Environment Claims

Defendants' final argument with respect to Plaintiffs' discrimination claims — that their

hostile work environment claims under the NYSHRL must be dismissed as time barred, *see*

Defs.' Mem. 13-15 — can be swiftly rejected.  To establish a hostile work environment claim

under the NYSHRL, "a plaintiff must show that 'the workplace is permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment.'" *Littlejohn v. City of*

*New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S.

17, 21 (1993)); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 123-24 (2d Cir. 2013) (noting that the

NYSHRL and Title VII are governed by the same standards).  In general, to bring a claim under

the NYSHRL, the actionable conduct must occur within a three-year statute of limitations.

*Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007); N.Y. C.P.L.R. § 214(2).

The continuing violations exception, however, provides that "if a plaintiff has experienced a

continuous practice and policy of discrimination, . . . the commencement of the statute of

limitations period may be delayed until the last discriminatory act in furtherance of

it." *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir. 2001); *see also Drew v. Plaza Constr.*

*Corp.*, 688 F. Supp. 2d 270, 278-79 (S.D.N.Y. 2010) (applying the exception to the NYSHRL).

To successfully invoke the exception, "a plaintiff must at the very least allege that one act of

discrimination in furtherance of the ongoing policy occurred within the limitations period." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004).

Plaintiffs' allegations of sexual harassment here plainly constitute a continuing violation. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) ("[H]ostile work environment claims are different in kind from discrete acts. Their very nature involves repeated conduct." (internal quotations omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002))); *Williams v. N.Y.C. Dep't of Educ.*, 19-CV-1353 (CM), 2019 WL 4393546, at *7 (S.D.N.Y. Aug. 28, 2019) ("[T]he creation of a hostile work environment over time is the quintessence of a continuing violation."). And at least one act in furtherance of the overall pattern of sexual harassment directed toward each Plaintiff occurred within the three-year limitations period, which began on March 18, 2017. *See* ECF No. 1-1. For instance, they allege that, "until April 2017," Father Makris would wink and smirk at them while "grazing *their* legs or arms." Am. Comp. ¶ 42 (emphasis added). These allegations are sufficiently related to Father Makris's alleged ongoing pattern of unwanted and offensive touching to plausibly support application of the continuing violations exception. *See, e.g.*, Am. Comp. ¶ 42 (alleging, *inter alia*, that Father Makris subjected Plaintiffs to unwanted kissing and "full-body hugs from which Plaintiffs could not move"). Accordingly, Defendants' motion to dismiss Plaintiffs' NYSHRL hostile work environment claims is denied.

## B. Unpaid Wage Claims

Next, Plaintiffs bring claims under the NYLL for unpaid minimum wages and unpaid overtime wages. *See* Am. Compl. ¶¶ 105-10. Significantly, however, the NYLL excludes from the definition of "employee" any individual who is "employed or permitted to work . . . *as a member of a religious order*, or as a duly ordained, commissioned or licensed minister, priest or

17

rabbi." N.Y. Lab. Law § 651(5)(f) (emphasis added).  The New York Department of Labor has interpreted the term "religious order" to mean "a group of persons who are joined together under the authority of a religious leader, and are dedicated to the performance of religious works."  12 N.Y.C.R.R. § 142-3.12(c)(8).  Plaintiffs do not — and could not — seriously dispute that the Archdiocese constitutes a "religious order."  As is evident from the Amended Complaint, the Archdiocese and its clergy are "dedicated to the performance of religious works," *see, e.g.*, Am. Compl. ¶ 4 ("Defendant [Archdiocese] is a religious institution . . . ."); *id.* ¶ 33 (noting that the Archdiocese employed Plaintiffs in part to "run Mass services"), and the group is joined together under religious leaders, *see, e.g.*, *id.* ¶ 41 ("Defendant Archdiocese appointed Defendant Makris the Spiritual Father of the All Saints Monastery . . . .").  And Plaintiffs were intimately involved in this "religious order."  *See, e.g.*, *id.* ¶ 40 ("Plaintiff Brandenburg and Plaintiff Kallis became nuns with the Greek Orthodox Archdiocese of New York and together with Defendant Makris founded the All Saints Monastery . . . .").

In spite of these facts, Plaintiffs argue that they were "employees" for purposes of the NYLL because the Archdiocese viewed female clergy as "laypeople."  *See* Pls.' Opp'n 15.  But whatever that may mean, Plaintiffs also acknowledge that they viewed themselves as "nuns" and that they each held the formal title of "nun."  *See* Am. Compl. ¶¶ 20, 40.[8]  Moreover, Plaintiffs explain that after becoming "sanctified" nuns, they joined their "Spiritual Father" in founding a monastery, where their primary employment duties included "sing[ing] in the Mass" and "run[ning] Mass services."  *Id.* ¶¶ 20, 33, 37, 40.  Thus, regardless of what the Archdiocese

---

[8]     *Cf.* U.S. Dep't of Labor, Field Operations Handbook § 10b03(b) (2016) (discussing the coverage of the Fair Labor Standards Act and noting that "[p]ersons such as *nuns*, monks, priests, lay brothers, ministers, deacons, *and other members of religious orders* . . . shall not be considered to be 'employees'" under that statute (emphasis added)).

called Plaintiffs or how the Archdiocese viewed them, it is beyond reasonable dispute that they were permitted to work as members of a "group of persons," "joined together under the authority of a religious leader" and "dedicated to the performance of religious works." 12 N.Y.C.R.R. § 142-3.12(c)(8). Nor, contrary to Plaintiffs' suggestion, *see* Pls.' Opp'n 15, does it matter for purposes of coverage under the NYLL that male clergy members were paid while Plaintiffs were not. That may be evidence in support of a discrimination claim. But whether Plaintiffs were paid or not does not change the fact that they were "permitted to work . . . as . . . member[s] of a religious order" and, thus, were not covered by the NYLL at all. N.Y. Lab. Law § 651(5)(f). Accordingly, Plaintiffs' NYLL claims must be and are dismissed.

## C. Defamation Claims

Finally, Plaintiffs bring defamation claims based on the allegation that Mother Eisodia repeatedly told current and potential parishioners, as well as local law enforcement, that Plaintiffs stole a car from the Monastery. *See* Am. Compl. ¶¶ 60-67, 88-93.[9] "Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (internal quotation marks omitted). "The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or

---

[9]     In their Amended Complaint, Plaintiffs also base their defamation claims on the allegation that Defendants "falsely accused Plaintiffs of asserting false claims of sexual harassment." *Id.* ¶ 90. But Plaintiffs' sole argument in opposing Defendants' motion to dismiss is based on Mother Eisodia's alleged statements regarding the stolen car. *See* Pls.' Opp'n 12-14. Accordingly, the Court deems any defamation claims based on false statements regarding the sexual harassment complaints abandoned. *See Wexler v. Dorsey & Whitney, LLP*, No. 18-CV-3066 (SJB), 2019 WL 5485265, at *5 (E.D.N.Y. Oct. 25, 2019) (deeming defamation claims based on certain factual allegations abandoned because where the plaintiff had failed to address them in his opposition brief).

constitute defamation per se." *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 160 (S.D.N.Y. 2020) (internal quotations omitted) (quoting *Kamchi v. Weissman*, 1 N.Y.S.3d 169, 180 (2d Dep't 2014)).  Accusing someone of a serious crime is defamatory *per se*.  *See Oakley v. Dolan*, 833 F. App'x 896, 900 (2d Cir. 2020) (summary order).  A crime is "serious" for the purposes of defamation if it is punishable by imprisonment or is "regarded by public opinion as involving moral turpitude."  *Conti v. Doe*, No. 17-CV-9268 (VEC), 2019 WL 952281, at *7 (S.D.N.Y. Feb. 27, 2019) (internal quotation marks omitted).

In light of these standards, the Court need not linger on Defendants' first argument for dismissal, namely that Plaintiffs fail to allege special damages or defamation *per se*.  *See* Defs.' Mem. 22-23.  Regardless of whether Plaintiffs allege special damages, Mother Eisodia's allegedly false statements to parishioners and law enforcement that Plaintiffs stole a car from the Monastery, *see* Am. Compl. ¶¶ 61-65, are actionable because they are defamatory *per se*. Stealing a motor vehicle with a value of at least one hundred dollars is a class E felony under New York law, N.Y. Penal Law § 155.30(8), and stealing any property is a class A misdemeanor, *id.* § 155.25.  Both are punishable by imprisonment.  *See id.* § 70.00(2)(e) (class E felonies); *id.* § 70.15(1) (class A misdemeanors).  Thus, Mother Eisodia's statements are defamatory *per se*, and Plaintiffs need not allege special damages to adequately plead a defamation claim.

Defendants' second argument — that the allegedly false statements are not actionable because they were privileged, *see* Defs.' Mem. 23-25 — has more force.  Defendants invoke two theories of privilege.  First, they contend that the statements made to police fall within New York's qualified law enforcement privilege.  New York recognizes that, in some circumstances, the public interest is served by shielding potentially defamatory statements from litigation, at least to some degree: "When compelling public policy requires that the speaker be immune from

suit, the law affords an absolute privilege, while statements fostering a lesser public interest are only conditionally privileged . . . ."  *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992).  One conditional, or qualified, privilege applies when a person reports a suspected crime to law enforcement.  *See Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 410 (2d Cir. 2000); *Bah v. Apple, Inc.*, No. 19-CV-3539 (PKC), 2020 WL 614932, at *11 (S.D.N.Y. Feb. 10, 2020).  Here, Mother Eisodia filed a report of a stolen car with the police.  Am. Compl. ¶ 62.  These statements to the police clearly fall within the qualified privilege for communications with law enforcement.  Thus, the question becomes whether Plaintiffs allege sufficient facts to overcome the qualified privilege.

A plaintiff can overcome a defendant's qualified privilege if she can show that the defendant made the relevant statements with malice — either common-law malice, meaning "spite or ill will," or constitutional malice, meaning "[a] high degree of awareness of [the statement's] probable falsity."  *Liberman*, 605 N.E.2d at 349-50 (internal quotation marks omitted); *see also Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 576 (S.D.N.Y. 2019).[10]  Here, however, Plaintiffs fail to plausibly allege that Mother Eisodia made her initial police report with either form of malice.  The only allegation in the Amended Complaint concerning Mother Eisodia's state of mind when she communicated with the police is the conclusory assertion that

---

[10]     Defendants cite *Stukuls v. State*, 366 N.E.2d 829 (N.Y. 1977), for the proposition that Plaintiffs are required to allege "personal spite or ill will" to satisfy the malice requirement.  *See* ECF No. 25 ("Defs.' Reply"), at 9-10.  But in the years since *Stukuls*, New York courts have clarified that while spite or ill will is *one* way to show malice, it is not the only way.  *See, e.g.*, *Liberman*, 605 N.E.2d at 349-50 ("[T]he term 'malice' has become somewhat confused . . . . Nevertheless, malice has now assumed a dual meaning, and we have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege . . . ."); *see also Giuffre*, 410 F. Supp. 3d at 576 (rejecting the argument that malice can be established only by ill will or spite because "either common law *or* constitutional malice can defeat the defense of qualified privilege in New York").

she made her statements "with reckless disregard of the truth of these statements and/or knowing these statements to be untrue." Am. Compl. ¶ 61. This is not enough. *See Biro v. Condé Nast*, 963 F. Supp. 2d 255, 278-80 (S.D.N.Y. 2013) (holding that conclusory assertions of malice "buzzwords" are not themselves sufficient to survive a motion to dismiss under Rule 12(b)(6)), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (summary order); *see also Edelman v. U.S. Gov't*, No. 18-CV-2143 (JS) (AKT), 2020 WL 7123175, at *13 (E.D.N.Y. Dec. 4, 2020) (holding that allegations that the defendant "intentionally and/or negligently published false statements" and that the defendant "was aware that these statements were false" were insufficient to overcome a qualified privilege at the motion to dismiss stage because they were "conclusory and unsupported by any factual allegations"). It follows that Plaintiffs' defamation claims must be dismissed to the extent they are based on Mother Eisodia's communications with the police.[11]

Plaintiffs, however, base their defamation claims not only on Mother Eisodia's communications with the police, but also on her statements to parishioners and potential parishioners. *See* Am. Compl. ¶¶ 61, 63, 65. With respect to these communications, Defendants invoke a different theory of privilege, the common-interest theory, which applies to "communication[s] made by one person to another upon a subject in which both have an interest." *Liberman*, 605 N.E.2d at 349 (internal quotations omitted) (quoting *Stillman v. Ford*,

---

[11] Plaintiffs allege that, roughly one month after learning that the car had not been stolen, Mother Eisodia called the police to tell them that Kallis was no longer allowed in the Monastery "because of all the bad things she did." Am. Compl. ¶¶ 63, 67. To the extent that they base their defamation claims on these statements, the claims are subject to dismissal for other reasons. First, there is no allegation that these statements were false, which is required for a defamation claim. *See Watson*, 439 F. Supp. 3d at 160. Second, the assertion that the Monastery no longer welcomed Kallis because she had done "bad things" is not defamatory *per se*, *see Oakley*, 833 F. App'x at 900, and Plaintiffs fail to plead that they suffered any special damages, as is required when a statement is not defamatory *per se*. *See* Pls.' Opp'n 12-14.

238 N.E.2d 304, 306 (N.Y. 1968)).  "This qualified privilege has been applied to

communications carried out 'in furtherance of a common interest of a religious organization.'"

*Kamchi*, 1 N.Y.S.3d at 181 (quoting *Berger v. Temple Beth-El of Great Neck*, 839 N.Y.S.2d 504,

504 (2d Dep't 2007)).  The parties dispute whether or to what extent this privilege applies to

statements made to a congregation (as opposed to statements made among religious leaders),

*compare* Defs.' Mem. 25, *and* Defs.' Reply 7-9, *with* Pls.' Opp'n 13-14, but the Court need not

and does not decide that question because, even if the privilege does apply, it — like the law

enforcement privilege — is only conditional, *see Kamchi*, 1 N.Y.S.3d at 181-82, and here

Plaintiffs do plausibly allege malice.  That is, Plaintiffs allege that Mother Eisodia continued

telling parishioners and potential parishioners that Plaintiffs had stolen the car even after the

police had informed her that the car had not been stolen "and instead belonged to Plaintiffs."

Am. Compl. ¶ 63.  Drawing all reasonable inferences in Plaintiffs' favor, the Court concludes

that these allegations are sufficient to show "a high degree of awareness of [the statements']

probable falsity."  *Liberman*, 605 N.E.2d at 350 (cleaned up).  Thus, Plaintiffs' defamation

claims survive to the extent they are based on Mother Eisodia's assertions to parishioners and

potential parishioners.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and

DENIED in part.  Specifically:

- Plaintiffs' gender discrimination claims (Fifth Cause of Action) are dismissed pursuant to the ministerial exception, as are their retaliation claims (First Cause of Action) to the extent that they are based on any tangible employment actions;

- Plaintiffs' NYCHRL claims are dismissed because Plaintiffs do not plausibly allege a discriminatory or retaliatory impact in New York City;

- Plaintiffs' NYLL claims (Seventh Cause of Action) are dismissed because they are not "employees" within the meaning of the NYLL;

- Plaintiffs' defamation claims (Fourth Cause of Action) are dismissed to the extent that they are based on the statements made to the police;

- Plaintiffs' Civil Rights Law claims (Sixth Cause of Action) are dismissed to the extent that the corresponding claims under the NYSHRL are dismissed; and

- Plaintiffs' claims otherwise survive.

Plaintiffs are granted leave to amend to cure the deficiencies with respect to their NYCHRL claims. The other claims are dismissed with prejudice because the problems with the claims are substantive and amendment would therefore be futile. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).

Plaintiffs shall file any amended complaint **within three weeks of the date of this Opinion and Order**. Defendants shall answer or otherwise respond to the operative complaint **within two weeks of the filing of an amended complaint or the deadline for Plaintiffs to file an amended complaint, whichever is earlier**. Additionally, the initial pretrial conference is REINSTATED and scheduled for **July 15, 2021,** at **2:30 p.m.** The conference will be governed by the Court's Order of May 19, 2020, and the parties should prepare accordingly, including by submitting a joint status letter and proposed Case Management Plan no later than the Thursday prior to that conference. *See* ECF No. 4.

The Clerk of Court is directed to terminate ECF No. 21.

SO ORDERED.

Dated: June 1, 2021
New York, New York

_____
JESSE M. FURMAN
United States District Judge