UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------- X
ELIZABETH BRANDENBURG a/k/a          :          Civil Action No.: 1:20 Civ. 03809-JMF
MOTHER FOTEINI, MARIA KALLIS a/k/a   :
SISTER THEONYMPHI,                   :          Hon. Jesse M. Furman
                                     :
                    Plaintiffs,      :          **ORAL ARGUMENT REQUESTED**
                                     :
          -against-                  :
                                     :
GREEK ORTHODOX ARCHDIOCESE OF        :
NORTH AMERICA, GERASIMOS             :
MAKRIS a/k/a FATHER GERASIMOS        :
MAKRIS, DEMETRIOS TRAKATELLIS        :
a/k/a ARCHBISHOP DEMETRIOS, ALLEN    :
PAROPOULOS a/k/a BISHOP ANDONIOS,    :
AND CHARLENE ASQUITH a/k/a           :
MOTHER EISODIA,                      :
                                     :
                    Defendants.      :
----------------------------------------------------- X

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO FOR SUMMARY JUDGMENT

---

Dated:  New York, New York

     July 22, 2022

*Of Counsel and On the Brief:*
     Gerald L. Maatman, Jr.
     Karen Y. Bitar
     Max Scharf

SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018
(212) 218-5500

# TABLE OF CONTENTS

Page

I. .........INTRODUCTION ........................................................................................ 1

II. ........PROCEDURAL HISTORY.......................................................................... 3

III........FACTUAL BACKGROUND........................................................................ 5

    A.    Plaintiffs Join the Greek Orthodox Church ............................................ 5

    B.    Father Makris Allegedly Engages in Inappropriate Conduct ................. 5

    C.    Plaintiffs Become Nuns in The All Saints Monastery ........................... 6

    D.    Plaintiffs Complain Regarding Father Makris........................................ 7

    E.    Plaintiffs Leave the Monastery .............................................................. 9

IV. ......ARGUMENT ............................................................................................... 11

    A.    The Ministerial Exception Applies and Bars Plaintiffs' Claims Of Hostile
        Work Environment, Retaliation, and Constructive Discharge............................. 12

        i.    Plaintiffs Were Ministers Under the Ministerial Exception ..................... 12

        ii.    The Ministerial Exception Bars Plaintiffs' Claims of Hostile Work
            Environment, Retaliation, And Constructive Discharge......................... 13

            a.    The Law On The Ministerial Exception Has Developed
                Since Defendants' Motion To Dismiss ......................................... 13

            b.    Plaintiffs' Claims Require Inquiry Into Religious Doctrine ......... 15

    B.    Plaintiffs' Constructive Discharge Claim Is Barred By The Church
        Autonomy Doctrine ........................................................................... 18

    C.    Plaintiffs' Hostile Work Environment and Constructive Discharge Claims
        Lack Merit.......................................................................................... 19

        i.    Plaintiffs' Hostile Work Environment Claims Lack Merit...................... 19

        ii.    Plaintiffs' Constructive Discharge Claim Lacks Merit........................... 21

    D.    Plaintiffs' Hostile Work Environment Claims Are Time-Barred ........................ 22

    E.    The NYCHRL Only Applies To New York City Residents and Workers .......... 23

**Table of Contents (continued)**

Page

V.........THE DEFAMATION CLAIM AGAINST MOTHER EISODIA FAILS ....................... 24

    A.    Plaintiffs Cannot Establish Defamation.................................................................. 24

        i.    There Is No Admissible Evidence That Mother Eisodia Made the Statement at Issue ........................................................................................ 24

        ii.    The Statement At Issue Is True................................................................ 25

        iii.    The Statement At Issue Is Inherently Reasonable ................................... 26

        iv.    The Statement At Issue Was Privileged.................................................... 26

            a.    Common Interest Privilege ........................................................ 27

            b.    Actual Malice .............................................................................. 27

VI. ......CONCLUSION.......................................................................................................... 28

81051602v.9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................11

*Anyachebelu v. Brooklyn Hosp. Ctr.*,
   No. 16-cv-3159, 2017 WL 9511073 (E.D.N.Y. July 20, 2017)..................................17, 21, 22

*Belya v. Hilarion*,
   No. 20-cv-6597, 2021 WL 1997547 (S.D.N.Y. May 19, 2021) .............................................27

*Brandenburg v. Greek Orthodox Archdiocese of N. Am.*,
   No. 20-cv-3809, 2021 WL 2206486 (S.D.N.Y. June 1, 2021) ....................................... *passim*

*Butler v. St. Stanislaus Kostka Catholic Academy, et al.*,
   No. 19-cv-3574, 2022 WL 2305567 (E.D.N.Y. June 27, 2022)......................................18, 19

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................11

*Demkovich v. St. Andrew the Apostle Par.*,
   3 F.4th 968 (7th Cir. 2021) ...................................................................... *passim*

*Elvig v. Calvin Presbyterian Church*,
   375 F.3d 951 (9th Cir. 2004) ........................................................................14

*Fratello v. Roman Catholic Archdiocese of N.Y.*,
   175 F. Supp. 3d 152 (S.D.N.Y 2016), *aff'd*, 863 F.3d 190 (2d Cir. 2017) .............................12

*George v. Prof'l Disposables Int'l, Inc.*,
   221 F. Supp. 3d 428 (S.D.N.Y. 2016)................................................................22

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995)...........................................................................11

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012)..............................................................................12, 14, 15

*Iwuchukwu v. Archdiocese for Mil. Servs.*,
   No. 21-cv-1980, 2022 WL 424984 (D.D.C. Feb. 11, 2022)...................................................19

*Joseph v. Westchester Cty. Dep't of Cmty. Mental Health*,
   No. 20-cv-0420, 2020 WL 2555334 (S.D.N.Y. May 19, 2020) .............................................23

i

*Kavanagh v. Zwilling*,
   997 F. Supp. 2d 241 (S.D.N.Y. 2014) (Furman, J.) ............................................................15, 17

*Lesnik v. Lincoln Fin. Advisors Corp.*,
   No. 18-cv-3656, 2020 WL 3057456 (S.D.N.Y. June 9, 2020) ................................................24

*Maragh v. Roosevelt Island Operating Corp.*,
   No. 16-cv-7530, 2021 WL 3501238 (S.D.N.Y. Aug. 5, 2021) (Furman, J.) ..........................11

*Martin v. Hearst Corp.*,
   777 F.3d 546 (2d Cir. 2015) ....................................................................................................25

*Martinos v. Greek Orthodox Archdiocese of America*,
   Index No. 114948/2005, 2008 WL 5380440 (Sup. Ct. N.Y. Cty. Dec. 16,
   2008) .......................................................................................................................................27

*Moon v. Moon*,
   431 F. Supp. 3d 394 (S.D.N.Y. 2019) .....................................................................................18

*Natal v. Christian & Missionary Alliance*,
   878 F.2d 1575 (1st Cir. 1989) ..................................................................................................16

*Ogle v. Church of God*,
   153 F. App'x 371 (6th Cir. 2005) ............................................................................................16

*Orr v. Christian Bros. High Sch.*,
   No. 20-cv-177, ECF 32 (E.D. Cal. Feb. 23, 2021) ..................................................................15

*Orr v. Christian Bros. High Sch.*,
   No. 21-cv-15109, 2021 WL 5493416 (9th Cir. Nov. 23, 2021) ..............................................15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) .................................................................................................12, 14, 17

*Patenaude v. Salmon River Cent. Sch. Dist.*,
   No. 03-cv-1016, 2005 WL 6152380 (N.D.N.Y. Feb. 16, 2005) ..............................................20

*Penn v. N.Y. Methodist Hosp.*,
   884 F.3d 416 (2d Cir. 2018) ....................................................................................................17

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006) ....................................................................................................16

*Reyes v. Westchester Cty. Health Care Corp.*,
   No. 21-cv-410, 2021 WL 4944285 (2d Cir. Oct. 25, 2021) ....................................................23

*Roe v. City of Waterbury*,
   542 F.3d 31 (2d Cir. 2008) ......................................................................................................11

ii

*Rolls-Royce Motor Cars v. Schudroff*,
  929 F. Supp. 117 (S.D.N.Y. 1996) .......................................................................25

*Rossbach v. Montefiore Med. Ctr.*,
  No. 19-cv-5758, 2021 WL 930710 (S.D.N.Y. Mar. 11, 2021)................................20

*Russo v. N.Y. Presbyterian Hosp.*,
  972 F. Supp. 2d 429 (E.D.N.Y. 2013) .............................................................16, 20

*Rutkowski v. Sears Roebuck Corp.*,
  No. 99-cv-9219, 2000 WL 354223 (2d Cir. 2000) ...............................................21

*Simon v. Saint Dominic Acad.*,
  No. 19-cv-21271, 2021 WL 6137512 (D.N.J. Dec. 29, 2021)................................13

*Skrzypczak v. Roman Catholic Diocese*,
  611 F.3d 1238 (10th Cir. 2010) .....................................................................15, 16

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017).................................................................................25

*Williams v. N.Y. City Dep't of Health & Mental Hygiene*,
  299 F. Supp. 3d 418 (S.D.N.Y. 2018)...................................................................17

*Zaleuke v. Archdiocese of St. Louis & Assumption Cath. Church - O'Fallon*,
  No. 19-cv-2856, 2021 WL 5161732 ..............................................................14, 15

**Statutes**

New York City Human Rights Law............................................................. *passim*

New York Civil Rights Law ......................................................................4, 21, 22

New York Labor Law .....................................................................................4

**Other Authorities**

Fed. R. Civ. Proc. 56..........................................................................................1

Fed. R. Evid. 801(c)..........................................................................................24

11 Moore's Federal Practice - Civil § 56.91 (3d ed. 2022) .........................................24

Restatement (Second) of Torts § 580B (1977) .......................................................26

iii

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Greek Orthodox Archdiocese of North America (the "GOA"), Gerasimos Makris a/k/a Father Gerasimos Makris, Demetrios Trakatellis a/k/a Archbishop Demetrios, Allen Paropoulos a/k/a Bishop Andonios, and Charlene Asquith a/k/a Mother Eisodia, by and through their attorneys Seyfarth Shaw LLP, respectfully submit this Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

## I.   INTRODUCTION

Plaintiffs are two nuns who voluntarily chose a monastic life devoted to the service of the Greek Orthodox Church.  This Court has already held that, as such, they are ministers subject to the First Amendment's ministerial exception.  In serving the Church, they willingly accepted a number of restrictions on their lives, including an around-the-clock prayer schedule at a monastery in Long Island, an inability to own personal property in accordance with religious doctrine, and a close relationship with their chosen Spiritual Father, Father Gerasimos Makris.  The issue of whether Plaintiffs now regret their choice to participate in this monastic life, or whether that monastic life made them uncomfortable, is not an issue that is properly before this Court – the ministerial exception does not permit courts to determine whether a religious institution treated its nuns appropriately.

Indeed, the alleged "sexual harassment" and "retaliation" at issue in this case – which includes a priest kissing nuns on the forehead and another priest refusing to let nuns visit his parish – are so inextricably entangled in religious practices, that they are flatly barred by the ministerial exception.  In ruling on Defendants' motion to dismiss in this case, the Court predicted that "the law may [] have developed further" on the ministerial exception by the summary judgment stage – and, in fact, the law has developed further.  On July 9, 2021, the Seventh Circuit ruled that the First Amendment barred a plaintiff's claim of "minister-on-minister harassment" because

1

adjudicating this issue would "cause civil intrusion into, and excessive entanglement with, the religious sphere." *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 977-78 (7th Cir. 2021). As in *Demkovich*, adjudicating Plaintiffs' claims of hostile work environment, retaliation, and constructive discharge would cause excessive entanglement with Greek Orthodox doctrine.

Further, Plaintiffs have not come close to establishing their claims of hostile work environment and constructive discharge, and their own deposition testimony confirms these claims lack merit. Plaintiffs claim Father Makris's improper conduct included: (i) kissing Kallis on the cheek and forehead; (ii) hugging Kallis; (iii) holding her hand; and (iv) telling her that she looked nice. But this type of interaction is consistent with, and an integral part of, behavior between a monastic and a Spiritual Father. Moreover, even if these more modest allegations were actionable, they are long since time-barred – Plaintiffs have not identified any examples of alleged harassment within the last ten years.

Plaintiffs' claims under the New York City Human Rights Law ("NYCHRL") also lack merit. The NYCHRL is designed to protect New York City workers and residents from employment discrimination, but the undisputed evidence shows that Plaintiffs **did not work or reside** in New York City.

Plaintiffs have also failed to establish a claim for defamation, and for multiple reasons. First, there is no first-hand evidence that Mother Eisodia actually made the defamatory statement at issue – *i.e.*, stating to monastery visitors that Plaintiffs stole a Nissan Pathfinder. Mother Eisodia denies making such a statement, and Plaintiffs' evidence of this alleged statement is based on second-hand, inadmissible hearsay – *i.e.*, claims that monastery visitors told Plaintiffs that Mother Eisodia told them that Plaintiffs had stolen the car. Second, it is undisputed that: (i) the monastery was the registered owner of the car; (ii) the monastery was the insured on the car insurance policy;

2

and (iii) Plaintiffs took a vow of poverty in which they promised they would have no personal belongings. Accordingly, assuming *arguendo* Mother Eisodia told monastery visitors that Plaintiffs stole a car, that would be a truthful statement. Third, even assuming it was untrue, it was more than reasonable for Mother Eisodia to believe that Plaintiffs stole the car – it is not in dispute that the monastery was the car's registered owner. Fourth, the statement is subject to the common interest privilege because monastery visitors were making the car insurance payments, and therefore they certainly had an interest in learning where the car went.

This lawsuit manifests that Plaintiffs now regret their past lives as monastics. When Plaintiffs finally decided to leave the Greek Orthodox Church, notwithstanding the vow of poverty they made that served to divest them of their earthly possessions, Plaintiffs wasted no time. They drove off with almost everything they could – they cleaned out $100,000 from the monastery's bank account that Brandenburg controlled as the Abbess of the monastery, and, for good measure, also took tables, chairs, lamps, an iPad, nearly $2,000 worth of books, as well as the Nissan Pathfinder to Missouri, where they currently reside. Plaintiffs were free to choose to act as ministers in the service of God, just as they were free to leave the monastic world for a secular life. However, as set forth below, what Plaintiffs may not do is prevail in this action – their claims fail as a matter of law, and there are no issues of material fact that preclude Defendants' motion for summary judgment.

## II.   PROCEDURAL HISTORY

On June 1, 2021, the Court granted, in part, Defendants' Motion to Dismiss the Amended Complaint. *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-cv-3809, 2021 WL 2206486 (S.D.N.Y. June 1, 2021) ("Motion to Dismiss Opinion"). In the Motion to Dismiss Opinion, the Court dismissed the following claims with prejudice: (i) gender discrimination, pursuant to the ministerial exception; (ii) retaliation to the extent that this claim is based on any

3

tangible employment actions, pursuant to the ministerial exception; (iii) New York Labor Law ("NYLL") wage and overtime claims  because Plaintiffs were not "employees" within the meaning of the NYLL; (iv) defamation claims based on the statements made to the police as privileged under the law enforcement privilege; (v) claim of discrimination in place of public accommodation; (vii) defamation claims based on statements regarding Plaintiffs' sexual harassment allegations; and (viii) the New York Civil Rights Law claims, to the extent the corresponding NYSHRL claims were dismissed.  The Court dismissed Plaintiffs' NYCHRL claims because they "lived and primarily worked in Calverton, New York," but granted leave re-plead those claims in the Second Amended Complaint ("SAC").

On June 22, 2021, Plaintiffs filed the SAC, which includes a defamation claim, as well as overlapping claims pursuant to the NYSHRL, NYCHRL, and New York Civil Rights Law for retaliation, hostile work environment, constructive discharge, and gender discrimination.  Notably, the SAC includes a number of claims which the Court has already dismissed **with prejudice**, including claims that Defendants "knowingly made false statements" to "local law enforcement." *See* SAC ¶ 99.  Accordingly, in effect, the following claims remain at this stage: (i) retaliation that is not based on a tangible employment action under the NYCHRL and NYSHRL; (ii) constructive discharge that is not based on a tangible employment action under the NYCHRL and NYSHRL; (iii) hostile work environment under the NYCHRL and NYSHRL; (iv) an unspecified claim of "discrimination" under the New York Civil Rights Law; and (v) a claim for defamation based on Mother Eisodia's alleged statement to visitors of the monastery that Plaintiffs stole a Nissan Pathfinder.

## III.     FACTUAL BACKGROUND

### A.     Plaintiffs Join the Greek Orthodox Church

Kallis and Brandenburg became students at Hellenic College Holy Cross Greek Orthodox School of Theology ("Holy Cross School of Theology") in Brookline, Massachusetts in 2003 and 2004, respectively. *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts ("SUF") ¶ 1. While Plaintiffs attended the Holy Cross School of Theology, Father Makris was the school's Director of Student Life. *Id.* ¶ 3.

Father Makris became Kallis and Brandenburg's Spiritual Father in 2003 and 2004, respectively. *Id.* ¶ 4. A spiritual father is "someone who one goes to, for the sacrament of confession," and "for guidance in developing one's rules for life." *Id.* ¶ 5. A spiritual father is someone a spiritual child would contact "when there are things weighing on their heart." *Id.* ¶ 6. If a spiritual child is uncomfortable with their spiritual father, they "are allowed to seek a different spiritual father." *Id.* ¶ 7 (quoting Kallis Tr. 338:13-338:17).

### B.     Father Makris Allegedly Engages in Inappropriate Conduct

According to Plaintiffs, Father Makris engaged in inappropriate conduct while serving as their Spiritual Father. For example, Plaintiffs allege Father Makris engaged in the following conduct toward Plaintiff Kallis: (i) he hugged her from 2003 to 2005; (ii) he encouraged her to visit his mother's home overnight in 2005; (iv) he kissed her on the forehead, winked at her, told her she looks "cute" and "nice," and stroked her arm in 2007; (v) he engaged in "prolonged" hugging and hand-holding, as well as kissing on the cheek and ear, in 2008; (vi) he "interlocked" their legs while they had a conversation, touched her back, and rested his head on her head and chest in 2009; and (vii) he stroked her hand and arm in 2010. *See* Exs. F, K to the Declaration of Karen Y. Bitar.

With respect to Plaintiff Brandenburg, she claimed that Father Makris brushed his penis against her hand while she was helping a student move out of a dormitory in 2006.  *Id.* ¶ 14. Critically, Plaintiff Brandenburg has not claimed this conduct by Father Makris was intentional. Rather, she testified that "I do not know how" this happened.  *Id.* ¶ 16.  Father Makris clarified at his deposition that he "bumped into her by accident"; they were both fully clothed; and "it was just an awkward moment."  *Id.* ¶ 17.

All of the aforementioned, alleged inappropriate conduct occurred more than a decade ago. At their depositions, neither of the Plaintiffs were able to recall any specific examples of inappropriate conduct after 2011.  *Id.* ¶ 20; *see also* Kallis Tr. 346:24-347:15 ("Q. Can you think of . . . any specific examples of inappropriate behavior after 2011?  A.  I can't.").

Further, there is no evidence of any actionable behavior by Father Makris, *e.g.*, there is no evidence he (i) kissed them on the lips; (ii) saw them in any state of disrobe; (iii) touched their genitals; (iv) exposed himself to them; or (v) ejaculated in front of them – nor do they even allege that Father Makris requested to engage in any of this conduct.  SUF ¶¶ 8-12.

### C.    Plaintiffs Become Nuns in The All Saints Monastery

On August 14, 2009, Plaintiffs began serving as novices at the All Saints Greek Orthodox Mission/Monastery ("All Saints Monastery") in Calverton, New York.  *Id.* ¶ 21.  In their roles as novices, Plaintiffs' duties included "[c]aring for the grounds [of the monastery] and sustaining the general upkeep and maintenance of the monastery's chapel and residence," as well as "keeping the daily cycle of prayer services by chanting the Hours, Vespers, and Orthros as prescribed by the Church."  *Id.* ¶ 22.  In particular, their duties required them to conduct prayer services each day, every three hours (*e.g.,* at 12:00 a.m., 3:00 a.m., 6:00 a.m., etc.).  *Id.* ¶ 23.

On April 17, 2010, Plaintiffs voluntarily entered into a tonsuring ceremony, during which they became sanctified as nuns of the Greek Orthodox religion.  *Id.* ¶ 27.  During the tonsuring

ceremony, Plaintiffs took the "Great Schema," which is "a series of vows that you make," and "those vows are chastity, humility, obedience and poverty." *Id.* ¶¶ 28-29.  The vow of poverty provides that a nun's only "personal belongings" are "the clothes on her back." *Id.* ¶ 30.  The regulations of the monastery confirmed that Plaintiffs would not be permitted to retain personal property after tonsuring. *Id.* ¶¶ 34-35.  In their roles as nuns, Plaintiffs performed the "same tasks as a novice," *e.g.*, "keeping the daily cycle of prayer services." *Id.* ¶ 36; Brandenburg Tr. 99:4-9.

When Plaintiffs became nuns at the All Saints Monastery, they saw Father Makris less frequently because he was "busy in his parish." *Id.* ¶¶ 40-41 (quoting Brandenburg Tr. 160:5-9). Father Makris has been the head priest of his own parish, Holy Cross Greek Orthodox Church in Brooklyn, New York (the "Holy Cross Church"), since 2006. *Id.* ¶ 42.  The Holy Cross Church is more than 70 miles from the All Saints Monastery. *Id.* ¶ 43.  Plaintiffs have admitted they only saw Father Makris "six to eight" times per year after they became nuns, at "church events" in Long Island and New York City; (ii) they "didn't see him weekly" after they became nuns; and (iii) they "were never separated" with him during this period – they "would always be in some sort of group, some group of the nuns." *Id.* ¶¶ 44-47 (quoting Kallis Tr. 316:2-319:5).

The last time Plaintiffs saw Father Makris was October 20, 2017 – on the date, they came to the Holy Cross Church to celebrate Father Makris's name day. *Id.* ¶¶ 49-51.  Plaintiffs do not allege that Father Makris sexually harassed them on that date. *Id.*; Kallis Tr. 345:11-345:22 ("Q.  You said nothing happened in October, correct?  A.  Right.").

### D.    Plaintiffs Complain Regarding Father Makris

On October 25, 2017, Plaintiffs had a telephone call with co-defendant, Bishop Andonios, Chancellor of the GOA, during which they claimed Father Makris engaged in inappropriate conduct. *Id.* ¶ 53.  On October 26, 2017, Plaintiff Brandenburg emailed Bishop Andonios to follow up and wrote: "[w]e both want to express our gratitude for your call last night.  [Kallis] said it

7

helped her so much to hear from someone else that she should not feel guilty or to blame." *Id.* ¶ 54.  In this email, Brandenburg "felt it was important to [] clearly state that":  (i) the alleged misconduct from Father Makris toward Kallis occurred from **"from Jan 2009-August 2011"**; and (ii) Father Makris "commented" on Brandenburg's physical appearance, and "chided [Brandenburg] for being cold." *Id.* ¶ 55.  This email – which "clearly states" Plaintiffs' allegations – does not mention any misconduct after 2011. *Id* ¶ 56.

On October 31, 2017, Bishop Andonios required heart surgery. *Id.* ¶ 57.  He had the surgery and was out of the office until January 2018. *Id.* ¶ 58.  On January 11, 2018, he emailed Plaintiffs to confirm that he was still investigating their allegations. *Id.* ¶ 59.  On January 12, 2018, Plaintiffs submitted written statements to Bishop Andonios regarding Father Makris's alleged misconduct – again, those written statements do not allege any misconduct after 2011. *Id.* ¶¶ 60-61.

On January 22, 2018, Bishop Andonios referred Father Makris to Saint Luke Institute, an internationally renowned Catholic education and treatment center, for an evaluation. *Id.* ¶ 62.  On February 2, 2018, Bishop Andonios informed the parishioners of the Holy Cross Church that Father Makris had been "immediately suspended an investigation was on-going," in accordance with "the Sexual Misconduct Policy of the Archdiocese." *Id.* ¶ 63.

Plaintiffs allege that, on February 12, 2018, Bishop Andonios told Kallis "via phone . . . that she and [Brandenburg] will be sent to Greece to learn about real monasticism." *Id.* ¶ 64. During his deposition, Bishop Andonios clarified that Kallis sounded "very distressed," and so he offered to permit her to join a monastery in Greece, as an "option for her to go for a retreat and healing" – it is undisputed that Kallis declined the offer to go to Greece, and no one forced her to

go there. *Id.* ¶¶ 65-67. Bishop Andonios also "offered on several occasions to refer [Kallis] to a therapist if she felt the need, and the Archdiocese would assume the costs . . . ." *Id.* ¶ 68.

On February 16, 2018, Plaintiffs sent a letter regarding these issues to co-defendant Archbishop Demetrios, the presiding hierarch of the GOA. *Id.* ¶ 69. In the letter, Plaintiffs stated that "we are monastics," but "I implore you please direct [Bishop Andonios] and others responsible to treat us as any other parishioner or lay individual would be treated." *Id.* ¶ 70.

In March 2018, Plaintiffs had an in-person meeting with Archbishop Demetrios. *Id.* ¶ 71. At the start of the meeting, Plaintiffs reiterated that they told Bishop Andonios "**everything that happened until this past October 25th**" which, as discussed above, did not include any allegations of misconduct after 2011. *Id.* ¶ 72. During the meeting, Plaintiffs discussed this alleged misconduct, and Archbishop Demetrios questioned "why are we dealing with this situation ten years later?" *Id.* ¶ 73. Plaintiffs also complained to Archbishop Demetrios that "priests in Long Island will not allow us to come anymore to their church to sell [soaps and other products] at their festivals." *Id.* ¶ 74. Archbishop Demetrios informed Plaintiffs that Bishop Andonios was handling the investigation of these issues, given the Archbishop's trust in Bishop Andonios's judgment and fairness. *Id.* ¶¶ 75-76.

Ultimately, Bishop Andonios decided that Father Makris should return to his position at the Holy Cross Church. *Id.* ¶ 77. Archbishop Demetrios approved this decision. *Id.* ¶ 78. In August 2018, Archbishop Demetrios called Plaintiffs to inform them that Father Makris would be returning to the Holy Cross Church. *Id.* ¶ 79.

### E.   Plaintiffs Leave the Monastery

On November 14, 2018, Plaintiffs voluntarily resigned from their positions at the All Saints Monastery. *Id.* ¶ 80. Also on November 14, 2018, Mother Eisodia joined the monastery. *Id.* ¶ 81.

On November 18, 2018, Plaintiffs left the monastery, and absconded to Missouri – Mother Eisodia was not present when they left.  *Id.* ¶¶ 83-84.  Notwithstanding that Plaintiffs took a vow of poverty, they took numerous items when they left the monastery, including $100,000 from a monastery bank account, as well as tables, chairs, lamps, an iPad, nearly $2,000 worth of books, and a 2013 Nissan Pathfinder.  *Id.* ¶¶ 85-86; Kallis Tr. 210:15-19 ("Q. So the two of you . . . withdrew $100,000 from the All Saints Mission's account, right?  A.  Correct.").

Critically, the Nissan Pathfinder belonged to the monastery, not Plaintiffs.  It is undisputed the monastery was the registered owner of the car.  Brandenburg Tr. 235:15-20; Kallis Tr. 218:6-17 (testifying that "we put [the car] in the name of the monastery . . . as we've been instructed that we couldn't have our own property").  It is also undisputed that the monastery was the insured on the car's insurance policy.  Kallis Tr. 222:15-18; Brandenburg Tr. 264:22-25 ("Q. You understand that the insured on the policy was the monastery, right?"  A.  Yes.").  The All Saints Monastery relied on donations from its visitors to make insurance payments for the car.  SUF ¶ 87-89.

In December 2018, weeks after Plaintiffs resigned from the monastery, Brandenburg purported to authorize transferring title of the car from the monastery to Kallis.  *Id.* ¶ 90.  At her deposition, Brandenburg acknowledged that Plaintiffs failed to "register the car in advance of [their] leaving," and so they attempted to change the registration of the monastery's car **after they resigned**.  *Id.* ¶ 91 (quoting Brandenburg Tr. 239:21-25).

In January 2019, Mother Eisodia reported the car as stolen to the police in New York.  *Id.* ¶ 94.  The police in New York responded that this issue was "outside of [their] jurisdiction" because they "don't have authority over people who are in Missouri, but Mother Eisodia could "get a lawyer in Missouri to go after the car."  *Id.* ¶¶ 95-96.

Finally, Plaintiffs testified at their depositions that Mother Eisodia told visitors of the monastery that Plaintiffs stole this car – Plaintiffs' testimony here is entirely based on hearsay. For example, Brandenburg testified that she heard "from reports" that Mother Eisodia made this statement to visitors.  *Id.* ¶ 100.  Similarly, according to Kallis, a visitor named Mary Close told her that Mother Eisodia told Close that Plaintiffs stole the car.  *Id.* ¶ 101.  Plaintiffs do not claim they have any first-hand knowledge of whether Mother Eisodia made this statement.  Further, Mother Eisodia testified at her deposition that "I did not talk about the car specifically" with visitors of the monastery.  Eisodia Tr. 114:10-15, 97:2-14 ("Q.  Have you ever discussed the car, the car and the financial implication that it may cost for the monastery?  A.  No.").

## IV.    ARGUMENT

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Maragh v. Roosevelt Island Operating Corp.*, No. 16-cv-7530, 2021 WL 3501238, at *5 (S.D.N.Y. Aug. 5, 2021) (Furman, J.).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

81051602v.9

**A.      The Ministerial Exception Applies and Bars Plaintiffs' Claims Of
Hostile Work Environment, Retaliation, and Constructive Discharge**

First and foremost, Plaintiffs' claims of hostile work environment, retaliation, and constructive discharge are barred by the ministerial exception of the First Amendment of the United States Constitution.

As the Supreme Court unanimously recognized in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), and as this Court has long recognized, the ministerial exception is a fundamental First Amendment protection against government intrusion into the relationship between a religious group and its ministers. *Fratello v. Roman Catholic Archdiocese of N.Y.*, 175 F. Supp. 3d 152, 168 (S.D.N.Y 2016), *aff'd,* 863 F.3d 190 (2d Cir. 2017). "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049,  2060 (2020).

### i.      Plaintiffs Were Ministers Under the Ministerial Exception

As an initial matter, there is no question the ministerial exception applies here – Plaintiffs clearly qualify as ministers as a matter of law.

In the Motion to Dismiss Opinion, the Court addressed the issue of whether the ministerial exception applied.  As the Court explained, "to successfully invoke this 'ministerial exception,' a defendant must show merely that a plaintiff (1) worked for a 'religious institution' (2) as a 'minister.'" *Brandenburg*, 2021 WL 2206486, at *7. Based on the record, Defendants easily satisfy these two elements.

First, the Archdiocese is a "religious institution."  The Court already observed that "Plaintiffs do not – and indeed, could not – dispute this issue." *Id*.

Second, in the Motion to Dismiss Opinion, the Court already concluded that "by any reasonable definition of the word, Plaintiffs qualified as 'ministers' within the meaning of the ministerial exception." *Id.* The Court's conclusion is well-supported by the record, as Plaintiffs were nuns, and they worked and resided at a Greek Orthodox monastery.[1]

### ii. The Ministerial Exception Bars Plaintiffs' Claims of Hostile Work Environment, Retaliation, And Constructive Discharge

Given that the ministerial exception applies here, the Court should conclude that Plaintiffs' claims of hostile work environment, retaliation and constructive discharge are barred by that exception. The Court should reach this conclusion because (i) the law has significantly developed on this issue since Defendants' motion to dismiss; and (ii) adjudication of Plaintiffs' claims would require an invasive inquiry into religious doctrine.

### a. The Law On The Ministerial Exception Has Developed Since Defendants' Motion To Dismiss

In the Motion to Dismiss Opinion, the Court permitted Plaintiffs' hostile work environment, retaliation, and constructive discharge claims to proceed. In permitting these claims to proceed, the Court observed that the application of the ministerial exception to non-tangible employment actions was "somewhat unsettled," and the law on this issue "may also have developed further" by the summary judgment stage. *Brandenburg*, 2021 WL 2206486, at *7.

---

[1]    Notably, the SAC states that "[Plaintiffs] were referred to and considered as 'laypeople' by the Archdiocese Defendants . . . ." SAC ¶ 20. Plaintiffs directly contradicted this allegation at their depositions by testifying, *inter alia*, they would "keep the daily cycle of prayer services," and they had a "religious responsibility" at the All Saints Monastery. *Id.* ¶ 35. Not only are these contradictions troubling, they are potentially sanctionable. For example, in *Simon v. Saint Dominic Acad.*, No. 19-cv-21271, 2021 WL 6137512, at *3 (D.N.J. Dec. 29, 2021), the District Court of New Jersey was dismayed by deliberate amendments to plead around the ministerial exemption. There, the plaintiff initially pled that she was Chairperson of the Religion Department and Campus Minister for an academy of the Archdiocese of Newark. The plaintiff then amended her complaint by omitting the name of her position altogether, references to the fact that her academy was affiliated with the Catholic Church, and that she taught religion, all of which acts which the court deemed "**a clear effort to plead around the ministerial exception**." *Id.* (emphasis added). Troubled by this gamesmanship, the Court warned: "Of course, if such alterations to the SAC did not have evidentiary support, **Plaintiff could be subject to Rule 11 sanctions**." *Id.* at *3 n.5 (emphasis added).

Since the Court's ruling in June 2021, the law has, in fact, developed.  There have been a number of recent rulings that compel denial of Plaintiffs' hostile work environment, retaliation, and constructive discharge claims.

First, in July 2021, the Seventh Circuit ruled that the "ministerial exception" barred claims of hostile work environment based on non-tangible employment actions.  *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968 (7th Cir. 2021).  In *Demkovich*, the question at issue was as follows:  "Does the ministerial exception ban all claims of a hostile work environment brought by a plaintiff who qualifies as a minister, even if the claim does not challenge a tangible employment action?"  *Id.* at 974.  The Seventh Circuit concluded that the ministerial exception bars hostile work environment claims based on non-tangible actions, reasoning that the Supreme Court "made no distinction, explicit or implicit, between tangible or intangible employment actions, so neither do we."  *Id*. at 980.[2]

Following the *Demkovich* decision, in November 2021, a district court in the Eighth Circuit granted the Archdiocese of St. Louis's motion for summary judgment on a plaintiff's claims of retaliation and hostile work environment.  *Zaleuke v. Archdiocese of St. Louis & Assumption Cath. Church*, No. 19-cv-2856, 2021 WL 5161732, *Id.* at *7, n.4 (E.D. Mo. Nov. 5, 2021).  Significantly, the parties in *Zaleuke* accepted without dispute that, "if Plaintiff qualifies for the ministerial exception, then it bars all employment discrimination claims, including those that are based on hostile work environment rather than tangible employment actions."  *Id.* at *7, n.4.

---

[2] *Demkovich* also distinguished the Ninth Circuit's decision in *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 960 (9th Cir. 2004), which the Court cited in ruling on Defendants' motion to dismiss.  *Demkovich* noted that *Elvig* predated *Hosanna-Tabor* by eight years, and *Our Lady of Guadalupe* by seventeen years.  *See Demkovich*, 3 F.4th at 984 n.4.  Thus, the Ninth Circuit's eighteen-year old holding in *Elvig* does not represent the state of the law as it exists today.

Further, after the *Zaleuke* ruling, the Ninth Circuit affirmed the decision to grant a religious school's motion for summary judgment on a plaintiff's claims of hostile work environment and retaliation.  *Orr v. Christian Bros. High Sch.*, No. 21-cv-15109, 2021 WL 5493416, at *2 (9th Cir. Nov. 23, 2021).  The Ninth Circuit concluded that the ministerial exception barred these claims because they were "so intertwined with the [religious school's] employment decisions that the claims cannot be separated."  *Id.*; *see also Orr v. Christian Bros. High Sch.*, No. 20-cv-177, ECF 32 (E.D. Cal. Feb. 23, 2021) ("[A]ny case merely touching on the relationship between a religious school and its ministers is barred by the ministerial exception.").

In light of the recent decisions in *Demkovich*, *Zaleuke*, and *Orr*, the ministerial exception bars Plaintiffs' hostile work environment, constructive discharge, and retaliation claims.

b.     Plaintiffs' Claims Require Inquiry Into Religious Doctrine

Another ground for summary judgment is that it would defeat the purpose of the ministerial exception to allow Plaintiffs' claims of hostile work environment, constructive discharge, and retaliation to proceed.

The ministerial exception is intended to protect religious institutions from government interference in their relationships with their ministers.  *Hosanna-Tabor*, 565 U.S. 171 at 173.  The precise legal theory asserted by a plaintiff – hostile work environment, retaliation, invasion of privacy, breach of contract – does not affect the application of the ministerial exception. *Skrzypczak v. Roman Catholic Diocese*, 611 F.3d 1238, 1245 (10th Cir. 2010).  "The First Amendment is implicated **whenever** courts must interpret, evaluate, or apply underlying religious doctrine to resolve disputes involving religious organizations."  *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 251 (S.D.N.Y. 2014) (Furman, J.) (emphasis added).

Numerous U.S. Courts of Appeal have rejected attempted end-runs around the ministerial exception based on the aforementioned theories. *See, e.g.*, *Skrzypczak*, 611 F.3d at 1245 ("[W]e are not inclined to agree . . . that a hostile work environment claim brought by a minister does not implicate a church's spiritual functions"); *Demkovich,* 3 F.4th at 981 ("A hostile work environment claim based on the relationship between ministers would enmesh the court in endless inquiries as to whether each discriminatory act was based in Church doctrine or simply secular animus."); *Petruska v. Gannon Univ.*, 462 F.3d 294, 308 (3d Cir. 2006) (applying ministerial exception to claim that plaintiff was retaliated against and constructively discharged).[3]

In this case, Plaintiffs' hostile work environment, constructive discharge, and retaliation claims cannot be adjudicated without an intrusive evaluation of the conditions of a religious workplace.

*Hostile Work Environment*.  Plaintiffs' hostile work environment claims require a showing that the complained-of conduct was motivated by sex, not by religious customs.  *See Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 446 (E.D.N.Y. 2013).  The Court cannot resolve this issue without an invasive inquiry into the extent to which a Greek Orthodox priest was following the teachings of the GOA.

In this case, Father Makris has explained that Plaintiffs were his spiritual children, and he was their Spiritual Father.  He further testified that it is "customary . . . in the Greek Orthodox world" to greet someone with a kiss on the cheek.  SUF ¶ 13.  Critically, an inquiry into whether a priest's conduct toward a nun was intended to follow the customs of Greek Orthodox religion, or whether it was motivated by discriminatory intent, is exactly the issue the ministerial exception

---

[3]    *See also Ogle v. Church of God*, 153 F. App'x 371, 376 (6th Cir. 2005) (applying ministerial exception to claim of invasion of privacy); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1576-78 (1st Cir. 1989) (applying ministerial exception to contract and tort claims).

was designed to avoid.  *See Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 429 (2d Cir. 2018) ("[T]he First Amendment prohibits . . . the courts from inquiring into an asserted religious motive to determine whether it is pretextual.").

*Retaliation*.  Plaintiffs' retaliation claim requires a showing that they were subjected to an adverse action by Defendants because they complained of sexual harassment.  *See Williams v. N.Y. City Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 427 (S.D.N.Y. 2018).  But Plaintiffs have only identified adverse actions that would require the Court to evaluate the relationship between the Greek Orthodox Church and its nuns – *i.e.*, they claim they were not permitted to visit a church in Long Island, and Bishop Andonios "threatened" to send them to Greece learn about monasticism.  The resolution of whether these actions were "adverse," or why Defendants supposedly took these actions, requires an inquiry into religious doctrine which is not permitted by the ministerial exception.  *Our Lady of Guadalupe*, 140 S. Ct. at 2060 (courts must "stay out of employment disputes involving . . . religious institutions" and their ministers).

*Constructive Discharge*.  Finally, Plaintiffs' constructive discharge claim requires a showing that Defendants "deliberately" made the working conditions for these nuns "so intolerable."  *Anyachebelu v. Brooklyn Hosp. Ctr.*, No. 16-cv-3159, 2017 WL 9511073, at *17 (E.D.N.Y. July 20, 2017).  But the Court cannot resolve these issues without evaluating the nuns' working conditions, and whether the conduct of Defendants was motivated by a religious purpose. *See Kavanagh*, 997 F. Supp. 2d at 251 ("The First Amendment is implicated whenever courts must interpret, evaluate, or apply underlying religious doctrine").

In this case, it is impossible to examine whether Plaintiffs' working conditions were "so intolerable" without scrutinizing their religious duties – *e.g.*, Plaintiffs' upkeep of the monastery's chapel, and their around-the-clock prayer schedule.  Plaintiffs are a far cry from secular workers

employed by a company.  Plaintiffs were not employees – rather, they volunteered to serve God, living a monastic life according to Greek Orthodox principles.  Likewise, the Court should not evaluate whether Defendants assigned duties to these two nuns "deliberately" to make the conditions "so intolerable," or whether Defendants assigned duties based on religious doctrine and customs.

Ultimately, the Court cannot adjudicate Plaintiffs' hostile work environment, constructive discharge, and retaliation claims without an intrusive examination of the conditions of a religious workplace – *i.e.*, Plaintiffs' "workplace" of a Greek Orthodox monastery where they served God, uninterrupted by obligations of the secular world.  *See* Eisodia Tr. 142:12-13 ("[T]here's no secular purposes in the monastery.").  Accordingly, these claims are barred by the ministerial exception.

### B.    Plaintiffs' Constructive Discharge Claim Is Barred By The Church Autonomy Doctrine

Plaintiffs' constructive discharge claim is also independently barred by the First Amendment's church autonomy doctrine.  Plaintiffs contend they were constructively discharged due to "a pattern of sexual harassment and gender discrimination perpetrated by Defendant Makris and condoned by Defendants Demetrios, Andonios, and Archdiocese."  SAC ¶ 17.

 The church autonomy doctrine forbids secular courts from interfering in or determining religious disputes.  *Butler v. St. Stanislaus Kostka Catholic Academy, et al.*, No. 19-cv-3574, 2022 WL 2305567, at *6 (E.D.N.Y. June 27, 2022); *Moon v. Moon*, 431 F. Supp. 3d 394, 405 n.13 (S.D.N.Y. 2019).  The church autonomy doctrine and ministerial exception are "related – but distinct."  *Moon*, 431 F. Supp. 3d at 405 n.13.  Under the church autonomy doctrine, courts must "avoid interfering in matters of church government as well as those of faith and doctrine, including those involving theological controversy, church discipline, ecclesiastical government or the

conformity of the members of the church to the standard of morals required of them." *Butler*, 2022 WL 2305567, at *6.

Critically, the Court should not evaluate whether the GOA "condoned" Father Makris's conduct toward these two nuns – conduct which allegedly involved, *inter alia*, a priest kissing nuns on the forehead and cheek, hugging them, and holding their hand. Father Makris testified that his actions were "customary" in the Greek Orthodox religion. Further, Plaintiffs' complaints were, in fact, investigated by the GOA – Father Makris was promptly suspended for a number of months, and both Bishop Andonios and Archbishop Demetrios spoke with Plaintiffs multiple times about these issues.

While Plaintiffs may disagree or be disappointed with the manner or sufficiency of the GOA's handling of the situation, Plaintiffs' criticisms about the sufficiency of the investigation and/or punishment meted out to Father Makris are precisely of the ilk that the church autonomy doctrine prevents. *See Iwuchukwu v. Archdiocese for Mil. Servs.*, No. 21-cv-1980, 2022 WL 424984, at *5 (D.D.C. Feb. 11, 2022) ("Although it is true that [plaintiff's] unresolved accusations are not necessarily a matter of religion, **the Archbishop's motivations and decision-making process in this realm are entirely insulated from judicial review.**") (emphasis added).

### C.    Plaintiffs' Hostile Work Environment and Constructive Discharge Claims Lack Merit

Even assuming *arguendo* the First Amendment did not bar Plaintiffs' claims of hostile work environment and constructive discharge, those claims fail because they lack merit.

### i.    *Plaintiffs' Hostile Work Environment Claims Lack Merit*

As an initial matter, Plaintiffs cannot prove the complained-of conduct was caused by their gender, rather than a non-protected reason, *e.g.*, Father Makris's intent to adhere to Greek Orthodox customs.

19

To establish a hostile work environment under the NYSHRL, a plaintiff must show that "the complained of conduct (1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected characteristic." *Russo*, 972 F. Supp. 2d at 446. Under the NYCHRL, the plaintiff must show she was "treated less well" because of her protected characteristic in a way that is more than "trivial" or "petty." *See id; Rossbach v. Montefiore Med. Ctr.*, No. 19-cv-5758, 2021 WL 930710, at *6 (S.D.N.Y. Mar. 11, 2021). Under either statute, discrimination based on a protected characteristic is an essential element.

Here, there is no evidence on this essential element of the claim, *i.e.*, that the alleged misconduct occurred because of Plaintiffs' gender. Plaintiffs claim Father Makris hugged Kallis – but he was her Spiritual Father, and they have presented no evidence that he did not hug his male spiritual children. Similarly, they claim Father Makris kissed Kallis on the cheek and forehead, but there is no evidence he did not greet his male spiritual children in the same way. Indeed, Father Makris testified that it is "customary . . . in the Greek Orthodox world" to greet someone with a kiss on the cheek.

At bottom, Plaintiffs' allegations here (*e.g.*, hugs and hand-holding between a priest and his spiritual children) simply do not provide sufficient evidence of an intent to discriminate based on sex. *Patenaude v. Salmon River Cent. Sch. Dist.*, No. 03-cv-1016, 2005 WL 6152380, at *6 (N.D.N.Y. Feb. 16, 2005) (concluding "there is insufficient evidence tending to suggest [plaintiff] was treated in a particular manner because of sex," given that she was "not subjected to groping of genitalia or her breasts or other sexual contact, [and] she was not sexually propositioned.").

20

Based on the foregoing evidence, even if Plaintiffs' hostile work environment claims were not barred by the First Amendment (which they clearly are), those claims lack merit.[4]

### ii. *Plaintiffs' Constructive Discharge Claim Lacks Merit*

Plaintiffs' constructive discharge claim also fails on the merits.

Under the NYSHRL and NYCHRL, a constructive discharge occurs when an employer "deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Anyachebelu*, 2017 WL 9511073, at *17. "Difficult or unpleasant" working conditions are not enough to support a claim of constructive discharge. *Id.*

As an initial matter, Plaintiffs were not constructively discharged because they were not employees of the GOA. They became nuns by entering into a tonsuring ceremony in compliance with Greek Orthodox canons – they were never "hired" as employees and there is no evidence that they were "discharged" as employees, constructively or otherwise.

Further, a constructive discharge claim based on sexual harassment will not survive summary judgment where the harassment stopped in advance of the plaintiff's resignation. *Rutkowski v. Sears Roebuck Corp.*, No. 99-cv-9219, 2000 WL 354223, at *2 (2d Cir. 2000). In *Rutkowski*, the plaintiff claimed she was forced to quit her job at Sears because one of her co-workers was sexually harassing her. *Id.* The Second Circuit granted summary judgment on the plaintiff's constructive discharge claim because she quit her job at Sears in June 1997, and it was undisputed the alleged harassment stopped two months earlier, in April 1997. *Id.*

---

[4]   Plaintiffs' claims based on gender discrimination and the New York Civil Rights Law should be rejected for the same reasons as Plaintiffs' hostile work environment claims. Namely, those claims fail under the ministerial exception, and on the merits, because Plaintiffs cannot prove they were discriminated against because of their gender. Further, Plaintiffs' gender discrimination claims fail for the additional reason that they have already been dismissed with prejudice. *See* Motion to Dismiss Opinion at 10 ("Plaintiffs' Fifth Cause of Action (for gender discrimination) is indeed barred.)."

Here, the most recent alleged sexual harassment was in 2011, seven *years* before Plaintiffs voluntarily resigned.  Further, it is undisputed that the last time they saw their alleged "abuser," Father Makris, was October 2017, more than a year before they resigned.  Accordingly, Plaintiffs have not shown their working conditions as nuns at the All Saints Monastery were "so intolerable" in November 2018 that they were forced to resign, let alone that Defendants "deliberately" forced them to resign.  *Anyachebelu*, 2017 WL 9511073, at *17.[5]

Further, to the extent Plaintiffs allege their working conditions were "so intolerable" because they were not permitted to visit a church in Long Island, and Bishop Andonios threatened to send them to Greece learn about monasticism, Plaintiffs' claim is barred by the First Amendment, as discussed *supra*.  The Court should not intervene on these strictly religious issues.  *See Demkovich*, 3 F.4th at 979 ("Deciding where a minister's supervisory power over another minister ends and where employment discrimination law begins is not a line to be drawn in litigation, the point of the ministerial exception.").

### D.    Plaintiffs' Hostile Work Environment Claims Are Time-Barred

The only colorable sexual harassment claims alleged by Plaintiffs occurred more than a decade before this action was commenced.  Accordingly, the statute of limitations has long since expired on Plaintiffs' hostile work environment claims based on that alleged harassment.

Claims arising under the NYSHRL are subject to a three-year statute of limitations.  *George v. Prof'l Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 436 (S.D.N.Y. 2016).  Similarly, the statute of limitations for a NYCHRL claim is "three years after the alleged unlawful discriminatory practice . . . occurred."  NYCHRL § 8-502(d).

Plaintiffs commenced this action on March 18, 2020, and therefore any sexual harassment

---

[5]    To the extent Plaintiffs assert a constructive discharge claim under the New York Civil Rights Law, that claim fails for the reasons stated above as to the NYSHRL and NYCHRL.

claims arising out of conduct that occurred prior to March 18, 2017 are time-barred.  Critically, all of the examples of sexual harassment in the record occurred prior to March 18, 2017.  For example, Plaintiffs allege Father Makris hugged Kallis in 2003, and kissed her on the forehead in 2007. Plaintiffs have admitted they cannot recall any instances of misconduct by Father Makris after 2011.  *See* Kallis Tr. 346:24-347:15 ("Q. Can you think of . . . any specific examples of inappropriate behavior after 2011?  A.  I can't.").

Accordingly, in addition to being barred under the First Amendment and lacking merit, Plaintiffs' hostile work environment claims fail because they are time-barred.

### E.     The NYCHRL Only Applies To New York City Residents and Workers

Plaintiffs' claims under the NYCHRL fail for the additional reason that the alleged misconduct occurred outside of New York City.

The NYCHRL "does not apply to discriminatory acts that occurred outside of New York City."  *Joseph v. Westchester Cty. Dep't of Cmty. Mental Health*, No. 20-cv-0420, 2020 WL 2555334, at *2 (S.D.N.Y. May 19, 2020).  "[T]o invoke the coverage of the [NYCHRL]," non-New York City residents must show the alleged discrimination occurred "within the boundaries of New York City."  *Reyes v. Westchester Cty. Health Care Corp.*, No. 21-cv-410, 2021 WL 4944285, at *4 (2d Cir. Oct. 25, 2021).

At all relevant times, Plaintiffs were not residents of New York City – they lived and worked as nuns at the All Saints Monastery in Long Island, and they now live in Missouri.  Thus, "to invoke the coverage of the [NYCHRL]," they must show that the alleged discrimination occurred "within the boundaries of New York City," *see id*. – but Plaintiffs cannot make that showing.  They saw Father Makris at "church events" in New York City "six to eight" times per

year, at most, and they were never alone with him in New York City.  Plaintiffs have also failed to identify any examples of alleged discrimination which occurred in New York City.

Accordingly, Plaintiffs' NYCHRL claims should be denied for the additional reason that the alleged harassment falls outside of the statute's geographical scope.

## V. THE DEFAMATION CLAIM AGAINST MOTHER EISODIA FAILS

Plaintiffs' defamation claim lacks merit for four reasons, including: (i) there is no admissible evidence that the statement at issue – *i.e.*, that Plaintiffs stole a car – was published; (ii) the statement is true; (iii) the statement is inherently reasonable; and (iv) the statement is privileged.

"The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se." *Brandenburg*, 2021 WL 2206486, at *9.

### A. Plaintiffs Cannot Establish Defamation

#### i. There Is No Admissible Evidence That Mother Eisodia Made the Statement at Issue

As an initial matter, there is no admissible evidence the statement at issue was published.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c). "[A] defamation plaintiff cannot rely on an inadmissible hearsay statement to defeat summary judgment unless the statement falls within one of the exceptions to the hearsay rule." *Lesnik v. Lincoln Fin. Advisors Corp.*, No. 18-cv-3656, 2020 WL 3057456, at *2 (S.D.N.Y. June 9, 2020). If there is no admissible evidence of a plaintiff's claim, there is "no need for a trial" to resolve the claim.  11 Moore's Federal Practice - Civil § 56.91 (3d ed. 2022).

In this case, there is no admissible evidence that Mother Eisodia actually told visitors of the All Saints Monastery that Plaintiffs stole a Nissan Pathfinder.  Mother Eisodia denies making such a statement, and Plaintiffs' evidence of this alleged statement is based on second-hand, quintessential hearsay – *i.e.*, monastery visitors told Plaintiffs that Mother Eisodia told them that Plaintiffs had stolen the car.  Plaintiffs presented not one witness who heard any such statement.

Accordingly, Plaintiffs' defamation claim rests exclusively upon hearsay that cannot defeat a summary judgment motion.  Plaintiffs' defamation claim should therefore be denied.

### ii.     The Statement At Issue Is True

Assuming *arguendo* Mother Eisodia told monastery visitors that Plaintiffs stole a car, she would have been telling the truth.

"It is axiomatic, of course, that truth is an absolute defense to a defamation claim." *Martin v. Hearst Corp*., 777 F.3d 546, 552 (2d Cir. 2015).  The Court need not determine whether each and every word was true, as "[s]ubstantial truth" is the standard by which New York law determines an allegedly defamatory statement to be true or false. *Tannerite Sports, LLC v. NBCUniversal News Grp*., 864 F.3d 236, 242 (2d Cir. 2017).  "A statement is substantially true if the statement would not have a different effect on the mind . . . from that which the pleaded truth would have produced." *Id*.

There is no material issue of fact that Plaintiffs did, in fact, steal the car.  It is undisputed that (i) All Saints Monastery was the registered owner of the car; (ii) the monastery was the insured on the car insurance policy, and was making car insurance payments; (iii) Plaintiffs took the car without the monastery's permission; and (iv) notwithstanding  numerous demands, they did not bring it back.  *See* Brandenburg Tr. 235:15-20 (testifying that "the title . . . was in the name of the monastery").  It is well settled in New York that "interference with a plaintiff's legal title" to personal property – *e.g.*, a 2013 Pathfinder – gives rise to a cause of action for conversion. *Rolls-*

*Royce Motor Cars v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) ("Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title").  Further, Plaintiffs were nuns who took a vow of poverty, and therefore they have already agreed they could not own personal property.

Based on these undisputed material facts, Plaintiffs' defamation claim fails for the additional reason that the statement at issue is true.

### iii.    The Statement At Issue Is Inherently Reasonable

Further, it would have been entirely reasonable for Mother Eisodia to that Plaintiffs' stole the Nissan Pathfinder.

In determining whether a defendant made a negligent statement, courts consider whether "the defendant acted as a reasonable, prudent person under the circumstances in publishing the defamatory communication."  Restatement (Second) of Torts § 580B (1977).

In this case the monastery was the registered owner of the car; it was making car insurance payments; and Plaintiffs took the car without the monastery's permission.  At the very least, there is no genuine dispute that it would be "reasonable" to state that Plaintiffs stole the car.  *Id.*  Further, the SAC alleges the police "informed Mother Eisodia that the car was not stolen and instead belonged to Plaintiffs," *see* SAC 65 – but that allegation is now belied by the record.  Plaintiffs admit they do not know what, if anything, the police told Mother Eisodia.  *See* Brandenburg Tr. 277:10-12 ("I did speak to the police officer, but he did not tell me what he told Mother Eisodia.").

### iv.    The Statement At Issue Was Privileged

Finally, Plaintiffs cannot prevail on their defamation claim because the statement at issue is subject to the common interest privilege.

81051602v.9

a.     Common Interest Privilege

The common interest privilege applies to "communication[s] made by one person to another upon a subject in which both have an interest." *Brandenburg*, 2021 WL 2206486, at *10. As the Court explained in the Motion to Dismiss Opinion, "[t]his qualified privilege has been applied to communications carried out in furtherance of a common interest of a religious organization." *Id.* (citing *Berger v Temple Beth-El of Great Neck*, 41 A.D.3d 626 (2d Dep't 2007) (finding common interest privilege applied to statements explaining termination of plaintiff's temple membership to the template congregation)).

According to Plaintiffs, Mother Eisodia should not have told monastery visitors the car was stolen, but it is undisputed these visitors were making the payments on the car's insurance policy. Accordingly, these visitors had every interest – including a financial interest – in knowing where the car went.

b.     Actual Malice

Because common interest privilege applies, Plaintiffs may only prevail if they show "actual malice (*i.e.*, knowledge of the statement's falsity or reckless disregard as to whether it was false)." *Belya v. Hilarion*, No. 20-cv-6597, 2021 WL 1997547, at *6 (S.D.N.Y. May 19, 2021); *Martinos v. Greek Orthodox Archdiocese of America*, Index No. 114948/2005, 2008 WL 5380440 (Sup. Ct. N.Y. Cty. Dec. 16, 2008) (granting summary judgment because Plaintiff could not show actual malice where church leaders shared allegedly defamatory statement with church congregation).

There is no evidence whatsoever that Mother Eisodia acted with actual malice.  Rather, the monastery was the car's registered owner when Plaintiffs absconded with it, and the police told Mother Eisodia that she had every right to "get a lawyer in Missouri to go after the car."  Eisodia Tr. 64:2-8.  The fact that the police told Mother Eisodia she could "go after the car" compels the

conclusion there was no actual malice here – it was entirely reasonable for Mother Eisodia to conclude the car was stolen.

## VI.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court: (1) grant their motion for summary judgment; (2) dismiss Plaintiffs' claims in their entirety; and (3) grant such other and further relief as this Court deems just and proper.

Dated: New York, New York                           Respectfully submitted,
       July 22, 2022
                                        SEYFARTH SHAW LLP


By: */s/ Gerald L. Maatman, Jr.*
      Gerald L. Maatman, Jr.
      gmaatman@seyfarth.com
      Karen Bitar
      kbitar@seyfarth.com
      Max Scharf
      mscharf@seyfarth.com
      620 Eighth Avenue
      New York, NY 10018
      Telephone: (212) 218-5500
      Facsimile: (212) 218-5526

      Attorneys for Defendants
      GREEK ORTHODOX ARCHDIOCESE OF
      NORTH AMERICA, GERASIMOS MAKRIS
      a/k/a FATHER GERASIMOS MAKRIS,
      DEMETRIOS TRAKATELLIS a/k/a
      ARCHBISHOP DEMETRIOS, ALLEN
      PAROPOULOS a/k/a BISHOP ANDONIOS,
      AND CHARLENE ASQUITH a/k/a
      MOTHER EISODIA