UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                :

ELIZABETH BRANDENBURG, et al.,            :
                                                :
                   Plaintiffs,         :
                                                  :              20-CV-3809 (JMF)
      -v-                           :
                                                :             OPINION AND ORDER
GREEK ORTHODOX ARCHDIOCESE OF NORTH  :
AMERICA, et al.,                       :
                                                :
                   Defendants.      :
                                                :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs Elizabeth Brandenburg and Maria Kallis, who worked as "sanctified nuns" at a

monastery run by the Greek Orthodox Archdiocese of North America (the "Archdiocese"), bring

this suit against the Archdiocese and several of its clergy members, including Father Gerasimos

Makris ("Father Makris"), Archbishop Demetrios Trakatellis ("Archbishop Demetrios"), Bishop

Allen Paropoulos ("Bishop Andonios"), and Mother Charlene Asquith ("Mother Eisodia").

Alleging that Father Makris subjected them to inappropriate sexual conduct for years, they bring

claims pursuant to the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290

*et seq.*, for hostile work environment discrimination, constructive discharge, and retaliation.  In

addition, they bring defamation claims against Mother Eisodia.  Defendants now move, pursuant

to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment with respect to all of

Plaintiffs' claims.  The motion implicates an issue that has divided the lower courts: whether,

and under what circumstances, a clergy member can bring a claim for hostile work environment

discrimination or retaliation against a religious employer.  For the reasons that follow, the Court

concludes that Plaintiffs' hostile work environment and retaliation claims can proceed (at least in

part), albeit subject to strict limitations on what a finder of fact could consider at trial, and that

Plaintiffs' other claims fail for reasons unrelated to the First Amendment.  Accordingly, and as discussed below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts, taken from the admissible materials submitted in connection with the pending motion, are either undisputed or viewed in the light most favorable to Plaintiffs.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

Brandenburg and Kallis became students at Hellenic College Holy Cross Greek Orthodox School of Theology in Brookline, Massachusetts, in 2003 and 2004, respectively.  *See* ECF No. 85 ("Pls.' Rule 56.1 Stat."), ¶ 1.  During their time there, Father Makris was the school's Director of Student Life.  *Id.* ¶ 3.  Not long after Kallis and Brandenburg enrolled, Father Makris became their "Spiritual Father."  *Id.* ¶ 4.  According to Bishop Andonios, a spiritual father is "someone who one goes to, for the sacrament of confession," and "for guidance in developing one's rules for life."  ECF No. 84-5 ("Bishop Andonios Depo."), at 62.  As Brandenburg put it, a "spiritual father holds a lot of authority over one person's life and they interpret God's will for your life."  ECF No. 84-1 ("Brandenburg Depo."), at 35.  Kallis testified that "a spiritual father in the orthodox [C]hristian religion is somebody who is basically your director."  ECF No. 84-2 ("Kallis Depo."), at 49.  After a few years, Father Makris was appointed to All Saints Monastery in Calverton, New York.  Brandenburg Depo. 35.  In part at his urging, Plaintiffs joined All Saints Monastery as novices in 2009 and became sanctified nuns there in 2010.  *Id.* at 32; Pls.' Rule 56.1 Stat. ¶¶ 21, 27.

Brandenbug and Kallis allege that Father Makris subjected them to unwanted sexual attention and contact throughout their relationship with him, which lasted until October 2017. Brandenburg, for instance, testified that Father Makris would "always comment on [her] looks or the looks of the other nuns or novices," Brandenburg Depo. 157-58, and that he would tell nuns

or novices "you look so beautiful, or you're so cute[,] [o]r isn't she so cute or look how beautiful she is." *Id.* at 280; *see also id.* at 285 (Brandenburg testifying that Father Makris would look over her body, making her "feel very uncomfortable" because "there was an element that I only experienced in a romantic relationship, winking across the room and looking up and down"). Additionally, Brandenburg claimed that Father Makris would "touch my head, my arms, [and] my legs," *id.* at 157, and would touch her "thigh," would "stroke" the "back part" of her arm and her lower back, would touch her hair and kiss her head, would hug her "so tightly that I could not breathe," and would "press himself against me so tightly that I couldn't breathe." *Id.* at 280-81; *see* Kallis Depo. 343-46 (alleging similar conduct). On one occasion, in 2006, Father Makris brushed his penis against Brandenburg's hand; she noted that she's "never had anyone . . . inadvertently press their penis up into my hand." Brandenburg Depo. 282-84; *see* Kallis Depo. 349-50 (Kallis testifying that Father Makris pressed his genitals against her in 2005 and touched her breasts in 2009). Brandenburg asserted that Father Makris's touching was not done "in a platonic way or a way that a family member" or an employer "would ever do." Brandenburg Depo. 281.

During their depositions, Brandenbug and Kallis were asked about allegations in the Second Amended Complaint regarding misconduct by Father Makris as late as October 2017, *see* ECF No. 29 ("SAC"), ¶ 44(j), (n) (alleging that Father Makris told Plaintiffs "that they shared a 'special connection,' implying a romantic or sexual desire rather than simply a spiritual and professional relationship," through "October 2017" and that Father Makris asked Plaintiffs to "meet him alone, after hours, or after dark so they could spend time alone together . . . [and] engage in the aforementioned acts of 'fatherly affection,' which consisted of unwanted and offensive touching, full-body hugs . . . , and kissing" through "October 2017"), and, more broadly, to specify anything relevant that occurred in 2017. Kallis responded that Father Makris

"did all the touching and rubbing arms and all of this kind of stuff so often that I will not be able to recall that in detail." Kallis Depo. 346. When pressed about what happened in 2017, Kallis stated that "the arm touching, the kissing on the head, things like that, [Father Makris] did all the way through the date that's listed in the complaint." *Id.* at 348. Brandenburg testified that the contact "was so common" and was "just constant and continual." Brandenburg Depo. 282.

For his part, Father Makris admitted that he kissed Kallis at least "five times" on her cheek and on the top of her head. *See* ECF No. 84-4 ("Father Makris Depo."), at 133. Father Makris offered that the kissing "was not any religious ceremony. It is an expression of — always as a person of — as a priest, who also knew Ms. Kallis for many, many years. So there was a — a friendship. And it's also very typical to kiss people in the Orthodox church in all — it's customary." *Id.* at 135. Separately, Father Makris admitted that he had been "inappropriately physical" with two other women. *Id.* at 154-57. According to Bishop Andonios, these inappropriate physical interactions included "stimulat[ion] to the point that [Father Makris] ejaculated." Bishop Andonios Depo. 71.

Brandenbug and Kallis saw Father Makris for the last time on October 20, 2017. Brandenburg Depo. 163-64. On October 25, 2017, they spoke by telephone with Bishop Andonios, then Chancellor of the Archdiocese, and accused Father Makris of having engaged in inappropriate conduct. *See* Kallis Depo. 305-07. In response, Bishop Andonios advised parishioners that Father Makris had been "suspended" in accordance with "the Sexual Misconduct Policy of the Archdiocese" pending an investigation. *See* ECF No. 77-12. In March 2018, Brandenbug and Kallis met with Archbishop Demetrios. *See* Brandenburg Depo. 184. During the meeting, they discussed Father Makris's conduct and also complained that "priests in Long Island will not allow us to come anymore to their church to sell [soaps and other products] at their festivals." *See* ECF No. 77, ¶¶ 21, 25. According to Plaintiffs, Archbishop Demetrios

asked them about "[their] fault in all of this sexual misconduct" and downplayed the behavior as not a "very serious offense by [Father] Makris." Brandenburg Depo. 149. Brandenburg testified that she and Kallis "did not feel safe," received "hate mail" from parishioners, and had "people coming to the convent who were very upset with us for reporting Father Makris." *Id.* at 150. Kallis testified that she left a meeting with Archbishop Demetrious feeling "victim blamed" and "threatened with being sent to Greece to learn how to become real nuns" because of the investigation. Kallis Depo. 163. Brandenburg also testified that Bishop Andonios and other church officials told her that they would send her and Kallis to Greece in retaliation for Kallis's report of sexual harassment. Brandenburg Depo. 166, 184. When asked if she thought they were going to be abducted, Kallis answered "yes," explaining that she and Brandenburg "went straight to the bank with our birth certificates and passports and opened a safety deposit box to hide them. That's how much they scared us." Kallis Depo. 164.

Ultimately, Bishop Andonios and Archbishop Demetrios allowed Father Makris to return to his position. Bishop Andonios Depo. 137. In August 2018, Archbishop Demetrios called Brandenbug and Kallis to inform them. Brandenburg Depo. 149. In the meantime, between Father Makris's alleged harassment and Archbishop Demetrios's "cruel and unkind and unhelpful" comments, including "victim blam[ing]," Brandenburg and Kallis had decided to leave the Monastery. Kallis Depo. 152-53. On November 14, 2018, they resigned their positions and left, taking with them, among other things, $100,000 from a Monastery bank account and a Nissan Pathfinder that had been registered to and insured by the Monastery. *See* Brandenburg Depo. 226-27; Kallis Depo. 210. Kallis testified that when they took the Pathfinder, they "hadn't switched the title yet," but proceeded later to switch the title. *See* Kallis Depo. 244. In January 2019, Mother Eisodia — who started at the Monastery on the same day that Plaintiffs resigned — reported the Pathfinder as stolen to the police. *See* ECF No. 84-3 ("Mother Eisodia Depo."),

at 50.  According to Plaintiffs, Mother Eisodia also told visitors to the Monastery that

Brandenbug and Kallis had stolen the Pathfinder.  Kallis Depo. 277.

Plaintiffs filed this case (originally in New York State court) in May 2020.  *See* ECF No.

1.  At the outset, Plaintiffs brought defamation claims; hostile work environment, discrimination,

constructive discharge, and retaliation claims pursuant to the NYSHRL, the New York City

Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, and the New York Civil

Rights Law ("NYCRL"), N.Y. Civ. Rights Law §§ 40-c, 40-d; as well as claims for unpaid

wages under the New York Labor Law and its supporting regulations, N.Y. Lab. Law § 650 *et*

*seq.*; 12 N.Y.C.R.R. §§ 142-2.1, 142-2.2.  On June 1, 2021, the Court entered an Opinion and

Order dismissing some of Plaintiffs' claims.  *See Brandenburg v. Greek Orthodox Archdiocese*

*of N. Am.* ("*Brandenburg I*"), No. 20-CV-3809 (JMF), 2021 WL 2206486, at *11 (S.D.N.Y. June

1, 2021) (ECF No. 28).  Most relevant here, the Court held that Plaintiffs' retaliation and

constructive discharge claims were barred by the First Amendment "ministerial exception" to the

extent that they were based on tangible employment actions.  *See id.* at *5-6, 11.  Plaintiffs have

since abandoned their NYCHRL claims, *see* ECF No. 83 ("Pls.' Mem."), at 2, as well as any

claims under the NYCRL, *see* January 18, 2023 Oral Argument Transcript ("Tr."), at 3.

Accordingly, the following claims remain: (1) hostile work environment under the NYSHRL;

(2) constructive discharge that is not based on a tangible employment action under the NYSHRL;

(3) retaliation that is not based on a tangible employment action under the NYSHRL; and (4) a

defamation claim based on Mother Eisodia's alleged statements about the Nissan Pathfinder.

## STANDARD OF REVIEW

Summary judgment is appropriate where the admissible evidence and the pleadings

demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a); *see Est. of Gustafson ex rel. Reginella v. Target Corp.*,

819 F.3d 673, 675 (2d Cir. 2016).  A dispute over an issue of material fact qualifies as genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of*

*Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).

"In moving for summary judgment against a party who will bear the ultimate burden of

proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to

support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes*

*Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986)); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002)

(per curiam).  Critically, however, all evidence must be viewed "in the light most favorable to

the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir.

2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in

favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old*

*Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, a non-moving party must advance more than

a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the

allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.

1996) (citation omitted).  Affidavits submitted in support of, or opposition to, summary judgment

must be based on "personal knowledge," must "set out facts that would be admissible in

evidence," and must "show that the affiant or declarant is competent to testify on the matters

stated." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

## DISCUSSION

Defendants argue that Plaintiffs' claims for hostile work environment, constructive discharge, and retaliation are precluded by the "ministerial exception," a First Amendment doctrine that bars certain employment discrimination claims by "ministers" (broadly defined) against a religious institution.  ECF No. 78 ("Defs.' Mem."), at 12.  They make additional arguments with respect to all claims other than the retaliation claims.  Defs.' Mem. 18-27.  In light of the venerable principle that a court should abstain from deciding a constitutional question if it can resolve a case on other grounds, *see, e.g.*, *Slack v. McDaniel*, 529 U.S. 473, 485 (2000) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)), the Court will begin with Defendants' arguments that are not based on the ministerial exception before turning, as needed, to their arguments based on the exception.

### A.  The Hostile Work Environment Claims

First, Defendants proffer two reasons for summary judgment with respect to Plaintiffs' hostile work environment claims aside from the ministerial exception: (1) that "Plaintiffs cannot prove the complained-of conduct was caused by their gender, rather than a non-protected reason," Defs.' Mem. 19-21; and (2) that the claims are time barred, *id.* at 22-23.

The first argument borders on frivolous.  Brandenburg and Kallis testified that Father Makris touched them in explicitly sexual ways.  *See* Brandenburg Depo. 280-81 (testifying that Father Makris would touch her "thigh," would "stroke" the "back part" of her arm and her lower back, would touch her hair and kiss her head, would hug her "so tightly that I could not breathe," and would "press himself against me so tightly that I couldn't breathe," and testified that it was not done "in a platonic way or a way that a family member" or an employer "would ever do"); Kallis Depo. 345-46 (testifying that Father Makris engaged in touching and rubbing).  Brandenburg further testified that Father Makris would "always comment on [her] looks or the

looks of the other nuns or novices," Brandenburg Depo. 157-58; *see id.* at 280, and that he engaged in non-verbal gestures and forms of communication that she had "only experienced in a romantic relationship," *id.* at 285 (explaining that Father Makris would look over her body, "wink[] across the room," and "look[]" her "up and down"). Additionally, Father Makris admitted that he was inappropriately physical with two other women and suspended for that behavior. *See* Father Makris Depo. 154-57. A reasonable jury could plainly find based on the evidence that Father Makris's conduct was because of Plaintiffs' sex.

Defendants note that Plaintiffs do not present any "male comparators," *see* ECF No. 90 ("Defs.' Reply"), at 7, but they cite, and the Court has found, no authority requiring such evidence where, as here, the conduct at issue was explicitly sexual in nature. More broadly, the Second Circuit has observed that, although "it is helpful in proving sex discrimination, . . . it is not strictly necessary for a plaintiff to identify an employee who was treated more favorably than the plaintiff and who was similarly situated to the plaintiff, except for being of the opposite sex." *Brown v. Henderson*, 257 F.3d 246, 253 (2d Cir. 2001). Finally, the one case that Defendants do cite in support of their argument — *Patenaude v. Salmon River Cent. Sch. Dist.*, No. 03-CV-1016, 2005 WL 6152380 (N.D.N.Y. Feb. 16, 2005) — is easily distinguished. In that case, the plaintiff sued for sex discrimination under Title IX after she had been "physically assaulted (punched in the face, pushed, elbowed) and otherwise treated (e.g., being locked in the bathroom, being threatened with non-sexual violence) in ways that [did] not suggest gender-based discrimination." *Id.* at *6. The plaintiff was not "subjected to . . . sexual contact"; the plaintiff testified that the language used towards her (*e.g.*, "bitch") was used against students "regardless of their gender"; and the "[p]laintiff [] testified that she did not know why the other students treated her like they did, including attacking her and/or calling her names, except, perhaps, that some of the other students thought that [the p]laintiff had been saying bad things about them."

9

*Id.* at *6-7.  Here, by contrast, there is plainly enough "evidence from which a fair-minded trier of fact could reasonably conclude that" Plaintiffs were treated the way they were "because of [their] gender." *Id.* at *7.

Defendants' second argument — that "Plaintiffs' hostile work environment claims fail because they are time-barred," Defs.' Mem. 23 — is a closer call, but it too falls short.  In general, to bring a claim under the NYSHRL, the actionable conduct must occur within a three-year statute of limitations.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007); N.Y. C.P.L.R. § 214(2).  The continuing violations exception, however, provides that, "if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (cleaned up); *see also Drew v. Plaza Constr. Corp.*, 688 F. Supp. 2d 270, 278-79 (S.D.N.Y. 2010) (applying the exception to the NYSHRL).  To successfully invoke the exception, "a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004).  Notably, "the creation of a hostile work environment over time is the quintessence of a continuing violation." *Williams v. N.Y.C. Dep't of Educ.*, 19-CV-1353 (CM), 2019 WL 4393546, at *7 (S.D.N.Y. Aug. 28, 2019); *accord McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) ("[H]ostile work environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct." (internal quotations omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002))).

At the motion to dismiss stage, the Court "swiftly rejected" Defendants' argument that Plaintiffs' hostile work environment claims were time barred. *Brandenburg I*, 2021 WL 2206486, at *7-8.  Citing the continuing violation exception, the Court noted that the First

Amended Complaint alleged sexual misconduct on the part of Father Makris toward each

Plaintiff as late as October 2017, within the three-year limitations period.  *See id.* at *8 (citing

ECF No. 18 ("FAC"), ¶ 42).  The Second Amended Complaint, filed after the Court's earlier

Opinion, does the same.  *See* SAC ¶ 44.  Most notably, Paragraph 44 of the Second Amended

Complaint alleges, among other things, that Father Makris: "[m]a[de] eye contact with, wink[ed]

at, and smirk[ed] at Plaintiffs . . . while grazing their legs or arms," which conduct they

"understood as an expression of his sexual desire for them," through "April 2017," *id.* ¶ 42(h);

told Plaintiffs "that they shared a 'special connection,' implying a romantic or sexual desire

rather than simply a spiritual and professional relationship," through "October 2017," *id.* ¶ 42(j);

and asked Plaintiffs to "meet him alone, after hours, or after dark so they could spend time alone

together . . . [and] engage in the aforementioned acts of 'fatherly affection,' which consisted of

unwanted and offensive touching, full-body hugs . . . , and kissing" through "October 2017,"  *id.*

¶ 42(n).

> At this stage, Plaintiffs can no longer rely on these allegations alone.  *See Gottlieb v.

*Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  But construing the evidence in the light most

favorable to Plaintiffs, the Court concludes that there are, at a minimum, genuine disputes of

material fact with respect to whether Father Makris's alleged misconduct continued into the

limitations period.  For example, Kallis was asked in her deposition about Paragraph 44 of the

Second Amended Complaint and about what happened in 2017.  Kallis Depo. 345.  She

responded that Father Makris "did all the touching and rubbing arms and all of this kind of stuff

so often that I will not be able to recall that in detail."  *Id.* at 346.  When pressed about whether

and how long this misconduct continued, however, Kallis testified that "he would still — like,

the touching, the arm touching, the kissing on the head, things like that, he *did all the way*

*through the date that's listed in the complaint*."  *Id.* at 348 (emphasis added).  As noted, the latest

such date is October 2017.  Brandenburg was even less explicit about dates, but she testified that Father Makris's sexual misconduct "was so common," and was "just constant and continual." Brandenburg Depo. 282.  That, combined with evidence that Father Makris visited them through at least October 2017, *see* Kallis Depo. 317-20, is sufficient to survive summary judgment.

In their initial memorandum of law, Defendants cite no authority for the proposition that Plaintiffs' testimony is insufficient to survive summary judgment.  In reply, they cite one case, *Lucas v. Chi. Transit Auth.*, 367 F.3d 714 (7th Cir. 2004), but that decision is not controlling and is distinguishable.  There, the plaintiff "assert[ed] that African-Americans were asked to change rail ties more frequently, work longer sections of the track and were written up for reasons that non-African-Americans were not," but he did "not set forth any of the times, dates or places which led to these conclusions."  *Id.* at 726.  In fact, the plaintiff did not provide "even a time frame in his appellate brief indicating when many of the statements occurred."  *Id.* at 719.  Here, by contrast, Plaintiffs testified that the relevant misconduct occurred through the dates listed in the Second Amended Complaint — that is, as late as October 2017.  A jury may not credit Plaintiffs' testimony.  But if a jury did, it could reasonably find that Plaintiffs' sexual harassment claims were timely filed.  *See, e.g.*, *Gerald v. DCV Holdings, Inc.*, No. 17-CV-6525 (EK), 2021 WL 2809915, at *7 (E.D.N.Y. July 6, 2021) (denying summary judgment on untimeliness grounds based on the plaintiff's testimony that the offending conduct happened "all the time," even though he did "not recall specific dates (or even years) for each instance").

In short, the Court rejects Defendants' arguments for dismissal of Plaintiffs' hostile work environment claims on grounds other than the ministerial exception.

**B.  The Constructive Discharge Claims**

Next, Defendants move for summary judgment with respect to Plaintiffs' constructive discharge claims.  A constructive discharge occurs when an employer "deliberately makes an

12

employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (internal quotation marks omitted).  In the context of workplace harassment, the Supreme Court has explained that such a claim "stems from, and can be regarded as an aggravated case of, sexual harassment or hostile work environment," *Pa. State Police v. Suders*, 542 U.S. 129, 146-47, and "presents a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," *id.* at 147-48. Significantly, because a claim arises only when working conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign," *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) (internal quotation marks omitted), a constructive discharge claim fails as a matter of law if there is a sufficient gap in time between the allegedly misconduct and the plaintiff's quitting, *see, e.g.*, *Rutkowski v. Sears Roebuck Corp.*, 210 F.3d 355, at *4 (2d Cir. 2000) (unpublished opinion) (affirming dismissal of the plaintiff's constructive discharge claim in light of the approximately two-month gap between the alleged misconduct and her resignation); *Bellom v. Neiman Marcus Grp., Inc.*, 975 F. Supp. 527, 534 n.6 (S.D.N.Y. 1997) (dismissing a constructive discharge claim in light of the eight-month gap between misconduct and the plaintiff's resignation).

Here, the lengthy gap in time between Father Makris's alleged misconduct and Plaintiffs' resignations is fatal to their constructive discharge claims.  Plaintiffs do not allege any misconduct on Father Makris's part after October 2017; indeed, it is undisputed that they did not even see him after that date.  *See* Brandenburg Depo. 164.  Yet they did not resign their positions until November 2018 — more than one year after the alleged misconduct ended.  *See id.* at 171; Kallis Depo. 249.  That is considerably longer than the gaps in time that doomed the claims in *Rutkowski* (approximately two months) and *Bellom* (eight months).  The same result is warranted here.  Notably, Plaintiffs do not cite any authority to the contrary.  Nor do they dispute that the

relevant gap here is more than year.  Indeed, in opposing summary judgment on their

constructive discharge claims, they merely assert that Father Makris's conduct continued into

2017.  *See* Pls.' Mem. 13-14.  In opposing summary judgment on their retaliation claims,

Plaintiffs do point to events in 2018, including Defendants' alleged threats to send them to

Greece, the reinstatement of Father Makris, and "hate mail and other negative treatment" they

received from parishioners, *see id.* at 17-18, but this conduct is only partially attributable to

Defendants themselves and, in any event, did not rise to the level of "so intolerable as to compel

[Plaintiffs] to resign," *Rutkowski*, 210 F.3d 355, at *4.  It follows that Plaintiffs' constructive

discharge claims fail as a matter of law, and the Court need not and does not reach Defendants'

other arguments for dismissal of those claims, including the ministerial exception and the church

autonomy doctrine.

## C.  The Defamation Claims

The final claims as to which Defendants seek summary judgment on grounds unrelated to

the ministerial exception are Plaintiffs' defamation claims.  "Under New York law, the elements

of a defamation claim are a false statement, published without privilege or authorization to a

third party, constituting fault that causes special harm or constitutes defamation per se." *Jeanty*

*v. Cerminaro*, No. 21-1974-CV, 2023 WL 325012, at *7 (2d Cir. Jan. 20, 2023) (summary order)

(cleaned up); *see also, e.g.*, *Neuman v. Glob. Sec. Sols., Inc.*, No. 21-CV-1670 (DLC), 2022 WL

1782588, at *2 (S.D.N.Y. June 1, 2022).  Significantly, the plaintiff has the burden of proving

the falsity of the statement at issue.  *See Tannerite Sports, LLC v. NBCUniversal Grp.*, 864 F.3d

236, 243-47 (2d Cir. 2017); *see also, e.g.*, *Neuman*, 2022 WL 1782588, at *2.  To do so, the

plaintiff must "establish that an allegedly defamatory statement is false or at least not

'substantially true.'  A statement is 'substantially true' when the overall gist or substance of the

challenged statement is true and it would not have a different effect on the mind of the [listener]

from that which the pleaded truth would have produced." *DeIuliis v. Engel*, No. 20-CV-3252 (NRB), 2021 WL 4443145, at *6 (S.D.N.Y. Sept. 27, 2021) (cleaned up).

Defendants move for summary judgment with respect to Plaintiffs' defamation claims on several grounds, *see* Defs.' Mem. 24-28, but the Court need only address one: Plaintiffs' failure to carry their burden of showing that the statements at issue were false. Put simply, there is no admissible evidence from which a jury could find that Mother Eisodia's statements — to the effect that Plaintiffs stole the car — were false. If anything, the record supports a contrary conclusion. Brandenburg acknowledged that the All Saints Monastery was the registered owner of the car and the insurance policyholder, *see* Brandenburg Depo. 235; and Kallis conceded that, when she and Brandenburg took the car, they "hadn't switched the title," Kallis Depo. 244. In opposing summary judgment on this ground, Plaintiffs assert that the police called them and "told" them, based on an examination of "the ownership of the car," that "they did not need to return the car" because "they did not steal it." Pls.' Mem. 20 (internal citations omitted). But that statement is "rank hearsay and therefore cannot defeat a motion for summary judgment." *Hall v. Urb. Assembly, Inc.*, No. 19-CV-11572 (JMF), 2022 WL 19708, at *4 (S.D.N.Y. Jan. 3, 2022) (internal quotation marks omitted) (citing cases). Plaintiffs also assert that they "purchased the car with their own money given to them by family members over time to use for personal expenses." Pls.' Mem. 20. But whether that is true or not has no bearing on who owned the car when Plaintiffs took it; as noted, it is undisputed that the monastery held legal title. In short, "although [Plaintiffs have] tried to undermine the defendants' basis for making the allegedly defamatory statement[s], [they have] presented no evidence to affirmatively show that the statement[s were] false." *Neuman*, 2022 WL 1782588, at *3. Accordingly, summary judgment must be and is granted as to Plaintiffs' defamation claims. *See id.*

### D.  The Ministerial Exception

In light of the foregoing, two sets of claims remain: Plaintiffs' hostile work environment and retaliation claims under the NYSHRL.  Defendants argue that both are barred by the ministerial exception.  *See* Defs.' Mem. 12-18.  That argument touches on an issue that has divided the lower courts: whether, and to what extent, the ministerial exception bars claims for hostile work environment and retaliation that are not based on tangible employment actions.  For reasons the Court will explain, though, there is no need to wade deeply into that divide here.  Instead, in light of precedent governing the adjudication of claims touching on religion generally, whether Plaintiffs' remaining claims can survive turns on whether the Court can avoid excessive entanglement with religion when resolving the claims.  Subject to certain constraints on what Plaintiffs may argue and a factfinder could consider, the Court concludes that Plaintiffs' remaining claims can, at least in part, proceed consistent with the First Amendment.

#### 1.  Relevant Law

The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  In *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 177 (2012), the Supreme Court held that these Clauses — the Establishment and Free Exercise Clauses — "flatly bar[]" certain employment-discrimination claims brought by ministers against the religious groups that employ or formerly employed them, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 202-03 (2d Cir. 2017), to "ensure[] that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical — is the church's alone," *Hosanna-Tabor*, 565 U.S. at 194-95 (cleaned up).[1]  This "ministerial exception" is "an affirmative defense

---

[1]    Because it derives from the First Amendment, the ministerial exception applies not only to employment-discrimination claims arising under federal law, but also to analogous claims

to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at 195 n.4.

To successfully invoke it, where applicable, a defendant must show that a plaintiff (1) worked

for a "religious institution" (2) as a "minister." *Id.* at 188-89.  Whether someone qualifies as a

"minister" for purposes of the exception does not turn only on the person's formal title.  Instead,

the inquiry is flexible and fact-specific.  "What matters, at bottom, is what an employee does."

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020).

Although Plaintiffs previously disputed that they qualified as "ministers" for purposes of

the exception, they now "concede" that — as the Court held at the motion-to-dismiss stage —

they did.  Pls.' Mem. 7; *see Brandenburg I*, 2021 WL 2206486, at *4.  Nor is there, or could

there be, any disagreement that the Archdiocese for which they worked qualifies as a "religious

institution."  Instead, the parties' dispute here turns on the question of whether and to what extent

the ministerial exception applies to hostile work environment and retaliation claims.  The law on

that question is — as it was when the Court decided Defendants' motion to dismiss —

"somewhat unsettled."  *Brandenburg I*, 2021 WL 2206486, at *4.  There is no dispute that the

exception "flatly bar[s]" claims arising from, or relating to, "tangible employment actions" —

such as hiring, firing, promoting, deciding compensation, job assignments, and the like.

*Fratello*, 863 F.3d at 202-03; *see Our Lady of Guadalupe*, 140 S. Ct. at 2060-61; *see also*

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining a "tangible employment

action").  But neither the Supreme Court nor the Second Circuit has expressly decided whether

the exception bars hostile work environment or retaliation claims that do not involve challenges

to tangible employment actions; indeed, in *Hosanna-Tabor*, the Supreme Court explicitly limited

its holding to termination claims and "express[ed] no view on whether the exception bars other

---

under state law, including, as relevant here, the NYSHRL.  *See Brandenburg I*, 2021 WL
2206486, at *3 n.3 (citing cases).

types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." 565 U.S. at 196. Meanwhile, the other Circuits are divided. *Compare Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 980-81, 985 (7th Cir. 2021) (en banc) (holding that the exception bars all hostile work environment claims), *and Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010) (same), *with Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 963-65 (9th Cir. 2004) (holding that the exception does not apply to hostile work environment and retaliation claims if, or to the extent, such claims do not involve tangible employment actions and adjudication of the claims would not itself result in excessive entanglement), *and Bollard v. Ca. Province of the Soc'y of Jesus*, 196 F.3d 940, 949-50 (9th Cir. 1999) (same).[2]

Although the Second Circuit has not addressed the issue explicitly, its prior rulings are more consistent with the nuanced approach taken by the Ninth Circuit than they are with the categorical approach taken by the Seventh and Tenth Circuits. In *Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008), for example, the court observed — quoting the Ninth Circuit's decision in *Bollard* — that "although its name might imply an absolute exception, [the ministerial exception]

---

[2]     The lower federal courts and state courts are also divided. *Compare, e.g.*, *Middleton v. United Church of Christ Bd.*, 483 F. Supp. 3d 489, 498 (N.D. Ohio 2020) ("Defendants' attempt to pull hostile workplace claims within the ambit of the ministerial exception constitutes an invitation to go beyond what controlling law requires. The court declines that invitation."); *McKelvey v. Pierce*, 173 N.J. 26, 55 (2002) ("[S]exual harassment is not doctrinally based, a protected choice, or inherent in church administration. Neither would monetary damages therefor impermissibly entangle church and state. Thus, there would have been no First Amendment prohibition against McKelvey's proving a Title VII case of sexual harassment." (citations omitted)); *Black v. Snyder*, 471 N.W.2d 715, 721 (Minn. Ct. App. 1991) (concluding that the plaintiff's sexual harassment claim was not barred because it was "unrelated to pastoral qualifications or issues of church doctrine" and because the plaintiff did "not seek reinstatement but only monetary damages"), *with, e.g.*, *Rivera v. Diocese of Venice in Fla.*, No. 20-CV-14414, ECF No. 39, at 18 (S.D. Fla. Dec. 12, 2022) ("The ministerial exception . . . protects the entire employment relationship between churches and ministers and forecloses court adjudication of Title VII hostile work environment employment claims brought by ministerial employees . . . .").

is not always a complete barrier to suit; for example, a case may proceed if it involves a limited

inquiry that, 'combined with the ability of the district court to control discovery, can prevent a

wide-ranging intrusion into sensitive religious matters.'" *Id.* at 207 (quoting *Bollard*, 196 F.3d at

950). The Second Circuit further explained that "however high in the church hierarchy he may

be, a plaintiff alleging particular wrongs by the church that are wholly non-religious in character

is surely not forbidden his day in court," because "[t]he salience of [the First Amendment]

concern [underlying the ministerial exception] depends upon the claim asserted by the plaintiff."

*Id.* at 208. To decide the case, however, the court did not "need . . . to delineate the boundaries

of the ministerial exception" as it held that the plaintiff's claim — involving the firing of a

minister because he was "insufficiently devoted to ministry" and parishioners had complained

about the quality of his homilies — fell "easily . . . within them." *Id.* at 200, 209.

The Second Circuit most recently confronted the ministerial exception in *Fratello* — a

case involving facts clearly subject to the holding of *Hosanna-Tabor* because the plaintiff

alleged unlawful termination — and clarified that the ministerial exception "flatly barred" claims

involving the hiring or firing of a minister, despite language in *Rweyemamu* that some lower

courts had read to suggest otherwise. *See Fratello*, 863 F.3d at 192-203. The court, however,

did not overrule any aspect of *Rweyemamu*. Indeed, *Fratello* "could not have overruled"

*Rweyemamu* "even had it presumed to do so, as a subsequent [Second Circuit] panel is bound by

the decisions of prior panels until such time as they are overruled either by an en banc panel of

[the] Court or by the Supreme Court." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 421 (2d

Cir. 2022) (internal quotation marks omitted).[3] Thus, *Rweyemamu* — with its favorable citation

to the Ninth Circuit's decision in *Bollard* — remains good law.

---

[3]    The Supreme Court decided *Hosannah-Tabor* after *Rweyemamu*, but, as noted, the
Supreme Court limited its holding to employment-related decisions. Nothing in the Supreme

Be that as it may, the Court need not and does not decide whether the Seventh and Tenth Circuits' categorical approach should be applied to claims of hostile work environment and retaliation.[4]  That is because, at oral argument, Defendants disclaimed reliance on the categorical approach and argued that the Court should instead analyze Plaintiffs' claims to determine whether adjudicating them "would involve neutral principles of law or a purely secular inquiry." Tr. at 16; *see also id.* at 18 ("THE COURT: Just to be absolutely clear about this, that sounds to me like you're conceding, at least for purposes of this motion, that I should apply the Ninth Circuit's approach and evaluate whether and to what extent [the Court] would need to entangle [itself] . . . in religious matters to resolve the claims here; is that correct?  [DEFENSE COUNSEL]: That's correct.  The issue is whether the Court can resolve the dispute without [religious entanglement] and if it can do so based on a purely secular inquiry.").  Indeed, defense counsel went so far as to concede that this is "[t]he law in the Second Circuit."  *Id.* at 16.  Thus, notwithstanding portions of their submissions that appear to argue for adoption of the Seventh and Tenth Circuits' approach, *see, e.g.*, Defs.' Mem. 14-15, Defendants have waived any argument that Plaintiffs' remaining claims are categorically barred for the reasons those courts have adopted.

---

Court's decision casts doubt on *Rweyemamu* as applied outside the context of the hiring and firing of ministers — and the *Fratello* court did not suggest otherwise.

[4]      At the motion-to-dismiss stage, the Court was also able to duck the (then-shallower) Circuit split because Defendants "conspicuously (and interestingly) [did] not move to dismiss Plaintiffs' hostile work environment claim based on the ministerial exception" and seemed to move to dismiss Plaintiffs' retaliation claims "only to the extent they relate[d] to the separation of Plaintiffs' 'employment' from the All Saints Monastery."  *Brandenburg I*, 2021 WL 2206486, at *4 (cleaned up).

## 2. Analysis

As noted, only two sets of claims remain: Plaintiffs' hostile work environment claims and their retaliation claims. Whether the First Amendment bars the former is a close call. On the one hand, the sexual harassment claims have nothing to do with the hiring or firing of Plaintiffs as "ministers," the core concern of the ministerial exception. *See Hosanna-Tabor*, 565 U.S. at 194-95; *Our Lady of Guadalupe*, 140 S. Ct. at 2060-61. Additionally, at first glance, the necessary inquiry would appear to be purely secular, focused on the factual question of whether Father Makris discriminated against Plaintiffs on the basis of sex by subjecting them to severe and pervasive unwanted sexual attention and conduct (and whether any of that conduct continued into the limitations period). Finally, like the defendant religious institution in *Bollard*, the Archdiocese does "not claim that allowing harassment to continue unrectified is a method of choosing their clergy." *Bollard*, 196 F.3d at 947-48. The plot is thicker than that, however, because Defendants assert in their summary judgment motion that Father Makris's treatment of Plaintiffs was based, at least in part, on religious doctrine and that the Court therefore cannot resolve Plaintiffs' claims "without an invasive inquiry" into Greek Orthodoxy that would run afoul of the First Amendment. Defs.' Mem. 16-17.

Defendants' assertion does distinguish this case from *Bollard* and *Elvig*, the cases in which the Ninth Circuit held that hostile work environment claims brought by "ministers" were not barred by the ministerial exception. In *Elvig*, for example, the Ninth Circuit explicitly noted that the defendants, like the defendants in *Bollard*, had offered no religious justification for the harassment. *See* 375 F.3d at 959 (citing *Bollard*, 196 F.3d at 947). The court did observe that a defendant "may . . . invoke First Amendment protection from Title VII liability if it claims that [the plaintiff's] subjection to or the [defendant's] toleration of sexual harassment was doctrinal." *Elvig*, 375 F.3d at 959. But given that the defendants in *Elvig* did not do so (indeed, they denied

the harassment altogether), that observation was dictum (and would not be binding here in any event).  Put simply, the Ninth Circuit was not called upon in *Bollard* or *Elvig* — and has not been called upon since — to articulate a standard for deciding whether or when the invocation of a religious defense to a claim of sexual harassment poses a First Amendment problem.  *See, e.g.*, *Green v. Concordia Univ.*, No. 09-CV-1519, 2010 WL 3522352, at *6 (D. Or. June 23, 2010).

Significantly, although both Plaintiffs and Defendants rely on case law construing the ministerial exception, that case law does not speak directly to whether Plaintiffs' hostile work environment claims should be permitted to proceed.  That is because the ministerial exception flows from the *plaintiff's* status as a "minister."  In this case, however, Defendants' argument has nothing to do with the fact that *Plaintiffs* were sanctified nuns; instead, it flows from *Father Makris's* status as minister and the alleged rationale for his conduct.  Put differently, the argument Defendants make here could equally be made — and, in fact, *has* been made — by religious institutions in litigation that is indisputably *not* subject to the ministerial exception, including employment discrimination suits brought by *non*-ministers or cases concerning sexual harassment or abuse brought by parishioners.  *See, e.g.*, *Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409, 430-31 (2d Cir. 1999) (affirming a jury's verdict that a religious institution had violated its fiduciary duties to a parishioner by failing to protect him from sexual abuse by a priest, despite the introduction at trial of evidence regarding religious doctrine and practices); *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 215-18 (D. Conn. 2000) (denying summary judgment on the ground that a trial would not cause excessive entanglement with religion, even though the defendant religious institution offered religious justifications for

its employment decisions).[5]  How the Second Circuit has approached these situations is thus

more instructive here than the ministerial exception case law on which both sides rely.

As it happens, the Second Circuit and district courts within the Circuit have addressed the

metes and bounds of what courts can and cannot consider when it comes to religious doctrine

and arguments many times.  *See Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022); *Moon v.

Moon*, 833 F. App'x 876, 879 (2d Cir. 2020) (summary order); *Martinelli*, 196 F.3d at 430-31;

*Gargano v. Diocese of Rockville Ctr.*, 80 F.3d 87, 90 (2d Cir. 1996); *DeMarco v. Holy Cross

High Sch.*, 4 F.3d 166, 170-71 (2d Cir. 1993); *Cath. High Sch. Ass'n of the Archdiocese v.

Culvert*, 753 F.2d 1161, 1168 (2d Cir. 1985); *Redhead v. Conf. of Seventh-Day Adventists*, 566 F.

Supp. 2d 125, 135-38 (E.D.N.Y. 2008); *Hartwig*, 93 F. Supp. 2d at 212-18; *see also

Rweyemamu*, 520 F.3d at 207 (discussing some of these cases).  These and other cases make

plain that the First Amendment does not shield all decisions by religious institutions, whether or

employment-related or otherwise, from review.[6]  Instead, a court is barred from adjudicating a

dispute involving a religious institution "only where resolution of the dispute will require the

Court or a jury to choose between competing religious views or interpretations of church

---

[5]      Notably, sexual harassment or abuse claims by parishioners or non-ministerial employees
are not barred by the ministerial exception even though they can be just as intrusive with respect
to church management and doctrine as claims brought by ministers, if not more so.  As Judge
Fletcher cogently explained in his concurrence in the denial of rehearing in *Elvig*, "[d]amages in
such suits are likely to be higher than the limited damages available in Title VII sexual
harassment suits brought by ministers.  In addition, the number of sexual abuse suits brought by
parishioners dwarfs the few sexual harassment suits that have been, and are likely to be, brought
by ministers." *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 792 (9th Cir. 2005) (W.
Fletcher, J., concurring in the denial of rehearing *en banc*); *see also id.* at 795 (Kozinski, J.,
concurring in the denial of rehearing *en banc*) ("Suits by parishioners or non-ministerial
employees resting on generally applicable law are just as likely . . .  if not more likely . . . to
affect the incentives to hire, fire and supervise ministers as suits by clergy.").

[6]      *See also, e.g.*, *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695-700 (1989);
*Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305 (1985); *Bob Jones Univ. v.
United States*, 461 U.S. 574, 602-04 (1983); *Jones v. Wolf*, 443 U.S. 595, 602-04 (1979).

doctrine or dogma in order to resolve the dispute." *Hartwig*, 93 F. Supp. 2d at 215.  Where, as here, a case involves a claim of discrimination, the rule can be stated more simply: "[A]lthough the validity of . . . religious code may not be impugned, the allegedly discriminatory application of such a code . . . is the proper subject of judicial scrutiny."  *Redhead*, 566 F. Supp. 2d at 135.

*DeMarco* is especially instructive.  There, the Second Circuit held that the Age Discrimination in Employment Act ("ADEA") could constitutionally be applied to a lay teacher's claim against a religious school despite the school's claim that it had discharged the plaintiff for failing to fulfill his religious duties.  *See* 4 F.3d 166.  Whereas the district court concluded that the pretext inquiry would necessarily involve "recurrent inquiry as to the value or truthfulness of church doctrine," the Second Circuit reasoned that "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action."  *Id.* at 170-71.  So long as the inquiry "focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination," the court continued, the First Amendment poses no obstacle.  *Id.* at 171; *see also Martinelli*, 196 F.3d at 431 ("To the extent that the jury did consider religious teachings and tenets, moreover, it did so to determine not their validity but whether, as a matter of fact, Martinelli's following of the teachings and belief in the tenets gave rise to a fiduciary relationship between Martinelli and the Diocese.").

The *DeMarco* court stressed two important guardrails for courts to observe in these cases. First, the court acknowledged that, in the employment discrimination context, a plaintiff could "put into question the genuineness of the employer's putative non-discriminatory purpose by

arguing that the stated purpose is implausible, absurd or unwise" and that such an inquiry "could give rise to constitutional problems where . . . a defendant proffers a religious purpose for a challenged employment action." 4 F.3d at 171.  In light of that risk, the court held, a plaintiff alleging discrimination "may not challenge the plausibility of putative religious purposes.  A fact-finder will necessarily have to presume that an asserted religious motive is plausible in the sense that it is reasonably or validly held." *Id.*  Second, the court observed that "[t]here may be cases . . . in which the relationship between employee and employer is so pervasively religious that it is impossible to" resolve whether a plaintiff was discharged on discriminatory grounds "without serious risk of offending the Establishment Clause." *Id.* at 172.[7]  But *DeMarco* was "not such a case." *Id.*  Although the defendant asserted that the plaintiff had failed to fulfill certain religious duties, the court concluded that those duties were "easily isolated and defined." *Id.*  Given that, the court expressed its "confiden[ce]" that the district court would "be able to focus the trial upon whether" the plaintiff was fired "because of his age or because of failure to perform religious duties, and that this [could] be done without putting into issue the validity or truthfulness of Catholic religious teaching." *Id.*

This case is arguably a closer one than *DeMarco*, if only because the relationship between Plaintiffs and the individual Defendants — all of whom are indisputably "ministers" — lies at the "pervasively religious" end of the spectrum.  But on the present record, the Court

---

[7]      *DeMarco* distinguished two cases cited by the defendant — *Scharon v. Saint Luke's Episcopal Presbyterian Hospital*, 929 F.2d 360 (8th Cir. 1991), and *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990) — on the ground that they dealt with the "pervasively religious relationship between a member of the clergy and his religious employer." *DeMarco*, 4 F.3d at 171.  But like *DeMarco*, both *Scharon* and *Minker* dealt with "hiring and firing" personnel decisions — the ministerial exception heartland.  For these reasons, the Court does not construe the court's language to preclude claims outside that context, such as Plaintiffs' hostile work environment claims.  And, of course, as discussed above, Defendants waived any argument to the contrary.

concludes that Plaintiffs' sexual harassment claims can nevertheless be adjudicated without running afoul of the First Amendment.  Context aside, religion is — subject to one caveat discussed below — irrelevant to the adjudication of Plaintiffs' claims and Defendants' defenses. The primary questions the jury will be asked to decide are whether Father Makris engaged in the conduct that Plaintiffs allege; whether any of that conduct occurred within the limitations period; and whether, as a result of that conduct, Plaintiffs' workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." *Del Villar v. Hyatt Hotel Corp.*, No. 19-CV-10891 (JMF), 2022 WL 2316205, at *4 (S.D.N.Y. June 28, 2022) (internal quotation marks omitted).  To answer these questions, the jury would not need to consider religion at all, let alone grapple with "the validity or truthfulness" of any "religious teaching." *DeMarco*, 4 F.3d at 172.  The fact that the parties managed to complete full-blown discovery with respect to Plaintiffs' sexual harassment claims without any contention from Defendants that the process or inquiry intruded on their First Amendment interests merely confirms the point. *Cf. Rweyemamu*, 520 F.3d at 207 (observing that district courts have "the ability . . . to control discovery" to "prevent a wide-ranging intrusion into sensitive religious matters" (quoting *Bollard*, 196 F.3d at 950)).

The one caveat stems from the fact that Plaintiffs must prove that Father Makris's conduct was because of their sex, *see Brown*, 257 F.3d at 253, and Defendants do, as noted, assert a religious rationale for some of that conduct, *see* Defs.' Mem. 16-17.  Importantly, however, the religious rationale is, at most, asserted with respect to only one relatively minor aspect of Father Makris's conduct: his kissing of Plaintiffs.  *See* Father Makris Depo. 133-35; *see also* Defs.' Reply 4.  Moreover, as in *DeMarco*, the fact that Defendants proffer a religious rationale does not mean that Defendants should be granted immunity from Plaintiffs' claims.  It

merely means that Plaintiffs "may not offer a conflicting interpretation of the teachings of the
[Greek Orthodox] Church or canon law to rebut [Defendants'] proffered religious reason."
*Hartwig*, 93 F. Supp. 2d at 216.   At trial, the jury would be instructed that that Defendants'
"asserted religious motive was plausible" and would "not have to choose between [Plaintiffs']
and [Defendants'] interpretation of ecclesiastical law."   *Id.*.   Subject to these limitations,
however, Plaintiffs are entitled to offer evidence and argument that Defendants' proffered
religious rationale was not the true rationale for Father Makris's behavior.   *See DeMarco*, 4 F.3d
at 171-72; *Hartwig*, 93 F. Supp. 2d at 216.[8]   Accordingly, Defendants' motion for summary
judgment with respect to Plaintiffs' hostile work environment claims must be and is denied.

   Plaintiffs' retaliation claims, on the other hand, can proceed only in part.   As noted, "in
both the sexual harassment and retaliation contexts, [the plaintiff] may not rely on protected
ministerial decisions — the removal of certain duties, her suspension, her termination and the
refusal to permit the circulation of her personal information form — as bases for the Defendants'
liability under Title VII."   *Elvig*, 375 F.3d at 969.   In this case, Plaintiffs' retaliation claims are
based on two sets of allegations: first, that Plaintiffs were prevented from going to other

---

[8]      On the present record, a jury could easily conclude that religious doctrine was not the
reason for Father Makris's kissing of Plaintiffs.   The only relevant evidence in the record is
Father Makris's testimony that his kissing of Kallis did not take place as part of "any religious
ceremony.   It is an expression of — always as a person of — as a priest, who also knew Ms.
Kallis for many, many years.   So there was a — a friendship.   And it's also very typical to kiss
people in the Orthodox church in all — it's customary."   Father Makris Depo. 135.   But a
reasonable jury could conclude that Father Makris's reference to "custom" was not to religious
dogma or teaching and, more broadly, that he was *disclaiming* a religious explanation.   In
Defendants' reply memorandum of law, defense counsel goes further and quotes from Scripture.
*See* Defs.' Reply 4 ("[T]hroughout the New Testament, Saint Paul exhorts the Christians to
'greet one another with a holy kiss' (*see Romans* 16:16; 1 *Corinthians* 16:20; 2 *Corinthians*
13:12; and 1 *Thessalonians* 5:26) and with a 'kiss of love' (1 *Peter* 5:14).").   But putting aside
the propriety of this eleventh-hour argument by counsel, *see, e.g.*, *Chevron Corp. v. Donziger*,
325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018) ("It is well established, of course, that arguments
first raised in reply briefs are forfeited or waived."), it merely underscores the absence of
evidence in the record connecting Father Makris's actions to religious doctrine.

churches, from interacting with churchgoers, and from selling soaps; and, second, that they were

threatened with being sent to Greece against their will.  *See* Tr. 32-33.[9]  The first set, however,

does not cut it.  By Plaintiffs' own admission, selling soap was a "side *hobby*."  Tr. 36 (emphasis

added).  It follows that barring them from selling soap did not constitute an adverse *employment*

action.  And any claims based on Defendants' barring them from certain churches and

parishioners runs headlong into the ministerial exception, as these allegations pertain directly to

the "removal of certain duties" from Plaintiffs and to Plaintiffs' "ability to perform 'spiritual

functions.'"  *Elvig*, 375 F.3d at 961 (citation omitted).

But the alleged threat to send Plaintiffs to Greece, which went unfulfilled, is a different

matter.  The Supreme Court has squarely held (in the Title VII context) that "unfulfilled threats"

are *not* tangible employment actions.  *See Ellerth*, 524 U.S. at 753-54 ("[T]he terms *quid pro quo*

and hostile work environment . . . illustrate the distinction between cases involving a threat

which is carried out and offensive conduct in general . . . When a plaintiff proves that a tangible

employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she

establishes that the employment decision itself constitutes a change in the terms and conditions

of employment . . . Because [Plaintiff's] claim involves only unfulfilled threats, it should be

categorized as a hostile work environment claim.").  The Second Circuit has likewise explained

that the analysis is "focus[ed] on [the harasser's] conduct.  For example, if [the harasser]

subsequently fired [the plaintiff] for resisting him, the termination would constitute a tangible

employment action.  But if [the plaintiff] initially resisted and he did not follow through with his

---

[9]     Plaintiffs also argue that "that they were sad, that they felt that the church turned their back on them, and that they were ostracized."  Tr. 33.  Plaintiffs do not explain how these allegations support a claim of retaliation.  *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) ("[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination.").

threat of termination, then that threat would not qualify as a tangible employment action." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 97 (2d Cir. 2002); *see also Bolick v. Alea Grp. Holdings, Ltd.*, No. 3-CV-165, 2005 WL 2621516, at *2 (D. Conn. Sept. 30, 2005) ("[A]n unfulfilled threat, by itself, is not sufficient to constitute a tangible employment action.").

For that reason, Plaintiffs' retaliation claims based upon the unfulfilled threat to send them to Greece are subject to the same legal framework as the hostile work environment claims above.  Applying that framework, the Court concludes that Plaintiffs' retaliation claims based on the unfulfilled threat can proceed.[10]  In contrast to what they did with respect to the sexual harassment claims, Defendants do not cite a religious rationale for the threat to send them to Greece except to argue in conclusory fashion that "[t]he resolution of whether these actions were 'adverse,' or why Defendants supposedly took these actions, requires an inquiry into religious doctrine which is not permitted by the ministerial exception."  Defs.' Mem. 17.  That argument fails.  A jury could apply neutral principles of law to determine whether Plaintiffs' allegation that they were threatened with being forcibly taken to Greece as punishment for reporting sexual harassment was retaliatory without resolving questions of religious doctrine.  Notably, the same limiting principle established in *DeMarco* would apply.  That is, to the extent that Defendants introduce evidence at trial that the threat was motivated by religious reasons, the jury can and would be instructed to consider only whether the "articulated purpose is the actual purpose for the challenged employment-related action" — and would be instructed not to evaluate whether any stated religious purpose was "unwise or unreasonable."  *See DeMarco*, 4 F.3d at 170-71. With that understanding, Plaintiffs' retaliation claims based on the unfulfilled threat survive.

---

[10]     As noted above, the ministerial exception is Defendants' sole argument for summary judgment with respect to Plaintiffs' retaliation claims.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Specifically, Plaintiffs' constructive discharge claims and defamation claims are dismissed, as are Plaintiffs' retaliation claims in part.  But Plaintiffs' hostile work environment claims and retaliation claims based on the unfulfilled threat to send them to Greece survive.  At trial, Plaintiffs may not contest, and the jury may not consider, the validity or plausibility of any religious teachings or tenets.  Subject to that strict and important limitation, the First Amendment poses no bar to further adjudication of Plaintiffs' surviving claims.[11]

Unless and until the Court orders otherwise, the parties shall submit a proposed Joint Pretrial Order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within thirty days of the date of this Opinion and Order**.  (The Court will schedule a trial date — or a conference to discuss a trial date — after reviewing the parties' submissions.)  In the meantime, the Court is of the view that the parties should try to settle this case without the need for an expensive and potentially embarrassing trial.  To that end, the Court directs the parties to confer **immediately** about the prospect of settlement and conducting a settlement conference before Magistrate Judge Stewart D. Aaron (or before a mediator appointed by the Court or retained privately).  If the parties agree that a settlement conference would be

---

[11]    It is important to note that the Court's conclusion that the First Amendment poses no bar to further adjudication of Plaintiffs' surviving hostile work environment and retaliation claims is based on the current record.  If the record at trial is materially different, the Court can always revisit the issue, just as the district court did in *Redhead*.  *See* Trial Transcript at 234, *Redhead v. Conf. of Seventh-Day Adventists*, 03-CV-06187 (DLI) (E.D.N.Y. July 29, 2008) (granting the defendant's motion for a directed verdict in part because, based on "[t]he record developed at trial" — as opposed to the summary judgment record — the jury would have been "in the inevitable position of assessing the plausibility, reasonableness, validity or truthfulness of the religious reason proffered by the defendant for terminating plaintiff").

appropriate, they should promptly advise the Court and, if needed, seek an appropriate referral

and extension of the pretrial deadlines.

The Clerk of Court is directed to terminate ECF No. 76.


SO ORDERED.

Dated: February 23, 2023
         New York, New York

                                             JESSE M. FURMAN
                                             United States District Judge